UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

CARTER SECURITIES, LLC,                                 :
                                                        :
                                    Plaintiff,          :
                                                        :          07 Civ. 10671
            -against-                                   :
                                                        :
MARKETING WORLDWIDE CORPORATION,                        :
                                                        :
                                    Defendant.          :
-------------------------------------------------------------------x

## DEFENDANTS' NOTICE OF MOTION
## TO DISMISS THE COMPLAINT

PLEASE TAKE NOTICE that upon the annexed exhibits and the accompanying

memorandum of law, defendant will move this Court before the Honorable Barbara S.

Jones, United States District Judge, at the United States Courthouse, 500 Pearl Street,

New York, New York, on January 4, 2008 for an order, pursuant to F.R.C.P. 12(b)(6),

dismissing the complaint on the ground that it fails to state a claim upon which relief may

be granted.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 6.1 (b) of this Court,

opposing papers, if any, are to be served by December 24, 2007.

Dated: New York, New York
    December 10, 2007

                                FERBER CHAN ESSNER & COLLER, LLP

                                By:    /s/Robert M. Kaplan
                                    Robert M. Kaplan (RK1428)
                                Attorneys for Defendant
                                530 Fifth Avenue
                                New York, New York 10036-5101
                                (212) 944-2200


TO:


LAW OFFICES OF KENNETH A. ZITTER, ESQ.
Attorneys for Plaintiff
260 Madison Avenue, 18th Fl.
New York, New York  10016
(212) 532-8000

# Exhibit A

Supreme Court of the State of New York
County of New York
-----------------------------------------------------------x

Carter Securities, LLC,

                                    Plaintiff,

      -against-

Marketing Worldwide Corporation,

                                    Defendant.
-----------------------------------------------------------x

Index No. 603620/07

Plaintiff designates
New York County as place of trial

The basis of the venue
Plaintiff's residence

**SUMMONS**

Plaintiff resides at
767 Third Avenue
New York, New York 10017

To the above-named Defendant:

      **YOU ARE HEREBY SUMMONED** to answer the verified complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorneys within **20** days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  November 1, 2007

**Defendant's Address:**
2212 Grand Commerce Drive
Howell, MI 48855

The nature of the action is:
      to recover brokerage fees
      due and owing

The relief sought is:    damages and
            injunctive relief

Law Offices of
**KENNETH A. ZITTER, ESQ.**

By:_____
      Kenneth A. Zitter, Esq.
      Attorneys for Plaintiff
      Carter Securities, LLC
      260 Madison Avenue, 18th Fl.
      New York, New York 10016
      (212) 532-8000

Upon you failure to appear, judgment will be taken against you by default for the sum of $140,000 with interest from September 27, 2007 plus applicable injunctive relief and the costs of this action.

Index No.                    Year

Supreme Court of the State of New York
County of New York

Carter Securities, LLC,

Plaintiff,

vs.

Marketing Worldwide Corporation,

Defendant.

Complaint

_____

Signature (Rule 130-1.1-a)

Print name beneath

Attorneys for

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated,

Attorney(s) for

KENNETH A. ZITTER

*Office and Post Office Address, Telephone*
260 MADISON AVENUE
NEW YORK, NEW YORK 10016
(212) 532-8000

---

PLEASE take notice that the within is a *(certified)*
true copy of a
duly entered in the office of the clerk of the within
named court on

Dated,

Yours, etc.,

KENNETH A. ZITTER

*Office and Post Office Address*
260 MADISON AVENUE
NEW YORK, NEW YORK 10016

To

Attorney(s) for

—— NOTICE OF SETTLEMENT ——

PLEASE take notice that an order

of which the within is a true copy will be presented
for settlement to the Hon.
one of the judges of the within named  Court, at

on
at                    M.
Dated,

Yours, etc.,

KENNETH A. ZITTER

*Office and Post Office Address*
260 MADISON AVENUE
NEW YORK, NEW YORK 10016

To

Attorney(s) for

Supreme Court of the State of New York
County of New York
----------------------------------------------------x

Carter Securities, LLC,

                              Plaintiff,

              v.

Marketing Worldwide Corporation,

                              Defendant.

----------------------------------------------------x

NEW YORK
COUNTY CLERK'S OFFICE

NOV − 1 2007

NOT COMPARED
WITH COPY FILE

Complaint

Index # 603620/07

        Plaintiff Carter Securities, LLC, by its attorneys, for its Complaint herein, respectfully

alleges:


the parties


        1. Plaintiff Carter Securities, LLC ("Carter") is a New York limited liability corporation

with its principal place of business located at 767 Third Avenue, New York, New York. At all

relevant times, Carter was a registered broker-dealer and a member of the Financial Industry

Regulatory Authority (formerly the National Association of Securities Dealers).


        2. Upon information and belief, Defendant Marketing Worldwide Corporation

(MWWC") is a Delaware corporation with its principal place of business located at 2212 Grand

Commerce Drive, Howell, Michigan.

<u>the facts</u>

3.  On or about December 21, 2006, Carter and MWWC entered into a written agreement (the "Agreement") whereby Carter was retained by MWWC as its exclusive placement agent to raise money for MWWC by finding investors to purchase its securities. Pursuant to that Agreement, Carter undertook to expend its reasonable efforts to sell MWWC securities.

4.  In consideration for Carter acting as such exclusive placement agent, as provided in the Agreement, MWWC agreed to pay Carter, among other amounts, on the closing date of any placement and on the date of any subsequent closing of such placement, a cash placement fee of 7% of the gross proceeds of the sale of the securities subscribed for by the investors; and to issue to Carter warrants to purchase a dollar value of shares of common stock of MWWC equal to 7% of the total gross proceeds from the investors in the placement.

5.  The Agreement also provided that in the event any potential or actual investor solicited by Carter and first introduced to MWWC by Carter makes an investment in MWWC within twelve months after either: i) the expiration of the term of the agreement, defined as February 15, 2007; or ii) consummation of the placement, then Carter is entitled to additional fees and warrants to be calculated as set forth in ¶4, *supra*.

2

6.  Pursuant to the Agreement, Carter in fact introduced MWWC to various sources of financing. Indeed, MWWC acknowledged that Carter put it in front of top quality people and the right organizations to raise funds for MWWC.

7.  As a result of Carter's introductions and efforts, on or about January 30, 2007, MWWC in fact signed a term sheet with Vision Opportunity Master Fund, Ltd. ("VOMF") whereby MWWC agreed to issue $3.5 million of its Series A Convertible Preferred Stock (the "Convertible Preferred Stock") to VOMF, which was convertible into shares of MWWC common stock, on the terms and conditions set forth in the term sheet. In connection therewith, MWWC and Carter agreed that VOMF would also receive Class A, B, and C Warrants, exercisable for five years after closing on the purchase of the Convertible Preferred Stock. Those warrants would enable VOMF to obtain, in total, an additional 150% of the common shares which MWWC could obtain upon conversion of the Convertible Preferred Stock. The issuance of warrants in connection with a purchase of Convertible Preferred Stock is a common term of such transactions and is intended as an additional inducement for the investor to make the agreed upon investment.

8.  The term sheet also provided VOMF with an Additional Investment Option which granted VOMF "the exclusive right, but not the obligation, to make an additional investment up to a maximum of 100% of its initial investment for a period of fourteen (14) months after the Closing on the same terms." If VOMF in fact made such additional investment, MWWC would be obligated to pay Carter additional fees, as set forth in the Agreement.

9. On or about March 11, 2006, VOMF and MWWC entered into an amended term sheet. The amount of Convertible Preferred Stock to be issued, the obligation to issue Class A, B and C Warrants and the provision granting VOMF the Additional Investment Option, however, remained unchanged from the original term sheet.

10. VOMF and MWWC agreed that VOMF's Additional Investment Option should take the form of a Series J Warrant, which would be issued by MWWC at the initial closing and would have a term of 14 months. The Series J Warrant would allow VOMF to make an additional investment in MWWC, up to the amount of the initial investment, by exercising the warrant and paying the warrant price to MWWC during the term of the warrant. The parties structured the Additional Investment Option as a Series J Warrant, rather than as a simple contractual undertaking because, among other reasons, such structure allowed MWWC to pre-register the shares to be issued pursuant to the warrant, thereby enabling VOMF to receive freely trading registered shares immediately, if it decided to make an additional investment in MWWC by exercising the Series J Warrant.

11. On or about April 23, 2007, VOMF in fact purchased $3.5 million of MWWC's Convertible Preferred and received the Series A, B and C Warrants. At the Closing, VOMF also received a Series J Warrant to purchase 5 million shares of MWWC common stock, with an exercise price of $.70 per share, which would allow VOMF to make an additional investment in MWWC, within the following fourteen months, of up to $3.5 million upon exercise of the Series J Warrant.

4

12. As an incentive to induce VOMF to make the additional investment in MWWC and to exercise the Series J Warrant, MWWC issued to VOMF at closing Series D, E and F Warrants. By their terms, VOMF could exercise those warrants only if it made an additional investment in MWWC by exercising the J Warrant. The D, E and F Warrants allowed VOMF to acquire up to an additional 150% of the number of shares it acquired upon exercise of the J Warrant.

13. In connection with the closing on or about April 23, 2007, and in accordance with the terms of the Agreement, MWWC paid Carter $242,500, representing 7% of the gross proceeds of the sale of the Convertible Preferred Stock subscribed for by VOMF, less some expenses, and issued to Carter warrants to purchase 490,000 shares of MWWC common stock at a price of $.65 per share (the "Series G Warrant").

14. On or about September 27, 2007, VOMF and MWWC entered into an agreement amending the Series F Warrant to reduce the exercise price from $1.20 to $.01 and amended the Series J Warrant to reduce its exercise price from $.70 to $.50.

15. On or about September 27, 2007, after amending the Series F and J Warrants as set forth in ¶14, *supra*, VOMF exercised the Series J Warrant, in part, to purchase four million shares of common stock, thereby making an additional investment of $2 million in MWWC. That partial exercise of the Series J Warrant left one million shares still available for VOMF to acquire pursuant to that warrant.

5

16. VOMF's additional $2 million investment in MWWC triggered MWWC's obligation to pay Carter an additional commission. Pursuant to the terms of the Agreement, MWWC is obligated to pay Carter an additional $140,000 representing 7% of the additional $2 million investment by VOMF and additional warrants to purchase 280,000 shares of MWWC common stock at $.65 per share, representing 7% of the shares purchased by VOMF with its additional investment.

<div align="center">

First Cause of Action
(breach of contract; failure to pay brokerage fees
relief sought - damages and order
directing delivery of additional warrants)

</div>

17. Carter realleges paragraphs 1 through 16.

18. As a result of VOMF's additional investment of $2 million in MWWC on or about September 27, 2007, MWWC became obligated to pay Carter, under the terms of the Agreement, $140,000 in cash and to issue to Carter warrants to purchase four million shares of MWWC common stock at $.65 per share.

19. Carter has duly demanded payment of the $140,000 and delivery of said warrants, but MWWC has refused to pay said amount or deliver said warrants. Such failure on the part of MWWC constitutes a breach of its obligations under the Agreement.

<div align="center">6</div>

20.  Carter is, therefore, entitled to judgment against MWWC in the amount of $140,000 plus interest and an order directing MWWC to deliver the warrants, as aforesaid.

<u>Second Cause of Action</u>
(anticipatory breach of contract
relief sought - declaratory relief)

21  Carter realleges paragraphs 1 through 16.

22.  VOMF has the right to acquire an additional one million shares of MWWC common stock, pursuant to the terms of the Series J Warrant.

23.  MWWC's failure to pay the additional brokerage fees to Carter upon the additional investment made by VOMF when it exercised its Series J Warrant in part on or about September 27, 2007 constitutes an anticipatory breach of MWWC's obligation to pay Carter additional brokerage fees in the event VOMF exercises the remaining portion of the Series J Warrant.

24.  Carter is, therefore, entitled to an order directing MWWC to pay Carter such additional brokerage fees as may be due upon exercise by VOMF of all or any part of the remaining Series J Warrant.

7

Third Cause of Action
(breach of obligation to adjust Series G Warrant exercise price
relief sought - order directing adjustment of exercise price

25.  Carter realleges paragraphs 1 through 16.

26.  Carter received the Series G Warrant as part of the payment of its brokerage fees.

27.  Under the terms of the Series G Warrant, in the event the exercise price of any warrants issued in connection with VOMF's purchase of the Convertible Preferred Stock is lowered, then the exercise price of the Series G Warrant was required to be accordingly adjusted downward.

28.  On or about September 27, 2007, the exercise price of the Series F Warrant, which was issued in connection with VOMF's purchase of the Convertible Preferred Stock, was adjusted downward to $.01 per share.

29.  As a result of such adjustment of the Series F Warrant exercise price to $.01 per share, the exercise price of the Series G Warrant was required to be adjusted downward to $.33 per share.

30.  Carter has duly requested MWWC to adjust the exercise price of the Series G Warrant downward to $.33 per share. Carter has failed and refused to make such adjustment.

8

31. Carter, therefore, is entitled to an order directing MWWC to adjust downward the exercise price of the Series G Warrant to $.33 per share.

Wherefore, Plaintiff Carter Securities, LLC demands judgment against Defendant Marketing Worldwide Corporation as follows:

i) one the First Cause of Action for damages in the amount of $140,000 plus interest and an order directing Defendant Marketing Worldwide Corporation to deliver warrants to purchase 280,000 shares of its common stock, at an exercise price of $.50 per share and otherwise in accordance with the agreements between the parties; and

ii) on the Second Cause of Action for an order directing Defendant Marketing Worldwide Corporation to pay Carter such additional brokerage fees as may be due under the agreements between the parties upon exercise by VOMF of all or any part of the remaining J Warrant; and

iii) on the Third Cause of Action for an order directing MWWC to adjust downward the exercise price of the Series G Warrant to $.33 per share.

iv) on all causes of action for interest, costs and attorneys' fees; and

v) for such other further and different relief as the Court may deem just and proper.

9

Law Offices of Kenneth A. Zitter

By_____
      Kenneth A. Zitter
Attorneys for Plaintiff
Carter Securities, LLC
260 Madison Avenue, 18th Floor
New York, NY 10016
212-532-8000

10

# Exhibit B

DEC 21 2006 12:52PM  LIPMAN CAPITAL GROUP, INC  2127553105

P.2

# CARTER SECURITIES, LLC
MEMBER NASD & SIPC
767 THIRD AVENUE 27TH FLOOR NEW YORK, NY 10017
P: 212.989.6899 F: 212.989.5899

December 21, 2006

Marketing Worldwide Corporation
2212 Grand Commerce Drive
Howell, MI 48855
Attn: Rainer Poertner

Dear Mr. Poertner:

In response to our recent discussions, the following sets forth the Agreement ("Agreement") between Carter Securities LLC ("CARTER") and Marketing Worldwide Corporation (together with its affiliates and subsidiaries, hereby referred to as the "Company"), as follows:

1.      Services to be Rendered.  During the Term, the Company hereby retains CARTER to serve as its exclusive placement agent for a reasonable-efforts private placement (the "Placement") of units (the "Units"), to be comprised of (i) equity securities, equity-linked securities or debt instruments of the Company and (ii) warrants to purchase Common Stock of the Company, expected to provide proceeds of up to $2.5-5million approximating the terms of the attached term sheets in appendix a & B.  CARTER agrees that it will use its reasonable efforts to find purchasers of the Units (the "Investors"), and any such Investors shall qualify themselves as "accredited investors" as defined in Rule 501(a) under the Securities Act of 1933 (the "Act"), but CARTER disclaims any agreement, expressed or implied, in this Agreement or otherwise, that it will be successful in placing the Units.  In connection with the Placement, the Company agrees to not offer the Units to prospective investors, or accept any subscriptions from prospective investors to invest in the Units, except through CARTER, except those investors Carter agrees in advance may be contacted by the Company.  Notwithstanding anything in this Agreement to the contrary, the Company shall have the sole and absolute discretion to accept or not accept, in whole or in part, the terms of any subscription for Units.  CARTER's obligations to commence the Private Placement shall be subject to its due diligence investigation of the Company and execution of a Placement Agency Agreement on customary terms and incorporating the principal terms hereof.  The parties agree to negotiate the Placement Agency Agreement in good faith.  The Placement Agency Agreement will provide that the Company will, at the closing of the Private Placement, furnish CARTER with a favorable opinion of its outside counsel, which include customary items contained in legal opinions rendered in connection with private placement transactions, including, among other things, opinions on matters relating to organization and good standing, capitalization, corporate power and authority, non-contravention, exemption of the Private Placement and 10b-5 statements.  In addition, at the closing of the Private Placement, the Company will provide CARTER with the certificates of the officers of the Company and other documents as CARTER or its counsel may deem appropriate, in form and substance satisfactory to CARTER and its counsel.

2.      Information.  In connection with CARTER's engagement, the Company will furnish, or cause to be furnished, to CARTER all data, material and other information requested by CARTER for the purposes of performing the services contemplated hereunder, subject to a non-disclosure agreement signed by CARTER and the Company if so requested.  The Company

Page 2                         Carter Securities, LLC

represents and warrants to CARTER that any such information, any reports required by it to be
filed by it with any state or federal authority (collectively "Reports") and any other information
supplied to CARTER or Investors by or on behalf of the Company in connection with the
Placement will not contain any materially untrue statement of a material fact or omit to state a
material fact necessary to make the statements therein not misleading. The Company agrees to
use its reasonable efforts to cooperate with CARTER in connection with the provision of
services by CARTER hereunder, including attendance or participation via phone by appropriate
officers or principals of the Company (with reasonable notice and availability) for meetings
coordinated by CARTER.

3.    Offering Materials. The Company (or the lead investor, if it so elects) shall prepare
disclosure documents to be provided to potential purchasers of the Units as offering materials
(the "Offering Materials"). The Company represents and warrants to the best of its knowledge
that the Offering Materials will not, as of the Closing Date of the Placement, contain any untrue
statement of material fact or omit to state any material fact required to be stated therein, or
necessary to make the statements contained therein, not misleading. CARTER recognizes and
acknowledges that it is not authorized to make any representations and statements to any
potential purchaser other than and to the extent that such representations and statements are
contained in the Offering Materials.

4.    Term and Termination. The engagement of CARTER shall begin as of the date hereof
and continue until the earlier of (i) the date on which the Company has accepted subscriptions for
all Units or (ii) 45 days from January 1, 2007 (the "Term), unless the Term is extended by
mutual agreement of CARTER and the Company. During the Term, either party hereto may
terminate the Agreement by giving 45 days prior written notice to the other party. In the event of
termination by the Company for reasons other than a material breach by CARTER of its
obligations hereunder or termination by CARTER for reasons relating to a material breach by the
Company of its obligations under this Agreement (including misrepresentations by the Company
with respect to the business operations, assets, condition, results of operations or prospects of the
Company), (i) CARTER shall be entitled to retain or receive compensation for services it has
rendered, including payment for expenses it has incurred up to the date of such termination, and
(ii) the Company shall be responsible for fees that may become due under the "tail" provisions
set forth in Section 5. Sections 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 of this Agreement shall
survive termination and remain operative and in full force and effect.

5.    Placement Agent Fees. In consideration for serving as the Placement Agent for the
Placement, the Company agrees to (i) pay CARTER on the date hereof a non-refundable retainer
equal to $5,000, (ii) pay CARTER on the Closing Date of the Placement, and on the date of any
subsequent closing of such Placement, a cash placement fee ("Placement Agent Cash Fee) of
seven (7%) percent of the gross proceeds of the sale of the Units subscribed for by Investors in
the Placement, and (iii) issue to CARTER (or its designees) warrants (the "Placement Agent
Warrants") to purchase a dollar value of shares of Common Stock of the Company equal to
seven (7%) percent of the total gross proceeds from Investors in the Placement. CARTER may
engage the services of additional broker dealers, each of which shall be a member in good
standing of the NASD, pursuant to selected dealer agreements. For investments introduced by

additional broker dealers, CARTER agrees to allocate a portion of the Placement Agent Cash Fee and Placement Agent Warrants to such broker-dealers on terms negotiated and reflected in the applicable selected dealer agreements. The Placement Agent Warrants shall have a term of four years from the Closing Date of the Placement, an exercise price of 130% of the price per share of the equity securities in the Units purchased by Investors in the Placement and provide the holder thereof with, among other things, a cashless exercise right and broad based anti-dilution protections. The Company will also reimburse CARTER, upon request, for documented expenses ("Out-of-Pocket Expenses") reasonably and directly incurred in performing the services of Placement Agent for the Placement up to $5,000. In addition, Carter will receive up to $7,500 fees and disbursements of CARTER's counsel. This Out-of-Pocket Expenses estimate explicitly assumes that the Company will retain legal counsel to draft the Offering Materials for the Placement. If any potential Investor solicited by CARTER and first introduced to the Company by CARTER during the Term makes an investment in the Company within twelve (12) months of (i) termination or expiration of the Term or (ii) consummation of the Placement, CARTER shall be entitled to fees and warrants as outlined in paragraph 5 herein. The Company shall be responsible for any costs and expenses associated with filings, applications or registrations with any governmental or regulatory body, including, without limitation, those associated with any sales pursuant to Regulation D under the Act, "blue sky" laws, and the laws of the foreign countries in which the securities will be offered or sold that are required to be made by the Company. If Carter raises at least $2.5 million for the Company within 45 days hereof and such investment has been accepted by the Company, Carter shall have a right of first refusal to represent the Company as its investment banker for any corporate finance transaction within two years hereof

6.      Obligations Limited. CARTER shall be under no obligation hereunder to make an independent appraisal of assets or investigation or inquiry as to any information regarding, or any representations of, Company and shall have no liability hereunder in regard thereto.

7.      Indemnification. The Company agrees to indemnify CARTER and its selected dealers and their respective representatives, agents, partners, affiliates, officers and directors in accordance with the indemnification provisions set forth in Appendix A, attached hereto and made part hereof.

8.      No Liability. The Company agrees that neither CARTER nor any of its partners, affiliates, directors, agents, employees or controlling persons shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either CARTER's engagement under this Agreement or any matter referred to in this Agreement, except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company are determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of CARTER in performing the services that are the subject of this Agreement.

9.      Independent Contractor. The parties hereto acknowledge and agree that the engagement of CARTER hereunder is not intended to confer rights upon any person (including shareholders, employees or creditors of CARTER) not a party hereto as against Company or its affiliates, or their respective directors, officers, employees or agents, successors or assigns. CARTER shall

Page 4                          Carter Securities, LLC

act as an independent contractor under this Agreement, and does not create any partnership, joint venture or other similar relationship between the Company and CARTER and any duties arising out of its engagement shall be owed solely to Company. CARTER shall have no authority to accept any order or to bind or obligate the Company in any way or to renew any debt or obligation for or on account of the Company without the Company's prior written consent. As an independent contractor, CARTER will be solely responsible for its income and all other applicable taxes. CARTER shall have no restrictions to on its ability to provide services to companies other than the Company, except as stated herein.

10.    Severability. If any provision of this Agreement for any reason shall be held to be illegal, invalid or unenforceable, such illegality shall not affect any other provision of this Agreement and this Agreement shall be amended so as to enforce the illegal, invalid or unenforceable provision to the maximum extent permitted by applicable law, and the parties shall cooperate in good faith to further modify this Agreement so as to preserve to the maximum extent possible the intended benefits to be received by the parties hereto.

11.    Publicity. With the Company's prior approval, which shall not be unreasonably withheld or delayed, CARTER may, at its own expense, place customary tombstone announcements or advertisements in financial newspapers and journals describing its services hereunder upon completion of the Placement.

12.    Assignment; Benefit. Neither party hereto, without the explicit prior written consent of the other may assign this Agreement or, in whole or in part, the rights and obligations hereunder. The provisions of the Agreement will be binding upon and inure to the benefit of the parties hereto and then respective heirs, legal representatives, permitted successors and assigns.

13.    Entire Agreement; Amendment; Waiver. This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby and supersedes any prior or contemporaneous communications, understandings, arrangements, discussions and agreements between the parties hereto concerning the subject matter herein. No change, amendment or supplement to, or waiver of this Agreement will be valid or of any effect, except by the written agreement of the parties hereto. The waiver of any particular condition, precedent, or provision provided by this Agreement will not constitute the waiver of any other.

14.    Governing Law. This agreement shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts executed and to be wholly performed therein without giving effect to its conflicts of laws principles of rules. This letter, including Appendix A, constitutes the entire understanding of the parties with respect to the subject matter hereof and may not be altered or amended except in writing signed by both parties. This Agreement shall be deemed to have been made and delivered in New York City and shall be governed as to validity, interpretation, construction, affect and in all other respects by the internal laws of the State of New York. The Company (1) agrees that any legal suit, action or proceeding arising out of or relating to this letter shall be instituted exclusively in New York State Supreme Court, County of New York, or in the United States District Court for the Southern District of New York, (2) waives any objection which the Company may have now or hereafter to the venue of any such suit, action or proceeding, and (3) irrevocably consents to the

jurisdiction of the New York State Supreme Court, County of New York, and the United States District Court for the Southern District of New York in any such suit, action or proceeding. The Company further agrees to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the New York State Supreme Court, County of New York, or in the United States District Court for the Southern District of New York and agrees that service and process upon the Company mailed by certified mailto the Company's address shall be deemed in every respect affective service of process upon the Company, in any suit action or proceeding. THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.

15.    Representations. Each party hereto represents, warrants and covenants to the other party that:

(a)    it has the power and authority to enter into this Agreement and to perform its respective obligations hereunder.

(b)    this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of such party, enforceable against it in accordance with its terms.

(c)    the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not result in any violation of, or be in conflict with, or constitute a default under, any agreement or instrument to which such party is a party or by which its properties are bound, or any judgment, decree, order, statute, rule or regulation applicable to such party.

16.    Counterparts. This Agreement may be executed in one or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

17.    Notices. Any notice, consent or other communication given pursuant to this Agreement shall be in writing and shall be effective when (i) delivered personally, (ii) sent by telex or telecopier (with receipt confirmed), provided that a copy is mailed registered mail, return receipt requested, or (iii) when received by the addressee, if sent by Express Mail, Federal Express or other express delivery service (receipt requested), in each case to the appropriate addressee set forth below:

Page 6                          Carter Securities, LLC


If to CARTER:          Carter Securities LLC
                       767 Third Avenue, 27 flr
                       New York, NY 10017
                       Attention: John C. Lipman, Chairman
                       Fax: 212.989-5899


If to the Company:     Marketing Worldwide Corporation
                       2212 Grand Commerce Drive
                       Howell, MI 48855
                       Attn: Rainer Poertner




[SIGNATURE PAGE FOLLOWS]

Page 7                          Carter Securities, LLC

    If the foregoing correctly sets forth your understanding, please so indicate by signing and returning to us the enclosed copy of this letter.

Sincerely,

Carter Securities LLC

By: _John C. Lipman_ ____ 12.21.06

John C. Lipman
    Chairman

Intending to be legally bound the foregoing
Is Confirmed and Agreed to by:


Marketing Worldwide Corporation

By: _____                Date: _____ ___, 2006
Name
Title

Page 8                        Carter Securities, LLC

APPENDIX A
INDEMNIFICATION

The Company agrees to indemnify and hold harmless CARTER, its selected dealers and their respective affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended) and their respective directors, officers, employees, agents and controlling persons (CARTER and each such person being an "Indemnified Party") from and against all losses, claims, damages and liabilities (or actions, including shareholder actions, in respect thereof), joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, which are related to or result from the performance by CARTER of the services contemplated by, or the engagement of CARTER pursuant to, this Agreement and will promptly reimburse any Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Company. The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions, (i) for any settlement by an Indemnified Party effected without its prior written consent (not to be unreasonably withheld); or (ii) to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from CARTER's willful misconduct or gross negligence. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or it security holders or creditors related to or arising out of the engagement of CARTER pursuant to, or the performance by CARTER of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from CARTER's willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of any intention or threat to commence an action, suit or proceeding or notice of the commencement of any action, suit or proceeding, such Indemnified Party will, if a claim in respect thereof is to be made against the Company pursuant hereto, promptly notify the company in writing of the same. In case any such action is brought against any Indemnified Party and such Indemnified Party notifies the Company of the commencement thereof, the Company may elect to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and an Indemnified Party may employ counsel to participate in the defense of any such action provided, that the employment of such counsel shall be at the Indemnified Party's own expense, unless (i) the employment of such counsel has been authorized in writing by the Company, (ii) the Indemnified Party has reasonably concluded (based upon advice of counsel to the Indemnified Party) that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Company, or that a conflict or potential conflict exists (based upon advice of counsel to the Indemnified Party) between the Indemnified Party and the Company that makes it impossible or inadvisable for counsel to the Indemnifying Party to conduct the defense of both The Company and the Indemnified Party (in which case the Company will not have the right to direct the defense of such action on behalf of the Indemnified Party), or (iii) the Company has not in fact employed counsel reasonably satisfactory to the Indemnified Party to assume the

DEC 21 2006 12:56PM  LIPMAN CAPITAL GROUP, INC  2127553185    p.10

Page 9                          Carter Securities, LLC

defense of such action within a reasonable time after receiving notice of the action, suit or proceeding, in each of which cases the reasonable fees, disbursements and other charges of such counsel will be at the expense of the Company; provided, further, that in no event shall the Company be required to pay fees and expenses for more than one firm of attorneys representing Indemnified Parties unless the defense of one Indemnified Party is unique or separate from that of another Indemnified party subject to the same claim or action. Any failure or delay by an Indemnified Party to give the notice referred to in this paragraph shall not affect such Indemnified Party's right to be indemnified hereunder, except to the extent that such failure or delay causes actual harm to the Company, or prejudices to its ability to defend such action, suit or proceeding on behalf of such Indemnified Party.

If the indemnification provided for in this Agreement is for any reason held unenforceable by an Indemnified Party, the Company agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and CARTER on the other hand, of the Offering as contemplated whether or not the Offering is consummated or, (ii) if (but only if) the allocation provided for in clause (i) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative benefits to the Company and CARTER of the Offering as contemplated shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company or its shareholders, as the case may be, as a result of or in connection with the Offering bear to the fees paid or to be paid to CARTER under this Agreement. Notwithstanding the foregoing, the Company expressly agrees that CARTER shall not be required to contribute any amount in excess of the amount by which fees paid CARTER hereunder (excluding reimbursable expenses), exceeds the amount of any damages which CARTER has otherwise been required to pay.

The Company agrees that without CARTER's prior written consent, which shall not be unreasonably withheld, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought under the indemnification provisions of this Agreement (in which CARTER or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding.

In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse CARTER on a monthly basis for all expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel.

If multiple claims are brought with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any judgment of arbitrate award shall be conclusively deemed to be based on claims as to which

Page 10                          Carter Securities, LLC

indemnification is permitted and provided for, except to the extent the judgment or arbitrate award expressly states that it, or any portion thereof, is based solely on a claim as to which indemnification is not available.

Page 11                    Carter Securities, LLC

APPEDIC B
Proposed Term Sheet

### Private Placement Term Sheet of $2.5 to $5 million

### Regulation D Offering of

### Common Stock

### Marketing Worldwide Corporation

### (MWWC.OB)

---

| | |
|---|---|
| **Closing Date:** | The date on which the Purchaser(s) and Marketing Worldwide Corporation (the "Company") execute the Subscription Agreement. |
| **Effective Date:** | The date in which the Securities Exchange Commission declares the registration statement registering the Company's common stock ("Common Stock") and Warrants for resale effective. |
| **Purchaser(s):** | Purchaser(s) selected by the Company and Carter Securities LLC to be listed on Addendum A. |
| **Security Issued:** | $2.5 to $5 million of Common Stock of the Company ("Securities") and Warrants ("Warrants"). |
| **Purchase Price:** | $0.70 per unit.  Each unit will consist of 1 share of common stock and a ½ warrant. |
| **Warrants:** | The Company will issue a 5 year warrant to the purchaser(s) in an amount equal to 50% of the number of shares that the purchaser would own if the Securities were converted on the initial closing date.  The warrants will have an exercise price equal to $1.00 per share. The warrants will have standard anti-dilution provisions that will be the same as the described below. |
| **Anti-Manipulation:** | The Purchasers will not, prior to the closing, sell, offer to sell, solicit offers to buy, dispose of, loan, pledge or grant any right with respect to (collectively, a "Disposition"), the Company's common stock, nor will the Purchasers engage in any hedging or other similar transaction, which is designed to or could reasonably be expected to lead to or result in a Disposition of common stock by any Purchaser or person or entity affiliated with any Purchaser.  Such prohibited hedging or similar transaction would include, without limitation, effecting any short sale or having in effect a short position (whether or not such sale or position |

Page 12                    Carter Securities, LLC

is against the box and regardless of when such position was entered into) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to the common stock or with respect to any security (other than a broad-based market basket or index) that includes, relates or derived any significant part of its value from the  common stock.

**Registration Rights:**   The Company will use its commercially best efforts to file, at its sole expense, a registration statement for the benefit of the holders of the Securities and Warrants, and Carter Securities LLC, to permit the public resale of the common shares underlying the Securities and Warrants and the shares issued in payment of interest on the Securities, with 30 days the company will file a resale registration statement covering all shares and warrants in the pipe and will use its best efforts to have the registration declared effective on the 90th day after the close of the transaction. If there is an SEC review the company will have 120 days to have the registration declared effective. The Company will pay to the Purchasers liquidated damages of 1.5% times the face value of the Securities, per month (pro-rated for partial calendar months) for any failure to file or effect the registration statement timely, with a maximum penalty of 20% of the face value of the Securities.  Such liquidated damages shall be paid in cash. Should the company become subject to restrictions in the number of shares to be registered under the SEC rule 415, the Company has the right to register the shares in separate registration statements as accepted by the SEC.

**Purchase Agreement:** The investment shall be made pursuant to a Securities Purchase Agreement reasonably acceptable to the company and the Purchasers, which agreement shall contain, among other things, appropriate representations and warranties of the Company, covenants of the company reflecting the provisions set forth herein and appropriate conditions of closing, including an opinion of counsel for the Company.

**Right of First Offer:**   For any equity linked private financing within twelve (12) months of the issue date, the Purchasers of the Common Stock shall have a right of first offer to purchase any or all of the private funding on the same terms as the offerees within 10 days of written notice from the company.  A carve out of this provision shall be granted for issuances and situation involving strategic partnerships, acquisitions candidates, public secondary offerings, employee, consultant and director stock options, issuances to non-affiliates for non-cash transactions and similar issuances.

DEC 21 2006 12:58PM  LIPMAN CAPITAL GROUP, INC  2127553185
P.14

Page 13                    Carter Securities, LLC

Agreed to and accepted this _____ day of December, 2006.

**Purchaser:**

Name of Purchaser:_____

By: _____

Name: _____

Title: _____

Page 14                         Carter Securities, LLC

APPEDIC C
Proposed Term Sheet

**Private Placement Term Sheet of $2.5 to 5 million**

**Regulation D Offering of**

**Convertible Perpetual Preferred Stock**

**& Warrants**

**Of**

**Marketing WorldWide Corp.**

**(MWCC)**

---

| | |
|---|---|
| **Closing Date:** | The date on which the Purchaser(s) and **Marketing Worldwide Corp** (the "Company") execute the Subscription Agreement. |
| **Effective Date:** | The date in which the Securities Exchange Commission declares the registration statement registering the Company's common stock ("Common Stock") and Warrants for resale effective. |
| **Purchaser(s):** | Purchaser(s) selected by the Company and Carter Securities LLC to be listed on Addendum A. |
| **Security Issued:** | $2.5 million to $5 million of Convertible Perpetual Preferred Stock of the Company ("Securities") and Warrants ("Warrants) described below. |
| **Conversion Terms:** | A proposed conversion and purchase price of $0.70 per share. |
| **Dividend:** | Starting six (6) months after the Closing Date, the Company shall pay Purchasers a dividend of 6 month LIBOR rate at an annual rate, payable quarterly in cash or registered stock, at the Company's option. |
| **Forced Conversion:** | In the event that the common stock of the Company trades at a price in excess of 200% of the fixed conversion price for 20 consecutive days and the re-sale registration statement then is in effect, the Company has the right to automatically convert some or all of the remaining outstanding Securities to Common Shares of the Company at the Conversion Price, provided that there is a |

Page 15                    Carter Securities, LLC

sufficient number of authorized, but un-issued and otherwise unreserved shares of Common Stock to satisfy all potential Purchaser conversion and exchange notices.

**Warrants:**

The Company will issue a 5 year warrant to the purchaser(s) in an amount equal to 25% of the number of shares that the purchaser would own if the Securities were converted on the initial closing date the warrants will be exercisable at $1.00 per share. The warrants will have standard anti-dilution provisions that will be the same as the described below.

**Forced Exercise of Warrants:**

In the event that the Common Stock of the Company closes at a price in excess of 200% of the strike price of the respective Warrants for 20 consecutive trading days and the re-sale registration statement then is in effect, the Company has the right automatically to require the holders to exercise some or all of the then outstanding Warrants. The holders will be given thirty (30) calendar days to convert their Warrants if called by the Company, after which date, all unexercised Warrants automatically shall expire.

**Anti-Manipulation:**

The Purchasers will not, prior to the closing, sell, offer to sell, solicit offers to buy, dispose of, loan, pledge or grant any right with respect to (collectively, a "Disposition"), the Company's common stock, nor will the Purchasers engage in any hedging or other similar transaction, which is designed to or could reasonably be expected to lead to or result in a Disposition of common stock by any Purchaser or person or entity affiliated with any Purchaser. Such prohibited hedging or similar transaction would include, without limitation, effecting any short sale or having in effect a short position (whether or not such sale or position is against the box and regardless of when such position was entered into) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to the common stock or with respect to any security (other than a broad-based market basket or index) that includes, relates or derived any significant part of its value from the common stock.

**Registration Rights:**

The Company will use its commercially best efforts to file, at its sole expense, a registration statement for the benefit of the holders of the Securities and Warrants, and Carter Securities LLC, to permit the public resale of the common shares underlying the Securities and Warrants and the shares issued in payment of interest on the Securities, within 30 days of the closing date and will use its commercially best efforts to have the registration statement declared effective within 90 days of the closing date. The Company will pay to the Purchasers liquidated damages of 1% times the face value of the Securities, per month (pro-rated for partial calendar months) for any failure to file or effect the registration statement timely, with a maximum penalty of 20% of the face value of the Securities. Such liquidated damages shall be paid in cash. . Should the company become subject to restrictions in the number of shares to be registered under the SEC rule 415, the Company has the right to register the shares in separate registration statements as accepted by the SEC.

**Purchase Agreement:**

The Investment shall be made pursuant to a Securities Purchase Agreement reasonably acceptable to the company and the Purchasers, which agreement shall

DEC 21 2006 12:59PM  LIPMAN CAPITAL GROUP, INC  2127553185                P.17

Page 16                    Carter Securities, LLC

contain, among other things, appropriate representations and warranties of the Company, covenants of the company reflecting the provisions set forth herein and appropriate conditions of closing, including an opinion of counsel for the Company.

**Right of First Offer:**  For any equity linked private financing within twelve (12) months of the issue date, the Purchasers of the Common Stock shall have a right of first offer to purchase any or all of the private funding on the same terms as the offerees within 10 days of written notice from the company. A carve out of this provision shall be granted for issuances and situation involving strategic partnerships, acquisitions candidates, public secondary offerings, employee, consultant and director stock options, issuances to non-affiliates for non-cash transactions and similar issuances.

Agreed to and accepted this _____ day of December, 2006.

**Purchaser:**

Name of Purchaser:_____

By: _____

Name: _____

Title: _____

# Exhibit C

```
<DOCUMENT>
<TYPE>EX-10.22
<SEQUENCE>10
<FILENAME>mww_8k-ex1022.txt
<DESCRIPTION>SERIES A CONVERTIBLE STOCK PURCHASE AGREEMENT
<TEXT>
<PAGE>
```

SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT


DATED AS OF APRIL 23, 2007


AMONG


MARKETING WORLDWIDE CORPORATION

AND

THE PURCHASERS LISTED ON EXHIBIT A

```
<PAGE>
```

TABLE OF CONTENTS
-----------------

|  |  | PAGE |
|---|---|---|
|  |  | ---- |
| ARTICLE I | PURCHASE AND SALE OF PREFERRED STOCK |  |
| Section 1.1 | Purchase and Sale of Preferred Stock | 1 |
| Section 1.2 | Warrants | 1 |
| Section 1.3 | Conversion Shares | 1 |
| Section 1.4 | Purchase Price and Closing | 2 |
|  |  |  |
| ARTICLE II | REPRESENTATIONS AND WARRANTIES |  |
| Section 2.1 | Representations and Warranties of the Company | 2 |
| Section 2.2 | Representations and Warranties of the Purchasers | 11 |
|  |  |  |
| ARTICLE III | COVENANTS |  |
| Section 3.1 | Securities Compliance | 13 |
| Section 3.2 | Registration and Listing | 13 |
| Section 3.3 | Inspection Rights | 13 |
| Section 3.4 | Compliance with Laws | 13 |
| Section 3.5 | Keeping of Records and Books of Account | 14 |
| Section 3.6 | Reporting Requirements | 14 |
| Section 3.7 | Amendments | 14 |
| Section 3.8 | Other Agreements | 14 |
| Section 3.9 | Distributions | 14 |
| Section 3.10 | Status of Dividends | 15 |
| Section 3.11 | Use of Proceeds | 15 |
| Section 3.12 | Reservation of Shares | 16 |
| Section 3.13 | Transfer Agent Instructions | 16 |
| Section 3.14 | Disposition of Assets | 16 |
| Section 3.15 | Reporting Status | 16 |
| Section 3.16 | Disclosure of Transaction | 16 |
| Section 3.17 | Disclosure of Material Information | 17 |

Section 3.18    Pledge of Securities                                    17
Section 3.19    Form SB-2 Eligibility                                  17
Section 3.20    Lock-Up Agreement                                      17
Section 3.21    DTC                                                    17
Section 3.22    Subsequent Financings                                  17
Section 3.23    Approval of Acquisitions.                              18
Section 3.24    Sarbanes-Oxley Act                                     19

i

<PAGE>

TABLE OF CONTENTS
-----------------
(continued)

ARTICLE IV    CONDITIONS
Section 4.1    Conditions Precedent to the Obligation                 19
               of the Company to Sell the Shares
Section 4.2    Conditions Precedent to the Obligation                 19
               of the Purchasers to Purchase the Shares

ARTICLE V     STOCK CERTIFICATE LEGEND
Section 5.1    Legend                                                  21

ARTICLE VI    INDEMNIFICATION
Section 6.1    General Indemnity                                       22
Section 6.2    Indemnification Procedure                               22

ARTICLE VII   MISCELLANEOUS
Section 7.1    Fees and Expenses                                       23
Section 7.2    Specific Enforcement, Consent to Jurisdiction           23
Section 7.3    Entire Agreement; Amendment                             24
Section 7.4    Notices                                                 24
Section 7.5    Waivers                                                 25
Section 7.6    Headings                                                25
Section 7.7    Successors and Assigns                                  25
Section 7.8    No Third Party Beneficiaries                            25
Section 7.9    Governing Law                                           25
Section 7.10   Survival                                                25
Section 7.11   Counterparts                                            26
Section 7.12   Publicity                                               26
Section 7.13   Severability                                            26
Section 7.14   Further Assurances                                      26

EXHIBITS
--------

Exhibit A      List of Purchasers
Exhibit B      Certificate of Designation of the Relative Rights and Preferences
               of the Series A Convertible Preferred Stock
Exhibit C-1    Series A Warrant
Exhibit C-2    Series B Warrant
Exhibit C-3    Series C Warrant

ii

<PAGE>

TABLE OF CONTENTS
------------------
(continued)

Exhibit C-4        Series J Warrant
Exhibit C-5        Series D Warrant
Exhibit C-6        Series E Warrant
Exhibit C-7        Series F Warrant
Exhibit D          Registration Rights Agreement
Exhibit E          Lock-Up Agreement
Exhibit F          Escrow Agreement
Exhibit G          Irrevocable Transfer Agent Instructions
Exhibit H          Opinion of Counsel

iii

<PAGE>

SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT

This SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT (the "AGREEMENT") is dated as of April 23, 2007 by and among Marketing Worldwide Corporation, a Delaware corporation (the "COMPANY"), and each of the Purchasers of shares of Series A Convertible Preferred Stock of the Company whose names are set forth on EXHIBIT A hereto (individually, a "PURCHASER" and collectively, the "PURCHASERS").

The parties hereto agree as follows:

ARTICLE I
PURCHASE AND SALE OF PREFERRED STOCK

SECTION 1.1        PURCHASE AND SALE OF PREFERRED STOCK. Upon the following terms and conditions, the Company shall issue and sell to the Purchasers and each of the Purchasers shall purchase from the Company, the number of shares of the Company's Series A Convertible Preferred Stock, par value $0.001 per share and at a purchase price of $1.00 per share (the "PREFERRED SHARES"), convertible into shares of the Company's common stock, par value $0.001 per share (the "COMMON STOCK"), in the amounts set forth opposite such Purchaser's name on EXHIBIT A hereto. The designation, rights, preferences and other terms and provisions of the Series A Convertible Preferred Stock are set forth in the Certificate of Designation of the Relative Rights and Preferences of the Series A Convertible Preferred Stock attached hereto as EXHIBIT B (the "CERTIFICATE OF DESIGNATION"). The Company and the Purchasers are executing and delivering this Agreement in accordance with and in reliance upon the exemption from securities registration afforded by Rule 506 of Regulation D ("REGULATION D") as promulgated by the United States Securities and Exchange Commission (the "COMMISSION") under the Securities Act of 1933, as amended (the "SECURITIES ACT") or Section 4(2) of the Securities Act.

SECTION 1.2        WARRANTS. Upon the following terms and conditions and for no additional consideration, each of the Purchasers shall be issued (i) Series A Warrants, in substantially the form attached hereto as EXHIBIT C-1 (the "SERIES A WARRANT"), (ii) Series B Warrants, in substantially the form attached hereto as EXHIBIT C-2 (the "SERIES B WARRANT"), (iii) Series C Warrants, in substantially the form attached hereto as EXHIBIT C-3 (the "SERIES C WARRANT"), (iv) Series J Warrants, in substantially the form attached hereto as EXHIBIT C-4 (the "SERIES J WARRANT"), (v) Series D Warrants, in substantially the form attached hereto as EXHIBIT C-5 (the "SERIES D WARRANT"), (vi) Series E Warrants,

in substantially the form attached hereto as EXHIBIT C-6 (the "SERIES E WARRANT"), and (vii) Series F Warrants, in substantially the form attached hereto as EXHIBIT C-7 (the "SERIES F WARRANT"; and, together with the Series A Warrant, the Series B Warrant, the Series C Warrant, the Series J Warrant, the Series D Warrant and the Series E Warrant, the "WARRANTS"). Any shares of Common Stock issuable upon exercise of the Warrants (and such shares when issued) are herein referred to as the "WARRANT Shares."

SECTION 1.3      CONVERSION SHARES. The Company has authorized and has reserved and covenants to continue to reserve, free of preemptive rights and other similar contractual rights of stockholders, a number of shares of Common Stock equal to one hundred twenty percent (120%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all of the Preferred Shares and a number of shares of Common Stock equal to one hundred percent (100%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the exercise of the Warrants then outstanding. Any shares of Common Stock issuable upon conversion of the Preferred Shares and exercise of the Warrants (and such shares when issued) are herein referred to as the "CONVERSION SHARES" and the Warrant Shares, respectively. The Preferred Shares, the Conversion Shares and the Warrant Shares are sometimes collectively referred to as the "SHARES."

1

<PAGE>

SECTION 1.4      PURCHASE PRICE AND CLOSING. Subject to the terms and conditions hereof, the Company agrees to issue and sell to the Purchasers and, in consideration of and in express reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Purchasers, severally but not jointly, agree to purchase the Preferred Shares and the Warrants for an aggregate purchase price of up to Three Million Five Hundred Thousand Dollars ($3,500,000) (the "PURCHASE PRICE"). The closing of the purchase and sale of the Preferred Shares and the Warrants to be acquired by the Purchasers from the Company under this Agreement shall take place at the offices of Sadis & Goldberg LLP, 551 Fifth Avenue, 21st Floor, New York, New York 10176 (the "CLOSING") at 10:00 a.m., New York time on such date as the Purchasers and the Company may agree upon; PROVIDED, that all of the conditions set forth in ARTICLE IV hereof and applicable to the Closing shall have been fulfilled or waived in accordance herewith (the "CLOSING DATE"). Subject to the terms and conditions of this Agreement, at the Closing the Company shall deliver or cause to be delivered to each Purchaser (x) a certificate for the number of Preferred Shares set forth opposite the name of such Purchaser on EXHIBIT A hereto, (y) its Warrants to purchase such number of shares of Common Stock as is set forth opposite the name of such Purchaser on EXHIBIT A attached hereto and (z) any other documents required to be delivered pursuant to ARTICLE IV hereof. At the Closing, each Purchaser shall deliver its Purchase Price by wire transfer to the escrow account pursuant to the Escrow Agreement (as hereafter defined). In addition, the parties acknowledge that Thirty Five Thousand Dollars ($35,000) of the Purchase Price funded on the Closing Date shall be deducted by the escrow agent from the total amount otherwise payable to the Company, and paid over to counsel for the Purchasers in payment of legal fees of the Purchasers.

ARTICLE II
REPRESENTATIONS AND WARRANTIES

SECTION 2.1      REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company hereby represents and warrants to the Purchasers, as of the date hereof and Closing Date (except as set forth on the Schedule of Exceptions attached hereto with each numbered Schedule corresponding to the section number herein), as follows:

(a)    ORGANIZATION, GOOD STANDING AND POWER. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power to own, lease and operate its properties and assets and to conduct its business as it is now being conducted. The Company does not have any Subsidiaries except as set forth in the Company's Form 10-KSB for the year ended September 30, 2006, including the accompanying financial statements (the "FORM 10-KSB"), or in the Company's Form 10-QSB for the fiscal quarter ended December 31, 2006 (the "FORM 10-QSB"), or on SCHEDULE 2.1(G) hereto. Except as set forth on SCHEDULE 2.1(A), the Company and each such Subsidiary is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary except for any jurisdiction(s) (alone or in the aggregate) in which the failure to be so qualified will not have a Material Adverse Effect (as defined in SECTION 2.1(C) hereof) on the Company's financial condition.

(b)    AUTHORIZATION; ENFORCEMENT. The Company has the requisite corporate power and authority to enter into and perform this Agreement, the Registration Rights Agreement in the form attached hereto as EXHIBIT D (the "REGISTRATION RIGHTS AGREEMENT"), the Lock-Up Agreement (as defined in SECTION 3.20 hereof) in the form attached hereto as EXHIBIT E, the Escrow Agreement by and among the Company, the Purchasers and the escrow agent named therein, dated as of the date hereof, substantially in the form of EXHIBIT F attached hereto (the "ESCROW AGREEMENT"), the Irrevocable Transfer Agent Instructions (as defined in SECTION 3.13) substantially in the form of EXHIBIT G attached hereto, the Certificate of

2

<PAGE>

Designation, and the Warrants (collectively, the "TRANSACTION DOCUMENTS") and to issue and sell the Shares, the Warrants and the Additional Warrants in accordance with the terms hereof. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action, and no further consent or authorization of the Company or its Board of Directors or stockholders is required. This Agreement has been duly executed and delivered by the Company. The other Transaction Documents will have been duly executed and delivered by the Company at the Closing. Each of the Transaction Documents constitutes, or shall constitute when executed and delivered, a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

(c)    CAPITALIZATION. The authorized capital stock of the Company and the shares thereof currently issued and outstanding as of the date hereof are set forth on SCHEDULE 2.1(C) hereto. All of the outstanding shares of the Common Stock and the Preferred Shares have been duly and validly authorized. Except as set forth on SCHEDULE 2.1(C) hereto, no shares of Common Stock are entitled to preemptive rights or registration rights and there are no outstanding options, warrants, scrip, rights to subscribe to, call or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company. There are no contracts, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of the capital stock of the Company or options, securities or rights convertible into shares of capital stock of the Company. Except as set forth on SCHEDULE 2.1(C) hereto, the Company is not a party to any

agreement granting registration or anti-dilution rights to any person with respect to any of its equity or debt securities. The Company is not a party to, and it has no knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock of the Company. The offer and sale of all capital stock, convertible securities, rights, warrants, or options of the Company issued prior to the Closing complied with all applicable Federal and state securities laws, and no stockholder has a right of rescission or claim for damages with respect thereto. The Company has furnished or made available to the Purchasers true and correct copies of the Company's Certificate of Incorporation as in effect on the date hereof (the "CERTIFICATE"), and the Company's Bylaws as in effect on the date hereof (the "BYLAWS"). For the purposes of this Agreement, "MATERIAL ADVERSE EFFECT" means any material adverse effect on the business, operations, properties, prospects, or financial condition of the Company and its Subsidiaries and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement.

(d)    ISSUANCE OF SHARES. The Preferred Shares and the Warrants to be issued at the Closing have been duly authorized by all necessary corporate action and the Preferred Shares, when paid for or issued in accordance with the terms hereof, shall be validly issued and outstanding, fully paid and nonassessable and entitled to the rights and preferences set forth in the Certificate of Designation. When the Conversion Shares and the Warrant Shares are issued in accordance with the terms of the Certificate of Designation and the Warrants, respectively, such shares will be duly authorized by all necessary corporate action and validly issued and outstanding, fully paid and nonassessable, and the holders shall be entitled to all rights accorded to a holder of Common Stock.

(e)    NO CONFLICTS. The execution, delivery and performance of the Transaction Documents by the Company, the performance by the Company of its obligations under the Certificate of Designation and the consummation by the Company of the transactions contemplated herein and therein do not and will not (i) violate any provision of the Company's Certificate or Bylaws, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination,

3

<PAGE>

amendment, acceleration or cancellation of, any agreement, mortgage, deed of trust, indenture, note, bond, license, lease agreement, instrument or obligation to which the Company is a party or by which it or its properties or assets are bound, (iii) create or impose a lien, mortgage, security interest, charge or encumbrance of any nature on any property of the Company under any agreement or any commitment to which the Company is a party or by which the Company is bound or by which any of its respective properties or assets are bound, or (iv) result in a violation of any federal, state, local or foreign statute, rule, regulation, order, judgment or decree (including Federal and state securities laws and regulations) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries are bound or affected. The business of the Company and its Subsidiaries is not being conducted in violation of any laws, ordinances or regulations of any governmental entity, except for possible violations which singularly or in the aggregate do not and will not have a Material Adverse Effect. The Company is not required under Federal, state or local law, rule or regulation to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under the Transaction Documents, or issue and sell the Preferred Shares, the Warrants, the Conversion Shares and the Warrant Shares in

accordance with the terms hereof or thereof (other than (x) any consent, authorization or order that has been obtained as of the date hereof, (y) any filing or registration that has been made as of the date hereof or (z) any filings which may be required to be made by the Company with the Commission or state securities administrators subsequent to the Closing, any registration statement which may be filed pursuant hereto or any other Transaction Document, and the Certificate of Designation); PROVIDED, that for purposes of the representation made in this sentence, the Company is assuming and relying upon the accuracy of the relevant representations and agreements of the Purchasers herein.

(f)     COMMISSION DOCUMENTS, FINANCIAL STATEMENTS. The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the Commission pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended the ("EXCHANGE ACT"), including material filed pursuant to Section 13(a) or 15(d) of the Exchange Act (all of the foregoing including filings incorporated by reference therein being referred to herein as the "COMMISSION DOCUMENTS"). The Company has delivered or made available to each of the Purchasers true and complete copies of the Commission Documents. The Company has not provided to the Purchasers any material non-public information or other information which, according to applicable law, rule or regulation, was required to have been disclosed publicly by the Company but which has not been so disclosed, other than with respect to the transactions contemplated by this Agreement. At the times of their respective filings, the Form 10-KSB and the Form 10-QSB complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder and other federal, state and local laws, rules and regulations applicable to such documents, and, as of their respective dates, none of the Form 10-KSB and the Form 10-QSB contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the Commission Documents comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission or other applicable rules and regulations with respect thereto. Such financial statements have been prepared in accordance with U. S. generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may not include footnotes or may be condensed or summary statements), and fairly present in all material respects the financial position of the Company and its Subsidiaries as of the dates thereof and the results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

4

<PAGE>

(g)     SUBSIDIARIES. SCHEDULE 2.1(G) hereto sets forth each Subsidiary of the Company, showing the jurisdiction of its incorporation or organization and showing the percentage of each person's ownership. For the purposes of this Agreement, "SUBSIDIARY" shall mean any corporation or other entity of which at least a majority of the securities or other ownership interest having ordinary voting power (absolutely or contingently) for the election of directors or other persons performing similar functions are at the time owned directly or indirectly by the Company and/or any of its other Subsidiaries. All of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, and are fully paid and nonassessable. There are no outstanding preemptive, conversion or other rights, options, warrants or

agreements granted or issued by or binding upon any Subsidiary for the purchase or acquisition of any shares of capital stock of any Subsidiary or any other securities convertible into, exchangeable for or evidencing the rights to subscribe for any shares of such capital stock. Neither the Company nor any Subsidiary is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of the capital stock of any Subsidiary or any convertible securities, rights, warrants or options of the type described in the preceding sentence. Neither the Company nor any Subsidiary is party to, nor has any knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock of any Subsidiary.

(h)    NO MATERIAL ADVERSE CHANGE. Other than as disclosed in the Company's Commission Documents, since September 30, 2006, the Company has not experienced or suffered any Material Adverse Effect.

(i)    NO UNDISCLOSED LIABILITIES. Except as set forth on SCHEDULE 2.1(I), since September 30, 2006 neither the Company nor any of its Subsidiaries has any liabilities, obligations, claims or losses (whether liquidated or unliquidated, secured or unsecured, absolute, accrued, contingent or otherwise) other than those incurred in the ordinary course of the Company's or its Subsidiaries' respective businesses and which, individually or in the aggregate, do not or would not have a Material Adverse Effect on the Company or its Subsidiaries, as the case may be.

(j)    OFF BALANCE SHEET ARRANGEMENTS. There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Commission Documents and is not so disclosed or that otherwise would be reasonably likely to have a Material Adverse Effect.

(k)    NO UNDISCLOSED EVENTS OR CIRCUMSTANCES. No event or circumstance has occurred or exists with respect to the Company or its Subsidiaries or their respective businesses, properties, prospects, operations or financial condition, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

(l)    INDEBTEDNESS. The Form 10-KSB, Form 10-QSB or SCHEDULE 2.1(L) hereto sets forth as of a recent date all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "INDEBTEDNESS" shall mean (a) any liabilities for borrowed money or amounts owed, whether individually or in aggregate, in excess of $100,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $25,000 due under leases required to be capitalized in accordance with GAAP. Except as set forth on SCHEDULE 2.1(L), neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

<center>5</center>

<PAGE>

(m)    TITLE TO ASSETS. Except as set forth on SCHEDULE 2.1(M), each of the Company and the Subsidiaries has good and marketable title to all of its real and personal property reflected in the Form 10-KSB, free and clear of any mortgages, pledges, charges, liens, security interests or other encumbrances,

except for those disclosed in the Form 10-KSB. Except as set forth on SCHEDULE 2.1(M), all leases of the Company and each of its Subsidiaries are valid and subsisting and in full force and effect.

(n)    ACTIONS PENDING. There is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or any other proceeding pending or, to the knowledge of the Company, threatened against the Company or any Subsidiary which questions the validity of this Agreement or any of the other Transaction Documents or the transactions contemplated hereby or thereby or any action taken or to be taken pursuant hereto or thereto. There is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or any other proceeding pending or, to the knowledge of the Company, threatened, against or involving the Company, any Subsidiary or any of their respective properties or assets. There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company or any Subsidiary or any officers or directors of the Company or Subsidiary in their capacities as such.

(o)    COMPLIANCE WITH LAW. The business of the Company and the Subsidiaries has been and is presently being conducted in accordance with all applicable federal, state and local governmental laws, rules, regulations and ordinances, except for such noncompliance that, individually or in the aggregate, would not cause a Material Adverse Effect. The Company and each of its Subsidiaries have all franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals necessary for the conduct of its business as now being conducted by it unless the failure to possess such franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals, individually or in the aggregate, would not have a Material Adverse Effect.

(p)    TAXES. The Company and each of the Subsidiaries has accurately prepared and filed all federal, state and other tax returns required by law to be filed by it, has paid or made provisions for the payment of all taxes shown to be due and all additional assessments, and adequate provisions have been and are reflected in the financial statements of the Company and the Subsidiaries for all current taxes and other charges to which the Company or any Subsidiary is subject and which are not currently due and payable. None of the federal income tax returns of the Company or any Subsidiary have been audited by the Internal Revenue Service. The Company has no knowledge of any additional assessments, adjustments or contingent tax liability (whether federal or state) of any nature whatsoever, whether pending or threatened against the Company or any Subsidiary for any period, nor of any basis for any such assessment, adjustment or contingency.

(q)    CERTAIN FEES. Except for the fees payable pursuant to that certain securities placement agreement dated December 21, 2006 by and between Carter Securities LLC and the Company, no brokers, finders or financial advisory fees or commissions will be payable by the Company or any Subsidiary or any Purchaser with respect to the transactions contemplated by this Agreement.

(r)    DISCLOSURE. Neither this Agreement or the Schedules hereto nor any other documents, certificates or instruments furnished to the Purchasers by or on behalf of the Company or any Subsidiary in connection with the transactions contemplated by this Agreement contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made herein or therein, in the light of the circumstances under which they were made herein or therein, not misleading.

6

<PAGE>

(s)    OPERATION OF BUSINESS. Except as set forth in SCHEDULE 2.1(S), the Company and each of the Subsidiaries owns or possesses all patents, trademarks, domain names (whether or not registered) and any patentable improvements or copyrightable derivative works thereof, websites and intellectual property rights relating thereto, service marks, trade names, copyrights, licenses and authorizations, and all rights with respect to the foregoing, which are necessary for the conduct of its business as now conducted without any conflict with the rights of others.

(t)    ENVIRONMENTAL COMPLIANCE. The Company and each of its Subsidiaries have obtained all material approvals, authorization, certificates, consents, licenses, orders and permits or other similar authorizations of all governmental authorities, or from any other person, that are required under any Environmental Laws. Except as set forth on SCHEDULE 2.1(T), the Form 10-KSB or Form 10-QSB describes all material permits, licenses and other authorizations issued under any Environmental Laws to the Company or its Subsidiaries. "ENVIRONMENTAL LAWS" shall mean all applicable laws relating to the protection of the environment including, without limitation, all requirements pertaining to reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, materials or wastes, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, material or wastes, whether solid, liquid or gaseous in nature. The Company has all necessary governmental approvals required under all Environmental Laws and used in its business or in the business of any of its Subsidiaries. The Company and each of its Subsidiaries are also in compliance with all other limitations, restrictions, conditions, standards, requirements, schedules and timetables required or imposed under all Environmental Laws. Except for such instances as would not individually or in the aggregate have a Material Adverse Effect, there are no past or present events, conditions, circumstances, incidents, actions or omissions relating to or in any way affecting the Company or its Subsidiaries that violate or may violate any Environmental Law after the Closing Date or that may give rise to any environmental liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation (i) under any Environmental Law, or (ii) based on or related to the manufacture, processing, distribution, use, treatment, storage (including without limitation underground storage tanks), disposal, transport or handling, or the emission, discharge, release or threatened release of any hazardous substance.

(u)    BOOKS AND RECORD INTERNAL ACCOUNTING CONTROLS. The books and records of the Company and its Subsidiaries accurately reflect in all material respects the information relating to the business of the Company and the Subsidiaries, the location and collection of their assets, and the nature of all transactions giving rise to the obligations or accounts receivable of the Company or any Subsidiary. The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(v)    MATERIAL AGREEMENTS. Except for the Transaction Documents (with

respect to clause (i) only), as disclosed in the Commission Documents or as set forth on SCHEDULE 2.1(V) hereto, or as would not be reasonably likely to have a Material Adverse Effect, (i) the Company and each of its Subsidiaries have performed all obligations required to be performed by them to date under any written or oral contract, instrument, agreement, commitment, obligation, plan or arrangement, filed or required to be filed with the Commission (the "MATERIAL AGREEMENTS"), (ii) neither the Company nor any of its Subsidiaries has received any notice of default under any Material Agreement and, (iii) to the best of the Company's knowledge, neither the Company nor any of its Subsidiaries is in default under any Material Agreement now in effect.

<center>7</center>

<PAGE>

     (w)  TRANSACTIONS WITH AFFILIATES. Except as set forth in the Commission Documents, there are no loans, leases, agreements, contracts, royalty agreements, management contracts or arrangements or other continuing transactions between (a) the Company or any Subsidiary on the one hand, and (b) on the other hand, any officer, employee, consultant or director of the Company or any of its Subsidiaries, or any person owning any capital stock of the Company or any Subsidiary or any member of the immediate family of such officer, employee, consultant, director or stockholder, or any corporation or other entity controlled by such officer, employee, consultant, director or stockholder, or a member of the immediate family of such officer, employee, consultant, director or stockholder.

     (x)  SECURITIES ACT OF 1933. Based in material part upon the representations herein of the Purchasers, the Company has complied and will comply with all applicable federal and state securities laws in connection with the offer, issuance and sale of the Shares and the Warrants hereunder. Neither the Company nor anyone acting on its behalf, directly or indirectly, has or will sell, offer to sell or solicit offers to buy any of the Shares, the Warrants or similar securities to, or solicit offers with respect thereto from, or enter into any preliminary conversations or negotiations relating thereto with, any person, or has taken or will take any action so as to bring the issuance and sale of any of the Shares and the Warrants under the registration provisions of the Securities Act and applicable state securities laws, and neither the Company nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of any of the Shares and the Warrants.

     (y)  GOVERNMENTAL APPROVALS. Except for the filing of any notice prior or subsequent to the Closing Date that may be required under applicable state and/or Federal securities laws (which if required, shall be filed on a timely basis), including the filing of a Form D and a registration statement or statements pursuant to the Registration Rights Agreement, and the filing of the Certificate of Designation with the Secretary of State for the State of Delaware, no authorization, consent, approval, license, exemption of, filing or registration with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, is or will be necessary for, or in connection with, the execution or delivery of the Preferred Shares and the Warrants, or for the performance by the Company of its obligations under the Transaction Documents.

     (z)  EMPLOYEES. Neither the Company nor any Subsidiary has any collective bargaining arrangements or agreements covering any of its employees. Except as set forth on SCHEDULE 2.1(Z), neither the Company nor any Subsidiary has any employment contract, agreement, regarding proprietary information, non-competition agreement, non-solicitation agreement, confidentiality

agreement, or any other similar contract or restrictive covenant, relating to the right of any officer, employee or consultant to be employed or engaged by the Company or such Subsidiary. No officer, consultant or key employee of the Company or any Subsidiary whose termination, either individually or in the aggregate, could have a Material Adverse Effect, has terminated or, to the knowledge of the Company, has any present intention of terminating his or her employment or engagement with the Company or any Subsidiary.

(aa)   ABSENCE OF CERTAIN DEVELOPMENTS. Except as set forth on SCHEDULE 2.1(AA), since September 30, 2006, neither the Company nor any Subsidiary has:

(i)   issued any stock, bonds or other corporate securities or any rights, options or warrants with respect thereto;

8

<PAGE>

(ii)   borrowed any amount or incurred or become subject to any liabilities (absolute or contingent) except current liabilities incurred in the ordinary course of business which are comparable in nature and amount to the current liabilities incurred in the ordinary course of business during the comparable portion of its prior fiscal year;

(iii)   discharged or satisfied any lien or encumbrance or paid any obligation or liability (absolute or contingent), other than current liabilities paid in the ordinary course of business;

(iv)   declared or made any payment or distribution of cash or other property to stockholders with respect to its stock, or purchased or redeemed, or made any agreements so to purchase or redeem, any shares of its capital stock;

(v)   sold, assigned or transferred any other tangible assets, or canceled any debts or claims, except in the ordinary course of business;

(vi)   sold, assigned or transferred any patent rights, trademarks, trade names, copyrights, trade secrets or other intangible assets or intellectual property rights, or disclosed any proprietary confidential information to any person except to customers in the ordinary course of business;

(vii)   suffered any substantial losses or waived any rights of material value, whether or not in the ordinary course of business, or suffered the loss of any material amount of prospective business;

(viii)   made any changes in employee compensation except in the ordinary course of business and consistent with past practices;

(ix)   made capital expenditures or commitments therefor that aggregate in excess of $100,000;

(x)   entered into any other transaction other than in the ordinary course of business, or entered into any other material transaction, whether or not in the ordinary course of business;

(xi)   made charitable contributions or pledges in excess of $25,000;

(xii)   suffered any material damage, destruction or casualty loss, whether or not covered by insurance;

(xiii) experienced any material problems with labor or management in connection with the terms and conditions of their employment;

(xiv) effected any two or more events of the foregoing kind which in the aggregate would be material to the Company or its Subsidiaries; or

(xv)  entered into an agreement, written or otherwise, to take any of the foregoing actions.

9

<PAGE>

(bb)  PUBLIC UTILITY HOLDING COMPANY ACT AND INVESTMENT COMPANY ACT STATUS. The Company is not a "holding company" or a "public utility company" as such terms are defined in the Public Utility Holding Company Act of 1935, as amended. The Company is not, and as a result of and immediately upon the Closing will not be, an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(cc)  ERISA. No liability to the Pension Benefit Guaranty Corporation has been incurred with respect to any Plan (as defined below) by the Company or any of its Subsidiaries which is or would be materially adverse to the Company and its Subsidiaries. The execution and delivery of this Agreement and the issuance and sale of the Shares will not involve any transaction which is subject to the prohibitions of Section 406 of ERISA or in connection with which a tax could be imposed pursuant to Section 4975 of the Internal Revenue Code of 1986, as amended (the "CODE"); PROVIDED that if any of the Purchasers, or any person or entity that owns a beneficial interest in any of the Purchasers, is an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) with respect to which the Company is a "party in interest" (within the meaning of Section 3(14) of ERISA), the requirements of Sections 407(d)(5) and 408(e) of ERISA, if applicable, are met. As used in this SECTION 2.1(CC), the term "PLAN" shall mean an "employee pension benefit plan" (as defined in Section 3 of ERISA) which is or has been established or maintained, or to which contributions are or have been made, by the Company or any Subsidiary or by any trade or business, whether or not incorporated, which, together with the Company or any Subsidiary, is under common control, as described in Section 414(b) or (c) of the Code.

(dd)  DILUTIVE EFFECT. The Company understands and acknowledges that its obligation to issue Conversion Shares upon conversion of the Preferred Shares in accordance with this Agreement and the Certificate of Designation and its obligations to issue the Warrant Shares upon the exercise of the Warrants in accordance with this Agreement and the Warrants, is, in each case, absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interest of other stockholders of the Company.

(ee)  NO INTEGRATED OFFERING. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offering of the Shares pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act which would prevent the Company from selling the Shares pursuant to Rule 506 under the Securities Act, or any applicable exchange-related stockholder approval provisions, nor will the Company or any of its affiliates or Subsidiaries take any action or steps that would cause the offering of the Shares to be integrated with other offerings. The Company does not have any registration statement pending before the Commission or currently under the Commission's review and since July 1, 2006, the Company has not offered or sold any of its equity securities or debt securities convertible into

shares of Common Stock.

(ff)  INDEPENDENT NATURE OF PURCHASERS. The Company acknowledges
that the obligations of each Purchaser under the Transaction Documents are
several and not joint with the obligations of any other Purchaser, and no
Purchaser shall be responsible in any way for the performance of the obligations
of any other Purchaser under the Transaction Documents. The Company acknowledges
that the decision of each Purchaser to purchase securities pursuant to this
Agreement has been made by such Purchaser independently of any other purchase
and independently of any information, materials, statements or opinions as to
the business, affairs, operations, assets, properties, liabilities, results of
operations, condition (financial or otherwise) or prospects of the Company or of
its Subsidiaries which may have made or given by any other Purchaser or by any
agent or employee of any other Purchaser, and no Purchaser or any of its agents
or employees shall have any liability to any Purchaser (or any other person)
relating to or arising from any such information, materials, statements or
opinions. The Company acknowledges that nothing contained herein, or in any

                                    10

<PAGE>

Transaction Document, and no action taken by any Purchaser pursuant hereto or
thereto, shall be deemed to constitute the Purchasers as a partnership, an
association, a joint venture or any other kind of entity, or create a
presumption that the Purchasers are in any way acting in concert or as a group
with respect to such obligations or the transactions contemplated by the
Transaction Documents. The Company acknowledges that each Purchaser shall be
entitled to independently protect and enforce its rights, including without
limitation, the rights arising out of this Agreement or out of the other
Transaction Documents, and it shall not be necessary for any other Purchaser to
be joined as an additional party in any proceeding for such purpose. The Company
acknowledges that for reasons of administrative convenience only, the
Transaction Documents have been prepared by counsel for one of the Purchasers
and such counsel does not represent all of the Purchasers but only such
Purchaser and the other Purchasers have retained their own individual counsel
with respect to the transactions contemplated hereby. The Company acknowledges
that it has elected to provide all Purchasers with the same terms and
Transaction Documents for the convenience of the Company and not because it was
required or requested to do so by the Purchasers.

(gg)  TRANSFER AGENT. The name, address, telephone number, fax
number, contact person and email address of the Company's current transfer agent
is set forth on SCHEDULE 2.1(GG) hereto.

SECTION 2.2       REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS. Each
Purchaser hereby makes the following representations and warranties to the
Company with respect solely to itself and not with respect to any other
Purchaser:

(a)  ORGANIZATION AND STANDING OF THE PURCHASERS. If the Purchaser
is an entity, such Purchaser is a corporation, partnership or limited liability
company duly incorporated or organized, validly existing and in good standing
under the laws of the jurisdiction of its incorporation or organization.

(b)  AUTHORIZATION AND POWER. Each Purchaser has the requisite
power and authority to enter into and perform this Agreement and to purchase the
Preferred Shares and Warrants being sold to it hereunder. The execution,
delivery and performance of this Agreement and the Registration Rights Agreement
by such Purchaser and the consummation by it of the transactions contemplated
hereby and thereby have been duly authorized by all necessary corporate or

partnership action, and no further consent or authorization of such Purchaser or its Board of Directors, stockholders or partners, as the case may be, is required. Each of this Agreement and the Registration Rights Agreement has been duly authorized, executed and delivered by such Purchaser and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with the terms thereof, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

(c)     NO CONFLICTS. The execution, delivery and performance of this Agreement and the Registration Rights Agreement and the consummation by such Purchaser of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Purchaser's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Purchaser is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Purchaser or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a

11

<PAGE>

material adverse effect on such Purchaser). Such Purchaser is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or the Registration Rights Agreement or to purchase the Preferred Shares or acquire the Warrants in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Purchaser is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(d)     ACQUISITION FOR INVESTMENT. Each Purchaser is acquiring the Preferred Shares and the Warrants solely for its own account for the purpose of investment and not with a view to or for sale in connection with distribution. Each Purchaser does not have a present intention to sell the Preferred Shares or the Warrants, nor a present arrangement (whether or not legally binding) or intention to effect any distribution of the Preferred Shares or the Warrants to or through any person or entity; PROVIDED, HOWEVER, that by making the representations herein and subject to SECTION 2.2(H) below, such Purchaser does not agree to hold the Shares or the Warrants for any minimum or other specific term and reserves the right to dispose of the Shares or the Warrants at any time in accordance with Federal and state securities laws applicable to such disposition. Each Purchaser acknowledges that it is able to bear the financial risks associated with an investment in the Preferred Shares and the Warrants and that it has been given full access to such records of the Company and the Subsidiaries and to the officers of the Company and the Subsidiaries and received such information as it has deemed necessary or appropriate to conduct its due diligence investigation and has sufficient knowledge and experience in investing in companies similar to the Company in terms of the Company's stage of development so as to be able to evaluate the risks and merits of its investment in the Company.

(e)    STATUS OF PURCHASERS. Each Purchaser is an "accredited investor" as defined in Regulation D promulgated under the Securities Act. Such Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act and such Purchaser is not a broker-dealer.

(f)    OPPORTUNITIES FOR ADDITIONAL INFORMATION. Each Purchaser acknowledges that such Purchaser has had the opportunity to ask questions of and receive answers from, or obtain additional information from, the executive officers of the Company concerning the financial and other affairs of the Company, and to the extent deemed necessary in light of such Purchaser's personal knowledge of the Company's affairs, such Purchaser has asked such questions and received answers to the full satisfaction of such Purchaser, and such Purchaser desires to invest in the Company.

(g)    NO GENERAL SOLICITATION. Each Purchaser acknowledges that the Preferred Shares and the Warrants were not offered to such Purchaser by means of any form of general or public solicitation or general advertising, or publicly disseminated advertisements or sales literature, including (i) any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media, or broadcast over television or radio, or (ii) any seminar or meeting to which such Purchaser was invited by any of the foregoing means of communications.

(h)    RULE 144. Such Purchaser understands that the Shares must be held indefinitely unless such Shares are registered under the Securities Act or an exemption from registration is available. Such Purchaser acknowledges that such Purchaser is familiar with Rule 144 of the rules and regulations of the Commission, as amended, promulgated pursuant to the Securities Act ("RULE 144"), and that such Purchaser has been advised that Rule 144 permits resales only under certain circumstances. Such Purchaser understands that to the extent that Rule 144 is not available, such Purchaser will be unable to sell any Shares without either registration under the Securities Act or the existence of another exemption from such registration requirement.

12

<PAGE>

(i)    GENERAL. Such Purchaser understands that the Shares are being offered and sold in reliance on a transactional exemption from the registration requirement of Federal and state securities laws and the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings of such Purchaser set forth herein in order to determine the applicability of such exemptions and the suitability of such Purchaser to acquire the Shares.

(j)    INDEPENDENT INVESTMENT. Except as may be disclosed in any filings with the Commission by the Purchasers under Section 13 and/or Section 16 of the Exchange Act, no Purchaser has agreed to act with any other Purchaser for the purpose of acquiring, holding, voting or disposing of the Shares purchased hereunder for purposes of Section 13(d) under the Exchange Act, and each Purchaser is acting independently with respect to its investment in the Shares.

ARTICLE III
COVENANTS

The Company covenants with each of the Purchasers as follows, which covenants are for the benefit of each Purchaser and its permitted assignees (as defined herein):

SECTION 3.1        SECURITIES COMPLIANCE. The Company shall notify the

Commission in accordance with their rules and regulations, of the transactions contemplated by any of the Transaction Documents, including filing a Form D with respect to the Preferred Shares, Warrants, Conversion Shares and the Warrant Shares as required under Regulation D and applicable "blue sky" laws, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Preferred Shares, the Warrants, the Conversion Shares and the Warrant Shares to the Purchasers or subsequent holders.

SECTION 3.2      REGISTRATION AND LISTING. The Company shall (a) comply in all respects with its reporting and filing obligations under the Exchange Act, (b) comply with all requirements related to any registration statement filed pursuant to this Agreement and the Registration Rights Agreement, and (c) not take any action or file any document (whether or not permitted by the Securities Act or the rules promulgated thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under the Exchange Act or Securities Act, except as permitted herein. The Company will take all action necessary to continue the listing or trading of its Common Stock on the OTC Bulletin Board or other exchange or market on which the Common Stock is trading or may be traded in the future. Subject to the terms of the Transaction Documents, the Company further covenants that it will take such further action as the Purchasers may reasonably request, all to the extent required from time to time to enable the Purchasers to sell the Shares without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act. Upon the request of the Purchasers, the Company shall deliver to the Purchasers a written certification of a duly authorized officer as to whether it has complied with such requirements.

SECTION 3.3      INSPECTION RIGHTS. The Company shall permit, during normal business hours and upon reasonable request and reasonable notice, each Purchaser or any employees, agents or representatives thereof, so long as such Purchaser shall be obligated hereunder to purchase the Preferred Shares or shall beneficially own any Preferred Shares, or shall own Conversion Shares which, in the aggregate, represent more than two percent (2%) of the total combined voting power of all voting securities then outstanding, for purposes reasonably related to such Purchaser's interests as a stockholder, to examine and make reasonable copies of and extracts from the records and books of account of, and visit and inspect the properties, assets, operations and business of the Company and any Subsidiary, and to discuss the affairs, finances and accounts of the Company and any Subsidiary with any of its officers, consultants, directors, and key employees.

13

<PAGE>

SECTION 3.4      COMPLIANCE WITH LAWS. The Company shall comply, and cause each Subsidiary, whether such Subsidiary is in existence as of the date of this agreement or formed or acquired subsequent to the date of this agreement, to comply, with all applicable laws, rules, regulations and orders, noncompliance with which could have a Material Adverse Effect.

SECTION 3.5      KEEPING OF RECORDS AND BOOKS OF ACCOUNT. The Company shall keep and cause each Subsidiary to keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, reflecting all financial transactions of the Company and its Subsidiaries, and in which, for each fiscal year, all proper reserves for depreciation, depletion, obsolescence, amortization, taxes, bad debts and other purposes in connection with its business shall be made.

SECTION 3.6    REPORTING REQUIREMENTS. If the Commission ceases making periodic reports filed under the Exchange Act available via the Internet, then at a Purchaser's request the Company shall furnish the following to such Purchaser so long as such Purchaser shall be obligated hereunder to purchase the Preferred Shares or shall beneficially own any Shares:

(a)    quarterly Reports filed with the Commission on Form 10-QSB as soon as practical after the document is filed with the Commission, and in any event within five (5) days after the document is filed with the Commission;

(b)    annual Reports filed with the Commission on Form 10-KSB as soon as practical after the document is filed with the Commission, and in any event within five (5) days after the document is filed with the Commission; and

(c)    copies of all notices and information, including without limitation notices and proxy statements in connection with any meetings, that are provided to holders of shares of Common Stock, contemporaneously with the delivery of such notices or information to such holders of Common Stock.

SECTION 3.7    AMENDMENTS. The Company shall not amend or waive any provision of the Certificate or Bylaws of the Company in any way that would adversely affect the liquidation preferences, dividends rights, conversion rights, voting rights or redemption rights of the Preferred Shares; PROVIDED, however, that any creation and issuance, in accordance with the Certificate of Designation, of another series of Junior Stock (as defined in the Certificate of Designation) or any other class or series of equity securities which by its terms shall rank on parity with the Preferred Shares shall not be deemed to materially and adversely affect such rights, preferences or privileges. No consideration shall be offered or paid to any holders of Preferred Shares or holders of the Warrants to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered to all of the parties to the Transaction Documents, holders of Preferred Shares or holders of the Warrants, as the case may be. The Company has not, directly or indirectly, made any agreements with any Purchasers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents. Without limiting the foregoing, the Company confirms that, except as set forth in this Agreement, no Purchaser has made any commitment or promise or has any other obligation to provide any financing to the Company or otherwise.

SECTION 3.8    OTHER AGREEMENTS. The Company shall not enter into any agreement in which the terms of such agreement would restrict or impair the right or ability to perform of the Company or any Subsidiary under any Transaction Document.

14

<PAGE>

SECTION 3.9    DISTRIBUTIONS. So long as any Preferred Shares remain outstanding, the Company agrees that it shall not (i) declare or pay any dividends or make any distributions to any holder(s) of Common Stock or (ii) purchase or otherwise acquire for value, directly or indirectly, any Common Stock or other equity security of the Company.

SECTION 3.10    STATUS OF DIVIDENDS. The Company covenants and agrees that (i) no Federal income tax return or claim for refund of Federal income tax or other submission to the Internal Revenue Service (the "SERVICE") will adversely affect the Preferred Shares, any other series of its preferred stock, or the Common Stock, and no deduction shall operate to jeopardize the availability to Purchasers of the dividends received deduction provided by

Section 243(a)(1) of the Code or any successor provision, (ii) in no report to shareholders or to any governmental body having jurisdiction over the Company or otherwise will it treat the Preferred Shares other than as equity capital or the dividends paid thereon other than as dividends paid on equity capital unless required to do so by a governmental body having jurisdiction over the accounts of the Company or by a change in generally accepted accounting principles required as a result of action by an authoritative accounting standards setting body, and (iii) it will take no action which would result in the dividends paid by the Company on the Preferred Shares out of the Company's current or accumulated earnings and profits being ineligible for the dividends received deduction provided by Section 243(a)(1) of the Code. In the event that the Purchasers have reasonable cause to believe that dividends paid by the Company on the Preferred Shares out of the Company's current or accumulated earnings and profits will not be treated as eligible for the dividends received deduction provided by Section 243(a)(1) of the Code, or any successor provision, the Company will, at the reasonable request of the Purchasers of 51% of the outstanding Preferred Shares, join with the Purchasers in the submission to the Service of a request for a ruling that dividends paid on the Shares will be so eligible for Federal income tax purposes, at the Purchasers expense. In addition, the Company will reasonably cooperate with the Purchasers (at Purchasers' expense) in any litigation, appeal or other proceeding challenging or contesting any ruling, technical advice, finding or determination that earnings and profits are not eligible for the dividends received deduction provided by Section 243(a)(1) of the Code, or any successor provision to the extent that the position to be taken in any such litigation, appeal, or other proceeding is not contrary to any provision of the Code. Notwithstanding the foregoing, nothing herein contained shall be deemed to preclude the Company from claiming a deduction with respect to such dividends if (i) the Code shall hereafter be amended, or final Treasury regulations thereunder are issued or modified, to provide that dividends on the Preferred Shares or Conversion Shares should not be treated as dividends for Federal income tax purposes or that a deduction with respect to all or a portion of the dividends on the Shares is allowable for Federal income tax purposes, or (ii) in the absence of such an amendment, issuance or modification and after a submission of a request for ruling or technical advice, the Service shall issue a published ruling or advise that dividends on the Shares should not be treated as dividends for Federal income tax purposes. If the Service specifically determines that the Preferred Shares or Conversion Shares constitute debt, the Company may file protective claims for refund.

        SECTION 3.11    USE OF PROCEEDS. The net proceeds from the sale of the Shares hereunder shall be used by the Company for working capital, with an emphasis on an infusion into a painting facility to be acquired in an all-equity transaction independent of the transactions contemplated in this Agreement. The proceeds shall also be used for new product development, new product inventory, new tooling, other capital assets, partial payment on the principal of a loan linked to a credit line and general corporate purposes and not to redeem any Common Stock or securities convertible, exercisable or exchangeable into Common Stock, to settle any outstanding litigation or to cause any increase in management's compensation, direct or otherwise, in a manner other than in the ordinary course of business. An estimated allocation of the net proceeds from the sale of the Shares hereunder is set forth on SCHEDULE 3.11 hereto.

                                    15

<PAGE>

        SECTION 3.12    RESERVATION OF SHARES. So long as any of the Preferred Shares or Warrants remain outstanding, the Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, no less than one hundred fifty percent (150%) of the aggregate number

of shares of Common Stock needed to provide for the issuance of the Conversion Shares and the Warrant Shares.

SECTION 3.13     TRANSFER AGENT INSTRUCTIONS. The Company shall issue irrevocable instructions to its transfer agent, and any subsequent transfer agent, to issue certificates, registered in the name of each Purchaser or its respective nominee(s), for the Conversion Shares and the Warrant Shares in such amounts as specified from time to time by each Purchaser to the Company upon conversion of the Preferred Shares or exercise of the Warrants in the form of EXHIBIT G attached hereto (the "IRREVOCABLE TRANSFER AGENT INSTRUCTIONS"). Prior to registration of the Conversion Shares and the Warrant Shares under the Securities Act, all such certificates shall bear the restrictive legend specified in SECTION 5.1 of this Agreement. The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this SECTION 3.13 will be given by the Company to its transfer agent and that the Shares shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Registration Rights Agreement. If a Purchaser provides the Company with an opinion of counsel, in a generally acceptable form, to the effect that a public sale, assignment or transfer of the Shares may be made without registration under the Securities Act or the Purchaser provides the Company with reasonable assurances that such Shares can be sold pursuant to Rule 144 without any restriction as to the number of securities acquired as of a particular date that can then be immediately sold, the Company shall permit the transfer, and, in the case of the Conversion Shares and the Warrant Shares, promptly instruct its transfer agent to issue one or more certificates in such name and in such denominations as specified by such Purchaser and without any restrictive legend. The Company acknowledges that a breach by it of its obligations under this SECTION 3.13 will cause irreparable harm to the Purchasers by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this SECTION 3.13 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this SECTION 3.13, that the Purchasers shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

SECTION 3.14     DISPOSITION OF ASSETS. So long as any Preferred Shares remain outstanding, neither the Company nor any Subsidiary shall sell, transfer or otherwise dispose of any of its properties, assets and rights including, without limitation, its software and intellectual property, to any person except for sales to customers in the ordinary course of business or with the prior written consent of the holders of a majority of the Preferred Shares then outstanding.

SECTION 3.15     REPORTING STATUS. So long as a Purchaser beneficially owns any of the Shares, the Company shall timely file all reports required to be filed with the Commission pursuant to the Exchange Act, and the Company shall not cease filing reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would permit such termination.

SECTION 3.16     DISCLOSURE OF TRANSACTION. The Company shall issue a press release describing the material terms of the transactions contemplated hereby (the "PRESS RELEASE") as soon as practicable after the Closing but in no event later than 9:00 A.M. Eastern Time on the first Trading Day following the Closing. The Company shall also file with the Commission a Current Report on Form 8-K (the "FORM 8-K") describing the material terms of the transactions contemplated hereby (and attaching as exhibits thereto this Agreement, the Registration Rights Agreement, the Certificate of Designation, the Lock-Up

Agreement, the Escrow Agreement, the form of each series of Warrant and the

16

<PAGE>

Press Release) as soon as practicable following the Closing Date but in no event more than four (4) Trading Days following the Closing Date, which Press Release and Form 8-K shall be subject to prior review and comment by counsel for the Purchasers. "TRADING DAY" means any day during which the OTC Bulletin Board (or other quotation venue or principal exchange on which the Common Stock is traded) shall be open for trading.

SECTION 3.17    DISCLOSURE OF MATERIAL INFORMATION. The Company represents, covenants and agrees that neither it nor any other person acting on its behalf has provided or will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information (other than with respect to the transactions contemplated by this Agreement), unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that each Purchaser shall be relying on the foregoing representations in effecting transactions in securities of the Company.

SECTION 3.18    PLEDGE OF SECURITIES. The Company acknowledges and agrees that the Shares may be pledged by a Purchaser in connection with a BONA FIDE margin agreement or other loan or financing arrangement that is secured by the Common Stock. The pledge of Common Stock shall not be deemed to be a transfer, sale or assignment of the Common Stock hereunder, and no Purchaser effecting a pledge of Common Stock shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document; PROVIDED that a Purchaser and its pledgee shall be required to comply with the provisions of ARTICLE V hereof in order to effect a sale, transfer or assignment of Common Stock to such pledgee. At the Purchasers' expense, the Company hereby agrees to execute and deliver such documentation as a pledgee of the Common Stock may reasonably request in connection with a pledge of the Common Stock to such pledgee by a Purchaser.

SECTION 3.19    FORM SB-2 ELIGIBILITY. The Company currently meets the "registrant eligibility" and transaction requirements set forth in the general instructions to Form SB-2 applicable to "resale" registrations on Form SB-2 and the Company shall file all reports required to be filed by the Company with the Commission in a timely manner.

SECTION 3.20    LOCK-UP AGREEMENT. The persons listed on SCHEDULE 3.20 attached hereto shall be subject to the terms and provisions of a lock-up agreement in substantially the form as EXHIBIT E hereto (the "LOCK-UP AGREEMENT"), which shall provide the manner in which such persons will sell, transfer or dispose of their shares of Common Stock.

SECTION 3.21    DTC. Not later than the effective date of the Registration Statement (as defined in the Registration Rights Agreement), the Company shall cause its Common Stock to be eligible for transfer with its transfer agent pursuant to the Depository Trust Company Automated Securities Transfer Program.

SECTION 3.22    SUBSEQUENT FINANCINGS.

(a)    For a period of three (3) years following the effective date of the Registration Statement (as defined in the Registration Rights Agreement), the Company covenants and agrees to promptly notify (in no event later than five

(5) days after making or receiving an applicable offer) in writing (a "RIGHTS Notice") each holder of Preferred Shares (each, a "PREFERRED STOCKHOLDER" and collectively the "PREFERRED STOCKHOLDERS") of the terms and conditions of any proposed offer or sale to, or exchange with (or other type of distribution to) any third party (a "SUBSEQUENT FINANCING"), of Common Stock or any debt or equity securities convertible, exercisable or exchangeable into Common Stock; PROVIDED, HOWEVER, prior to delivering to each Preferred Stockholder a Rights

<center>17</center>

<PAGE>

Notice, the Company shall first deliver to each Preferred Stockholder a written notice of its intention to effect a Subsequent Financing ("PRE-NOTICE") within three (3) Trading Days of receiving an applicable offer, which Pre-Notice shall ask such Preferred Stockholder if it wants to review the details of such financing. Upon the request of a Preferred Stockholder, and only upon a request by such Preferred Stockholder within three (3) Trading Days of receipt of a Pre-Notice, the Company shall promptly, but no later than two (2) Trading Days after such request, deliver a Rights Notice to such Preferred Stockholder. The Rights Notice shall describe, in reasonable detail, the proposed Subsequent Financing, the names and investment amounts of all investors participating in the Subsequent Financing (if known), the proposed closing date of the Subsequent Financing, which shall be no earlier than ten (10) Trading Days from the date of the Rights Notice, and all of the terms and conditions thereof and proposed definitive documentation to be entered into in connection therewith. The Rights Notice shall provide each Preferred Stockholder an option (the "RIGHTS OPTION") during the ten (10) Trading Days following delivery of the Rights Notice (the "OPTION PERIOD") to inform the Company whether such Preferred Stockholder will purchase up to its PRO RATA portion of all or a portion of the securities being offered in such Subsequent Financing on the same, absolute terms and conditions as contemplated by such Subsequent Financing. If any Preferred Stockholder elects not to participate in any such Subsequent Financing, the other Preferred Stockholders may therein participate on a PRO RATA basis. For purposes of this Section, all references to "PRO RATA" means, for any Preferred Stockholder electing to participate in such Subsequent Financing, the percentage obtained by dividing (x) the number of Preferred Shares held by such Preferred Stockholder at the Closing by (y) the total number of all of the Preferred Shares outstanding. Delivery of any Rights Notice constitutes a representation and warranty by the Company that there are no other material terms and conditions, arrangements, agreements or otherwise except for those disclosed in the Rights Notice, to provide additional compensation to any party participating in any proposed Subsequent Financing, including, but not limited to, additional compensation based on changes in the Purchase Price or any type of reset or adjustment of a purchase or conversion price or to issue additional securities at any time after the closing date of a Subsequent Financing. If the Company does not receive notice of exercise of the Rights Option from the Preferred Stockholder within the Option Period, the Company shall have the right to close the Subsequent Financing on the scheduled closing date with a third party; PROVIDED that all of the material terms and conditions of the closing are the same as those provided to the Preferred Stockholder in the Rights Notice. If the closing of the proposed Subsequent Financing does not occur that date, any closing of the contemplated Subsequent Financing or any other Subsequent Financing shall be subject to all of the provisions of this SECTION 3.22(A), including, without limitation, the delivery of a new Rights Notice. The provisions of this SECTION 3.22(A) shall not apply to issuances of securities in a Permitted Financing.

        (b)    For purposes of this Agreement, a Permitted Financing (as defined hereinafter) shall not be considered a Subsequent Financing. A "PERMITTED FINANCING" shall mean (i) securities issued (other than for cash) in

connection with a merger, acquisition, or consolidation that do no exceed 10% of the outstanding Common Stock of the Company as of the date hereof (such percentage subject to adjustment consistent with the terms of SECTION 5 of the Certificate of Designation), (ii) securities issued pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding on or prior to the date of this Agreement or issued pursuant to this Agreement (so long as the conversion or exercise price in such securities are not amended to lower such price and/or adversely affect the Purchasers), (iii) Common Stock issued or the issuance or grants of options to purchase Common Stock pursuant to the Company's stock option plans and employee stock purchase plans that either (x) exist on the date hereof, or (y) do not exceed ten percent (10%) of the outstanding Common Stock of the Company as of the date hereof (such percentage subject to adjustment consistent with the terms of SECTION 5 of the Certificate of Designation), and (v) any warrants issued to the placement agent and its designees for the transactions contemplated by this Agreement.

<div align="center">18</div>

<PAGE>

        (c)    Nothing herein shall prohibit the Company from establishing an employee stock option, restricted stock or other form of equity incentive plan for employees, officers or directors of the Company, and any awards made under such plan or exercises of such awards by the recipients thereof shall be deemed to be a Permitted Financing.

        SECTION 3.23    APPROVAL OF ACQUISITIONS. So long as any shares of the Series A Preferred Stock remain outstanding, the Company shall not effect, or agree to effect, an acquisition or buy out of or with any entity (including without limitation the acquisition of a substantial portion of the outstanding securities or assets of another entity other than in the ordinary course of business), or a consolidation or merger of the Company with or into any other corporation or corporations (or other entity or entities), or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of related transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed, without the affirmative vote or consent of the holders of at least seventy-five percent (75%) of the Preferred Shares outstanding at the time.

        SECTION 3.24    SARBANES-OXLEY ACT. The Company shall use its best efforts to be in compliance with the applicable provisions of the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder, as required under such Act.

<div align="center">ARTICLE IV<br>CONDITIONS</div>

        SECTION 4.1    CONDITIONS PRECEDENT TO THE OBLIGATION OF THE COMPANY TO SELL THE SHARES. The obligation hereunder of the Company to issue and sell the Preferred Shares and the Warrants to the Purchasers is subject to the satisfaction or waiver, at or before the Closing, of each of the conditions set forth below. These conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion.

        (a)    ACCURACY OF EACH PURCHASER'S REPRESENTATIONS AND WARRANTIES. The representations and warranties of each Purchaser shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that are expressly made as of a particular date, which shall be true and correct in all material respects as of such date.

(b)    PERFORMANCE BY THE PURCHASERS. Each Purchaser shall have performed, satisfied and complied in all respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Purchaser at or prior to the Closing.

(c)    NO INJUNCTION. No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction which prohibits the consummation of any of the transactions contemplated by this Agreement.

(d)    DELIVERY OF PURCHASE PRICE. The Purchase Price for the Preferred Shares and Warrants has been delivered to the escrow agent pursuant to the Escrow Agreement.

(e)    DELIVERY OF TRANSACTION DOCUMENTS. The Transaction Documents have been duly executed and delivered by the Purchasers to the Company.

SECTION 4.2    CONDITIONS PRECEDENT TO THE OBLIGATION OF THE PURCHASERS TO PURCHASE THE Shares. The obligation hereunder of each Purchaser to acquire and pay for the Preferred Shares and the Warrants is subject to the satisfaction or waiver, at or before the Closing, of each of the conditions set forth below. These conditions are for each Purchaser's sole benefit and may be waived by such Purchaser at any time in its sole discretion.

19

<PAGE>

(a)    ACCURACY OF THE COMPANY'S REPRESENTATIONS AND WARRANTIES. Each of the representations and warranties of the Company in this Agreement and the Registration Rights Agreement shall be true and correct in all respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that are expressly made as of a particular date), which shall be true and correct in all respects as of such date.

(b)    PERFORMANCE BY THE COMPANY. The Company shall have performed, satisfied and complied in all respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing.

(c)    NO SUSPENSION, ETC. Trading in the Company's Common Stock shall not have been suspended by the Commission or the OTC Bulletin Board (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the applicable Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg Financial Markets ("Bloomberg") shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by Bloomberg, or on the New York Stock Exchange, nor shall a banking moratorium have been declared either by the United States or New York State authorities, nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity or crisis of such magnitude in its effect on, or any material adverse change in any financial market which, in each case, in the judgment of such Purchaser, makes it impracticable or inadvisable to purchase the Preferred Shares.

(d)    NO INJUNCTION. No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction which

prohibits the consummation of any of the transactions contemplated by this Agreement.

(e)    NO PROCEEDINGS OR LITIGATION. No action, suit or proceeding before any arbitrator or any governmental authority shall have been commenced, and no investigation by any governmental authority shall have been threatened, against the Company or any Subsidiary, or any of the officers, directors or affiliates of the Company or any Subsidiary seeking to restrain, prevent or change the transactions contemplated by this Agreement, or seeking damages in connection with such transactions.

(f)    CERTIFICATE OF DESIGNATION OF RIGHTS AND PREFERENCES. Prior to the Closing, the Certificate of Designation in the form of EXHIBIT B attached hereto shall have been filed with the Secretary of State of Delaware.

(g)    OPINION OF COUNSEL, ETC. At the Closing, the Purchasers shall have received an opinion of counsel to the Company, dated the date of the Closing, in substantially the form of EXHIBIT H hereto, and such other certificates and documents as the Purchasers or its counsel shall reasonably require incident to the Closing.

(h)    REGISTRATION RIGHTS AGREEMENT. At the Closing, the Company shall have executed and delivered the Registration Rights Agreement to each Purchaser.

(i)    CERTIFICATES. The Company shall have executed and delivered to the Purchasers the certificates (in such denominations as such Purchaser shall request) for the Preferred Shares and the Warrants being acquired by such Purchaser at the Closing (in such denominations as such Purchaser shall request).

<div align="center">20</div>

<PAGE>

(j)    RESOLUTIONS. The Board of Directors of the Company shall have adopted resolutions consistent with SECTION 2.1(B) hereof in a form reasonably acceptable to such Purchaser (the "RESOLUTIONS").

(k)    RESERVATION OF SHARES. So long as any of the Preferred Shares or Warrants remain outstanding, the Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, no less than one hundred twenty percent (120%) of the aggregate number of shares of Common Stock needed to provide for the issuance of the Conversion Shares and no less than one hundred percent (100%) of the aggregate number of shares of Common Stock needed to provide for the issuance of the Warrant Shares.

(l)    TRANSFER AGENT INSTRUCTIONS. As of the Closing Date, the Irrevocable Transfer Agent Instructions, in the form of EXHIBIT G attached hereto, shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(m)    LOCK-UP AGREEMENT. As of the Closing Date, the persons listed on SCHEDULE 3.20 hereto shall have delivered to the Purchasers a fully executed Lock-Up Agreement in the form of EXHIBIT E attached hereto.

(n)    SECRETARY'S CERTIFICATE. The Company shall have delivered to such Purchaser a secretary's certificate, dated as of the Closing Date, as to (i) the Resolutions, (ii) the Certificate, (iii) the Bylaws, (iv) the Certificate of Designation, each as in effect at the Closing, and (iv) the authority and incumbency of the officers of the Company executing the

Transaction Documents and any other documents required to be executed or delivered in connection therewith.

(o)     OFFICER'S CERTIFICATE. The Company shall have delivered to the Purchasers a certificate of an executive officer of the Company, dated as of the Closing Date, confirming the accuracy of the Company's representations, warranties and covenants as of the Closing Date and confirming the compliance by the Company with the conditions precedent set forth in this SECTION 4.2 as of the Closing Date.

(p)     ESCROW AGREEMENT. At the Closing, the Escrow Agreement shall have been executed by, and delivered in the form of EXHIBIT F attached hereto, the parties thereto.

(q)     MATERIAL ADVERSE EFFECT. No Material Adverse Effect shall have occurred at or before the Closing Date.

ARTICLE V
STOCK CERTIFICATE LEGEND

SECTION 5.1     LEGEND. Each certificate representing the Preferred Shares and the Warrants, and, if appropriate, securities issued upon conversion or exercise thereof (or securities issued in connection with SECTION 1.4, shall be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required by applicable state securities or "blue sky" laws):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR MARKETING WORLDWIDE CORPORATION SHALL HAVE RECEIVED AN OPINION OF COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

21

<PAGE>

The Company agrees to reissue certificates representing any of the Conversion Shares and the Warrant Shares, without the legend set forth above if at such time, prior to making any transfer of any such securities, such holder thereof shall give written notice to the Company describing the manner and terms of such transfer and removal as the Company may reasonably request. Such proposed transfer and removal will not be effected until: (a) either (i) the Company has received an opinion of counsel reasonably satisfactory to the Company, to the effect that the registration of the Conversion Shares or the Warrant Shares under the Securities Act is not required in connection with such proposed transfer, (ii) a registration statement under the Securities Act covering such proposed disposition has been filed by the Company with the Commission and has become effective under the Securities Act, (iii) the Company has received other evidence reasonably satisfactory to the Company that such registration and qualification under the Securities Act and state securities laws are not required, or (iv) the holder provides the Company with reasonable assurances that such security can be sold pursuant to Rule 144 under the Securities Act; and (b) either (i) the Company has received an opinion of counsel reasonably satisfactory to the Company, to the effect that registration or qualification under the securities or "blue sky" laws of any state is not required in connection with such proposed disposition, or (ii) compliance with applicable state securities or "blue sky" laws has been effected or a valid

exemption exists with respect thereto. The Company will respond to any such notice from a holder within five (5) business days. In the case of any proposed transfer under this SECTION 5.1, the Company will use reasonable efforts to comply with any such applicable state securities or "blue sky" laws, but shall in no event be required, (x) to qualify to do business in any state where it is not then qualified, (y) to take any action that would subject it to tax or to the general service of process in any state where it is not then subject, or (z) to comply with state securities or "blue sky" laws of any state for which registration by coordination is unavailable to the Company. The restrictions on transfer contained in this SECTION 5.1 shall be in addition to, and not by way of limitation of, any other restrictions on transfer contained in any other section of this Agreement. Whenever a certificate representing the Conversion Shares or Warrant Shares is required to be issued to a Purchaser without a legend, in lieu of delivering physical certificates representing the Conversion Shares or Warrant Shares (provided that a registration statement under the Securities Act providing for the resale of the Warrant Shares and Conversion Shares is then in effect), the Company shall cause its transfer agent to electronically transmit the Conversion Shares or Warrant Shares to a Purchaser by crediting the account of such Purchaser or such Purchaser's Prime Broker with the Depository Trust Company ("DTC") through its Deposit Withdrawal Agent Commission ("DWAC") system (to the extent not inconsistent with any provisions of this Agreement).

<center>ARTICLE VI<br>INDEMNIFICATION</center>

SECTION 6.1    GENERAL INDEMNITY. The Company agrees to indemnify and hold harmless the Purchasers (and their respective directors, officers, managers, partners, members, shareholders, affiliates, agents, successors and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by the Purchasers as a result of any inaccuracy in or breach of the representations, warranties or covenants made by the Company herein.

<center>22</center>

<PAGE>

SECTION 6.2    INDEMNIFICATION PROCEDURE. Any party entitled to indemnification under this ARTICLE VI (an "INDEMNIFIED PARTY") will give written notice to the indemnifying party of any matters giving rise to a claim for indemnification; PROVIDED that the failure of any party entitled to indemnification hereunder to give notice as provided herein shall not relieve the indemnifying party of its obligations under this ARTICLE VI except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any action, proceeding or claim is brought against an indemnified party in respect of which indemnification is sought hereunder, the indemnifying party shall be entitled to participate in and, unless in the reasonable judgment of the indemnified party a conflict of interest between it and the indemnifying party may exist with respect of such action, proceeding or claim, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party. In the event that the indemnifying party advises an indemnified party that it will contest such a claim for indemnification hereunder, or fails, within thirty (30) days of receipt of any indemnification notice to notify, in writing, such person of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the indemnified party may, at its option, defend, settle or otherwise compromise or pay such action or claim. In any event, unless and until the indemnifying party elects in writing to assume and does so assume the defense of any such claim,

proceeding or action, the indemnified party's costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding shall be losses subject to indemnification hereunder. The indemnified party shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the indemnified party which relates to such action or claim. The indemnifying party shall keep the indemnified party fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. If the indemnifying party elects to defend any such action or claim, then the indemnified party shall be entitled to participate in such defense with counsel of its choice at its sole cost and expense. The indemnifying party shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent. Notwithstanding anything in this ARTICLE VI to the contrary, the indemnifying party shall not, without the indemnified party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof which imposes any future obligation on the indemnified party or which does not include, as an unconditional term thereof, the giving by the claimant or the plaintiff to the indemnified party of a release from all liability in respect of such claim. The indemnification required by this ARTICLE VI shall be made by periodic payments of the amount thereof during the course of investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred, so long as the indemnified party irrevocably agrees to refund such moneys if it is ultimately determined by a court of competent jurisdiction that such party was not entitled to indemnification. The indemnity agreements contained herein shall be in addition to (a) any cause of action or similar rights of the indemnified party against the indemnifying party or others, and (b) any liabilities the indemnifying party may be subject to pursuant to the law.

<div align="center">

ARTICLE VII

MISCELLANEOUS

</div>

     SECTION 7.1     FEES AND EXPENSES. Except as otherwise set forth in this Agreement and the other Transaction Documents, each party shall pay the fees and expenses of its advisors, counsel, accountants and other experts, if any, and all other expenses, incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. Notwithstanding the foregoing sentence, the Company shall pay all reasonable attorneys' fees and expenses (including disbursements and out-of-pocket expenses) incurred by the Purchasers in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated thereunder, which payment shall be made at the Closing, (ii) the filing and declaration of effectiveness by the

<div align="center">23</div>

&lt;PAGE&gt;

Commission of the Registration Statement and (iii) any amendments, modifications or waivers of this Agreement or any of the other Transaction Documents. The Company shall pay all reasonable fees and expenses incurred by the Purchasers in connection with the enforcement of this Agreement or any of the other Transaction Documents, including, without limitation, all reasonable attorneys' fees and expenses but only if the Purchasers are successful in any litigation or arbitration relating to such enforcement.

     SECTION 7.2     SPECIFIC ENFORCEMENT, CONSENT TO JURISDICTION.

     (a)     The Company and the Purchasers acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this

Agreement or the other Transaction Documents were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement or the Registration Rights Agreement and to enforce specifically the terms and provisions hereof or thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

(b)    Each of the Company and the Purchasers (i) hereby irrevocably submits to the jurisdiction of the United States District Court sitting in the Southern District of New York and the courts of the State of New York located in New York county for the purposes of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Transaction Documents or the transactions contemplated hereby or thereby and (ii) hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Each of the Company and the Purchasers consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this SECTION 7.2 shall affect or limit any right to serve process in any other manner permitted by law.

SECTION 7.3    ENTIRE AGREEMENT; AMENDMENT. This Agreement and the Transaction Documents contains the entire understanding and agreement of the parties with respect to the matters covered hereby and, except as specifically set forth herein or in the Transaction Documents, neither the Company nor any of the Purchasers makes any representations, warranty, covenant or undertaking with respect to such matters and they supersede all prior understandings and agreements with respect to said subject matter, all of which are merged herein. No provision of this Agreement may be waived or amended other than by a written instrument signed by the Company and the holders of at least seventy-five percent (75%) of the Preferred Shares then outstanding, and no provision hereof may be waived other than by an a written instrument signed by the party against whom enforcement of any such amendment or waiver is sought. No such amendment shall be effective to the extent that it applies to less than all of the holders of the Preferred Shares then outstanding. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents or holders of Preferred Shares, as the case may be.

SECTION 7.4    NOTICES. Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery by telex (with correct answer back received), telecopy or facsimile at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing

24

<PAGE>

by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: If to the Company: Marketing Worldwide Corporation 2212 Grand Commerce Drive Howell, Michigan 48855 Attention: James Marvin Tel.

No.: (517) 540-0045 Fax No.: (517) 540-0923

    with copies to:        Weed & Co. LLP
                        Attention: Richard O. Weed
                        4695 Mac Arthur Court, Suite 1430
                        Newport Beach, CA 92660
                        Tel. No.: (949) 475-9086
                        Fax No.: (949) 475-9087

    If to any Purchaser:     At the address of such Purchaser set forth on
                        EXHIBIT A to this Agreement, with copies to
                        Purchaser's counsel (which copies shall not
                        constitute notice to such purchaser) as set
                        forth on EXHIBIT A or as specified in writing by
                        such Purchaser.

    with copies to:        Sadis & Goldberg LLP
                        551 Fifth Avenue, 21st Floor
                        New York, New York 10176
                        Attention: Steven Huttler, Esq.
                        Tel No.: (212) 973-3793
                        Fax No.: (212) 973-3796

Any party hereto may from time to time change its address for notices by giving at least ten (10) days written notice of such changed address to the other parties hereto.

SECTION 7.5      WAIVERS. No waiver by either party of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any other provisions, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

SECTION 7.6      HEADINGS. The article, section and subsection headings in this Agreement are for convenience only and shall not constitute a part of this Agreement for any other purpose and shall not be deemed to limit or affect any of the provisions hereof.

SECTION 7.7      SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.

SECTION 7.8      NO THIRD PARTY BENEFICIARIES. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

                          25

&lt;PAGE&gt;

SECTION 7.9      GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction. This Agreement shall not be interpreted or construed with any presumption against the party causing this Agreement to be drafted.

SECTION 7.10     SURVIVAL. The representations and warranties of the Company and the Purchasers shall survive the execution and delivery hereof and the Closing hereunder.

SECTION 7.11     COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement, and shall become effective when counterparts have been signed by each party and delivered to the other parties hereto, it being understood that all parties need not sign the same counterpart. In the event that any signature is delivered by facsimile or electronic mail transmission, such signature shall create a valid binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were the original thereof.

SECTION 7.12     PUBLICITY. The Company agrees that it will not disclose, and will not include in any public announcement, the name of the Purchasers without the consent of the Purchasers unless and until such disclosure is required by law or applicable regulation, and then only to the extent of such requirement.

SECTION 7.13     SEVERABILITY. The provisions of this Agreement and the Transaction Documents are severable and, in the event that any court of competent jurisdiction shall determine that any one or more of the provisions or part of the provisions contained in this Agreement or the Transaction Documents shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement or the Transaction Documents and such provision shall be reformed and construed as if such invalid or illegal or unenforceable provision, or part of such provision, had never been contained herein, so that such provisions would be valid, legal and enforceable to the maximum extent possible.

SECTION 7.14     FURTHER ASSURANCES. From and after the date of this Agreement, upon the request of any Purchaser or the Company, each of the Company and the Purchasers shall execute and deliver such instrument, documents and other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement, the Preferred Shares, the Conversion Shares, the Warrants, the Warrant Shares, the Certificate of Designation and the Registration Rights Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

26

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officer as of the date first above written.

MARKETING WORLDWIDE CORPORATION

By: /s/ Michael Winzkowski
    ---------------------
Name: Michael Winzkowski
Title: Chief Executive Officer

PURCHASER
Vision Opportunity Master Fund, Ltd.

```
                              By: /s/ Adam Benowitz
                                  -----------------
                              Name: Adam Benowitz
                              Title: Portfolio Manager


                              27
</TEXT>
</DOCUMENT>
```

# Exhibit D

```
<DOCUMENT>
<TYPE>EX-4.11
<SEQUENCE>9
<FILENAME>mww_8k-ex0411.txt
<DESCRIPTION>SERIES J COMMON STOCK PURCHASE WARRANT
<TEXT>
<PAGE>
```

Exhibit 4.11

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE
NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE
"SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED
OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER
APPLICABLE STATE SECURITIES LAWS OR THE ISSUER SHALL HAVE RECEIVED AN OPINION OF
COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT REGISTRATION OF SUCH
SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE
SECURITIES LAWS IS NOT REQUIRED.

SERIES J WARRANT TO PURCHASE

SHARES OF COMMON STOCK

OF

MARKETING WORLDWIDE CORPORATION

Expires June 23, 2008

No.: W-J-07-01                                    Number of Shares: 5,000,000
Date of Issuance: April 23, 2007

     FOR VALUE RECEIVED, the undersigned, Marketing Worldwide Corporation, a
Delaware corporation (together with its successors and assigns, the "ISSUER"),
hereby certifies that Vision Opportunity Master Fund, Ltd. or its registered
assigns is entitled to subscribe for and purchase, during the Term (as
hereinafter defined), up to 5,000,000 shares (subject to adjustment as
hereinafter provided) of the duly authorized, validly issued, fully paid and
non-assessable Common Stock of the Issuer, at an exercise price per share equal
to the Warrant Price then in effect, subject, however, to the provisions and
upon the terms and conditions hereinafter set forth. Capitalized terms used in
this Warrant and not otherwise defined herein shall have the respective meanings
specified in SECTION 8 hereof.

     1.    TERM. The term of this Warrant shall commence on April 23, 2007 and
shall expire at 6:00 p.m., Eastern Time, on June 23, 2008 (such period being the
"TERM").

     2.    METHOD OF EXERCISE; PAYMENT; ISSUANCE OF NEW WARRANT; TRANSFER AND
EXCHANGE.

          (a)    TIME OF EXERCISE. The purchase rights represented by this
Warrant may be exercised in whole or in part during the Term.

          (b)    METHOD OF EXERCISE. The Holder hereof may exercise this
Warrant, in whole or in part, by the surrender of this Warrant (with the
exercise form attached hereto duly executed) at the principal office of the
Issuer, and by the payment to the Issuer of an amount of consideration therefor

equal to the Warrant Price in effect on the date of such exercise multiplied by the number of shares of Warrant Stock with respect to which this Warrant is then being exercised, payable by certified or official bank check or by wire transfer to an account designated by the Issuer.

1

<PAGE>

     (c)   ISSUANCE OF STOCK CERTIFICATES. In the event of any exercise of this Warrant in accordance with and subject to the terms and conditions hereof, certificates for the shares of Warrant Stock so purchased shall be dated the date of such exercise and delivered to the Holder hereof within a reasonable time, not exceeding three (3) Trading Days after such exercise (the "DELIVERY DATE") or, at the request of the Holder (provided that a registration statement under the Securities Act providing for the resale of the Warrant Stock is then in effect), issued and delivered to the Depository Trust Company ("DTC") account on the Holder's behalf via the Deposit Withdrawal Agent Commission System ("DWAC") within a reasonable time, not exceeding three (3) Trading Days after such exercise, and the Holder hereof shall be deemed for all purposes to be the holder of the shares of Warrant Stock so purchased as of the date of such exercise. The Holder shall deliver this original Warrant, or an indemnification undertaking with respect to such Warrant in the case of its loss, theft or destruction, at such time that this Warrant is fully exercised. With respect to partial exercises of this Warrant, the Issuer shall keep written records for the Holder of the number of shares of Warrant Stock exercised as of each date of exercise.

     (d)   COMPENSATION FOR BUY-IN ON FAILURE TO TIMELY DELIVER CERTIFICATES UPON EXERCISE. In addition to any other rights available to the Holder, if the Issuer fails to cause its transfer agent to transmit to the Holder a certificate or certificates representing the Warrant Stock pursuant to an exercise on or before the Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Stock which the Holder anticipated receiving upon such exercise (a "BUY-IN"), then the Issuer shall (1) pay in cash to the Holder the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of shares of Warrant Stock that the Issuer was required to deliver to the Holder in connection with the exercise at issue TIMES (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of shares of Warrant Stock for which such exercise was not honored or deliver to the Holder the number of shares of Common Stock that would have been issued had the Issuer timely complied with its exercise and delivery obligations hereunder. For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Issuer shall be required to pay the Holder $1,000. The Holder shall provide the Issuer written notice indicating the amounts payable to the Holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Issuer. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Issuer's failure to timely deliver certificates representing shares of Common Stock upon exercise of this Warrant as required pursuant to the terms hereof.

     (e)   TRANSFERABILITY OF WARRANT. Subject to SECTION 2(G) hereof,

this Warrant may be transferred by a Holder, in whole or in part, without the consent of the Issuer. If transferred pursuant to this paragraph, this Warrant may be transferred on the books of the Issuer by the Holder hereof in person or by duly authorized attorney, upon surrender of this Warrant at the principal office of the Issuer, properly endorsed (by the Holder executing an assignment in the form attached hereto) and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer. This Warrant is

2

<PAGE>

exchangeable at the principal office of the Issuer for Warrants to purchase the same aggregate number of shares of Warrant Stock, each new Warrant to represent the right to purchase such number of shares of Warrant Stock as the Holder hereof shall designate at the time of such exchange. All Warrants issued on transfers or exchanges shall be dated the Original Issue Date and shall be identical with this Warrant except as to the number of shares of Warrant Stock issuable pursuant thereto.

        (f)    CONTINUING RIGHTS OF HOLDER. The Issuer will, at the time of or at any time after each exercise of this Warrant, upon the request of the Holder hereof, acknowledge in writing the extent, if any, of its continuing obligation to afford to such Holder all rights to which such Holder shall continue to be entitled after such exercise in accordance with the terms of this Warrant; PROVIDED that if any such Holder shall fail to make any such request, the failure shall not affect the continuing obligation of the Issuer to afford such rights to such Holder.

        (g)    COMPLIANCE WITH SECURITIES LAWS.

        (i)    The Holder of this Warrant, by acceptance hereof, acknowledges that this Warrant and the shares of Warrant Stock to be issued upon exercise hereof are being acquired solely for the Holder's own account and not as a nominee for any other party, and for investment, and that the Holder will not offer, sell or otherwise dispose of this Warrant or any shares of Warrant Stock to be issued upon exercise hereof except pursuant to an effective registration statement, or an exemption from registration, under the Securities Act and any applicable state securities laws.

        (ii)   Except as provided in paragraph (iii) below, this Warrant and all certificates representing shares of Warrant Stock issued upon exercise hereof shall be stamped or imprinted with a legend in substantially the following form:

        THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON
        EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
        ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE
        SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE
        DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND
        UNDER APPLICABLE STATE SECURITIES LAWS OR THE ISSUER SHALL
        HAVE RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO
        THE ISSUER THAT REGISTRATION OF SUCH SECURITIES UNDER THE
        SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE
        SECURITIES LAWS IS NOT REQUIRED.

        (iii) The Issuer agrees to reissue this Warrant or certificates representing any of the Warrant Stock, without the legend set forth above if at such time, prior to making any transfer of any such securities, the Holder shall give written notice to the Issuer describing

the manner and terms of such transfer. Such proposed transfer will not be
effected until: (a) either (i) the Issuer has received an opinion of
counsel reasonably satisfactory to the Issuer, to the effect that the
registration of such securities under the Securities Act is not required
in connection with such proposed transfer, (ii) a registration statement
under the Securities Act covering such proposed disposition has been filed
by the Issuer with the Securities and Exchange Commission and has become

3

<PAGE>

effective under the Securities Act, (iii) the Issuer has received other
evidence reasonably satisfactory to the Issuer that such registration and
qualification under the Securities Act and state securities laws are not
required, or (iv) the Holder provides the Issuer with reasonable
assurances that such security can be sold pursuant to Rule 144 under the
Securities Act; and (b) either (i) the Issuer has received an opinion of
counsel reasonably satisfactory to the Issuer, to the effect that
registration or qualification under the securities or "blue sky" laws of
any state is not required in connection with such proposed disposition, or
(ii) compliance with applicable state securities or "blue sky" laws has
been effected or a valid exemption exists with respect thereto. The Issuer
will respond to any such notice from a holder within three (3) Trading
Days. In the case of any proposed transfer under this SECTION 2(G), the
Issuer will use reasonable efforts to comply with any such applicable
state securities or "blue sky" laws, but shall in no event be required,
(x) to qualify to do business in any state where it is not then qualified,
(y) to take any action that would subject it to tax or to the general
service of process in any state where it is not then subject, or (z) to
comply with state securities or "blue sky" laws of any state for which
registration by coordination is unavailable to the Issuer. The
restrictions on transfer contained in this SECTION 2(G) shall be in
addition to, and not by way of limitation of, any other restrictions on
transfer contained in any other section of this Warrant. Whenever a
certificate representing the Warrant Stock is required to be issued to a
the Holder without a legend, in lieu of delivering physical certificates
representing the Warrant Stock, the Issuer shall cause its transfer agent
to electronically transmit the Warrant Stock to the Holder by crediting
the account of the Holder's Prime Broker with DTC through its DWAC system
(to the extent not inconsistent with any provisions of this Warrant or the
Purchase Agreement).

         (h)    ACCREDITED INVESTOR STATUS. In no event may the Holder
exercise this Warrant in whole or in part unless the Holder is an "accredited
investor" as defined in Regulation D under the Securities Act.

         3.    STOCK FULLY PAID; RESERVATION AND LISTING OF SHARES; COVENANTS.

         (a)    STOCK FULLY PAID. The Issuer represents, warrants, covenants
and agrees that all shares of Warrant Stock which may be issued upon the
exercise of this Warrant or otherwise hereunder will, when issued in accordance
with the terms of this Warrant, be duly authorized, validly issued, fully paid
and non-assessable and free from all taxes, liens and charges. The Issuer
further covenants and agrees that during the period within which this Warrant
may be exercised, the Issuer will at all times have authorized and reserved for
the purpose of the issuance upon exercise of this Warrant a number of authorized
but unissued shares of Common Stock equal to at least one hundred percent (100%)
of the number of shares of Common Stock issuable upon exercise of this Warrant
without regard to any limitations on exercise.

    (b)    RESERVATION. If any shares of Common Stock required to be reserved for issuance upon exercise of this Warrant or as otherwise provided hereunder require registration or qualification with any Governmental Authority under any federal or state law before such shares may be so issued, the Issuer will in good faith use its best efforts as expeditiously as possible at its expense to cause such shares to be duly registered or qualified. If the Issuer shall list any shares of Common Stock on any securities exchange or market it will, at its expense, list thereon, and maintain and increase when necessary such listing, of, all shares of Warrant Stock from time to time issued upon exercise of this Warrant or as otherwise provided hereunder (PROVIDED that such Warrant Stock has been registered pursuant to a registration statement under the Securities Act then in effect), and, to the extent permissible under the

<div align="center">4</div>

&lt;PAGE&gt;

applicable securities exchange rules, all unissued shares of Warrant Stock which are at any time issuable hereunder, so long as any shares of Common Stock shall be so listed. The Issuer will also so list on each securities exchange or market, and will maintain such listing of, any other securities which the Holder of this Warrant shall be entitled to receive upon the exercise of this Warrant if at the time any securities of the same class shall be listed on such securities exchange or market by the Issuer.

    (c)    COVENANTS. The Issuer shall not by any action including, without limitation, amending the Certificate of Incorporation or the by-laws of the Issuer, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder hereof against dilution (to the extent specifically provided herein) or impairment. Without limiting the generality of the foregoing, the Issuer will (i) not permit the par value, if any, of its Common Stock to exceed the then effective Warrant Price, (ii) not amend or modify any provision of the Certificate of Incorporation or by-laws of the Issuer in any manner that would adversely affect the rights of the Holders of the Warrants, (iii) take all such action as may be reasonably necessary in order that the Issuer may validly and legally issue fully paid and nonassessable shares of Common Stock, free and clear of any liens, claims, encumbrances and restrictions (other than as provided herein) upon the exercise of this Warrant, and (iv) use its best efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof as may be reasonably necessary to enable the Issuer to perform its obligations under this Warrant.

    (d)    LOSS, THEFT, DESTRUCTION, MUTILATION OF WARRANTS. Upon receipt of evidence satisfactory to the Issuer of the ownership of and the loss, theft, destruction or mutilation of any Warrant and, in the case of any such loss, theft or destruction, upon receipt of indemnity or security satisfactory to the Issuer or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Issuer will make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same number of shares of Common Stock.

    (e)    PAYMENT OF TAXES. The Issuer will pay any documentary stamp taxes attributable to the initial issuance of the Warrant Stock issuable upon exercise of this Warrant; PROVIDED, HOWEVER, that the Issuer shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the issuance or delivery of any certificates representing Warrant

Stock in a name other than that of the Holder in respect to which such shares are issued.

4.    ADJUSTMENT OF WARRANT PRICE AND NUMBER OF SHARES ISSUABLE UPON EXERCISE. The Warrant Price and the number of shares of Warrant Stock that may be purchased upon exercise of this Warrant shall be subject to adjustment from time to time as set forth in this SECTION 4. The Issuer shall give the Holder notice of any event described below which requires an adjustment pursuant to this SECTION 4 in accordance with the notice provisions set forth in SECTION 5.

(a)    RECAPITALIZATION, REORGANIZATION, RECLASSIFICATION, CONSOLIDATION, MERGER OR SALE.

(i)    In case the Issuer after the Original Issue Date shall do any of the following (each, a "TRIGGERING EVENT"): (a) consolidate or merge with or into any other Person and the Issuer shall not be the continuing or surviving Person of such consolidation or merger, or (b) permit any other Person to consolidate with or merge into the Issuer and

5

<PAGE>

the Issuer shall be the continuing or surviving Person but, in connection with such consolidation or merger, any Capital Stock of the Issuer shall be changed into or exchanged for Securities of any other Person or cash or any other property, or (c) transfer all or substantially all of its properties or assets to any other Person, or (d) effect a capital reorganization or reclassification of its Capital Stock, then, and in the case of each such Triggering Event, proper provision shall be made to the Warrant Price and the number of shares of Warrant Stock that may be purchased upon exercise of this Warrant so that, upon the basis and the terms and in the manner provided in this Warrant, the Holder of this Warrant shall be entitled upon the exercise hereof at any time after the consummation of such Triggering Event, to the extent this Warrant is not exercised prior to such Triggering Event, to receive at the Warrant Price as adjusted to take into account the consummation of such Triggering Event, in lieu of the Common Stock issuable upon such exercise of this Warrant prior to such Triggering Event, the Securities, cash and property to which such Holder would have been entitled upon the consummation of such Triggering Event if such Holder had exercised the rights represented by this Warrant immediately prior thereto (including the right of a shareholder to elect the type of consideration it will receive upon a Triggering Event), subject to adjustments (subsequent to such corporate action) as nearly equivalent as possible to the adjustments provided for elsewhere in this SECTION 4, and the Warrant Price shall be adjusted to equal the product of (A) the closing price of the common stock of the continuing or surviving Person as a result of such Triggering Event as of the date immediately preceding the date of the consummation of such Triggering Event multiplied by (B) the quotient of (i) the Warrant Price divided by (ii) the Per Share Market Value of the Common Stock as of the date immediately preceding the Original Issue Date: PROVIDED, HOWEVER, the Holder at its option may elect to receive an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula. Immediately upon the occurrence of a Triggering Event, the Issuer shall notify the Holder in writing of such Triggering Event and provide the calculations in determining the number of shares of Warrant Stock issuable upon exercise of the new warrant and the adjusted Warrant Price. Upon the Holder's request, the continuing or surviving Person as a result of such Triggering Event shall issue to the Holder a new warrant of like tenor evidencing the right to purchase the adjusted number of shares of

Warrant Stock and the adjusted Warrant Price pursuant to the terms and provisions of this SECTION 4(A)(I). Notwithstanding the foregoing to the contrary, this SECTION 4(A)(I) shall only apply if the surviving entity pursuant to any such Triggering Event has a class of equity securities registered pursuant to the Securities Exchange Act of 1934, as amended, and its common stock is listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board. In the event that the surviving entity pursuant to any such Triggering Event is not a public company (or similar Person) that is registered pursuant to the Securities Exchange Act of 1934, as amended, or its common stock is not listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board, then the Holder shall have the right to demand that the Issuer pay to the Holder an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula.

        (ii)  In the event that the Holder has elected not to exercise this Warrant prior to the consummation of a Triggering Event and has also elected not to receive an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula pursuant to the provisions of SECTION 4(A)(I) above, so long as the surviving entity pursuant to any Triggering Event is a company that has a class of equity securities registered pursuant to the Securities Exchange Act of

                                6

<PAGE>

1934, as amended, and its common stock is listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board, the surviving entity and/or each Person (other than the Issuer) which may be required to deliver any Securities, cash or property upon the exercise of this Warrant as provided herein shall assume, by written instrument delivered to, and reasonably satisfactory to, the Holder of this Warrant, (A) the obligations of the Issuer under this Warrant (and if the Issuer shall survive the consummation of such Triggering Event, such assumption shall be in addition to, and shall not release the Issuer from, any continuing obligations of the Issuer under this Warrant) and (B) the obligation to deliver to such Holder such Securities, cash or property as, in accordance with the foregoing provisions of this SUBSECTION (A), such Holder shall be entitled to receive, and the surviving entity and/or each such Person shall have similarly delivered to such Holder an opinion of counsel for the surviving entity and/or each such Person, which counsel shall be reasonably satisfactory to such Holder, or in the alternative, a written acknowledgement executed by the President or Chief Financial Officer of the Issuer, stating that this Warrant shall thereafter continue in full force and effect and the terms hereof (including, without limitation, all of the provisions of this SUBSECTION (A)) shall be applicable to the Securities, cash or property which the surviving entity and/or each such Person may be required to deliver upon any exercise of this Warrant or the exercise of any rights pursuant hereto.

        (b)    STOCK DIVIDENDS, SUBDIVISIONS AND COMBINATIONS. If at any time the Issuer shall:

        (i)    make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, shares of Common Stock,

        (ii)   subdivide its outstanding shares of Common Stock into a

larger number of shares of Common Stock, or

       (iii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock,

then (1) the number of shares of Common Stock for which this Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock which a record holder of the same number of shares of Common Stock for which this Warrant is exercisable immediately prior to the occurrence of such event would own or be entitled to receive after the happening of such event, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment.

      (c)    CERTAIN OTHER DISTRIBUTIONS. If at any time the Issuer shall make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive any dividend or other distribution of:

       (i)    cash (other than a cash dividend payable out of earnings or earned surplus legally available for the payment of dividends under the laws of the jurisdiction of incorporation of the Issuer),

<div align="center">7</div>

&lt;PAGE&gt;

       (ii)  any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock), or

       (iii) any warrants or other rights to subscribe for or purchase any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock), then (1) the number of shares of Common Stock for which this Warrant is exercisable shall be adjusted to equal the product of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the Per Share Market Value of Common Stock at the date of taking such record and (B) the denominator of which shall be such Per Share Market Value less the amount allocable to one share of Common Stock of any such cash so distributable and of the fair value (as determined in good faith by the Board of Directors of the Issuer and supported by an opinion from an investment banking firm mutually agreed upon by the Issuer and the Holder) of any and all such evidences of indebtedness, shares of stock, other securities or property or warrants or other subscription or purchase rights so distributable, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment. A reclassification of the Common Stock (other than a change in par value, or from par value to no par value or from no par value to par value) into shares of Common Stock and shares of any other class of stock shall be deemed a distribution by the Issuer to the holders of its Common Stock of such shares of such other class of stock within the meaning of this SECTION 4(C) and, if the outstanding shares of Common Stock shall be

changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock within the meaning of SECTION 4(B).

      (d)    ISSUANCE OF ADDITIONAL SHARES OF COMMON STOCK COMMON STOCK EQUIVALENTS. In the event the Company, shall, at any during the Term, issue or sell any Additional Shares of Common Stock or Common Stock Equivalents (otherwise than as provided in the foregoing SUBSECTIONS (A) THROUGH (C) OF THIS SECTION 4), at a price per share less than the Warrant Price, or without consideration, the Warrant Price then in effect upon each such issuance shall be adjusted to that price (rounded to the nearest cent) determined by multiplying the Warrant Price by a fraction: (1) the numerator of which shall be equal to the SUM of (A) the number of shares of Common Stock outstanding immediately prior to the issuance of such Additional Shares of Common Stock PLUS (B) the number of shares of Common Stock (rounded to the nearest whole share) which the aggregate consideration for the total number of such Additional Shares of Common Stock so issued would purchase at a price per share equal to the then Warrant Price; and (2) the denominator of which shall be equal to the number of shares of Common Stock outstanding immediately after the issuance of such Additional Shares of Common Stock. No adjustment of the number of shares of Common Stock shall be made upon the issuance of any Additional Shares of Common Stock which are issued pursuant to the exercise of any warrants or other subscription or purchase rights or pursuant to the exercise of any conversion or exchange rights in any Common Stock Equivalents if any such adjustment shall previously have been made upon the issuance of such warrants or other rights or upon the issuance of such Common Stock Equivalents (or upon the issuance of any warrant or other rights therefore).

<center>8</center>

&lt;PAGE&gt;

      (e)    OTHER PROVISIONS APPLICABLE TO ADJUSTMENTS UNDER THIS SECTION. The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which this Warrant is exercisable and the Warrant Price then in effect provided for in this SECTION 4:

      (i)    COMPUTATION OF CONSIDERATION. To the extent that any Additional Shares of Common Stock or any Common Stock Equivalents (or any warrants or other rights therefor) shall be issued for cash consideration, the consideration received by the Issuer therefor shall be the amount of the cash received by the Issuer therefor, or, if such Additional Shares of Common Stock or Common Stock Equivalents are offered by the Issuer for subscription, the subscription price, or, if such Additional Shares of Common Stock or Common Stock Equivalents are sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price (in any such case subtracting any amounts paid or receivable for accrued interest or accrued dividends and without taking into account any compensation, discounts or expenses paid or incurred by the Issuer for and in the underwriting of, or otherwise in connection with, the issuance thereof). In connection with any merger or consolidation in which the Issuer is the surviving Person (other than any consolidation or merger in which the previously outstanding shares of Common Stock of the Issuer shall be changed to or exchanged for the stock or other securities of another Person), the amount of consideration therefore shall be, deemed to be the fair value, as determined reasonably and in good faith by the Board, of such portion of the assets and business of the nonsurviving Person as the Board may determine to be attributable to such shares of Common Stock or Common Stock Equivalents, as the case may be. The consideration for any Additional Shares of Common Stock

issuable pursuant to any warrants or other rights to subscribe for or
purchase the same shall be the consideration received by the Issuer for
issuing such warrants or other rights plus the additional consideration
payable to the Issuer upon exercise of such warrants or other rights. The
consideration for any Additional Shares of Common Stock issuable pursuant
to the terms of any Common Stock Equivalents shall be the consideration
received by the Issuer for issuing warrants or other rights to subscribe
for or purchase such Common Stock Equivalents, plus the consideration paid
or payable to the Issuer in respect of the subscription for or purchase of
such Common Stock Equivalents, plus the additional consideration, if any,
payable to the Issuer upon the exercise of the right of conversion or
exchange in such Common Stock Equivalents. In the event of any
consolidation or merger of the Issuer in which the Issuer is not the
surviving Person or in which the previously outstanding shares of Common
Stock of the Issuer shall be changed into or exchanged for the stock or
other securities of another Person, or in the event of any sale of all or
substantially all of the assets of the Issuer for stock or other
securities of any Person, the Issuer shall be deemed to have issued a
number of shares of its Common Stock for stock or securities or other
property of the other Person computed on the basis of the actual exchange
ratio on which the transaction was predicated, and for a consideration
equal to the fair market value on the date of such transaction of all such
stock or securities or other property of the other Person. In the event
any consideration received by the Issuer for any securities consists of
property other than cash, the fair market value thereof at the time of
issuance or as otherwise applicable shall be as determined in good faith
by the Board. In the event Common Stock is issued with other shares or
securities or other assets of the Issuer for consideration which covers
both, the consideration computed as provided in this SECTION 4(G)(I) shall
be allocated among such securities and assets as determined in good faith
by the Board.

9

<PAGE>

          (ii)  WHEN ADJUSTMENTS TO BE MADE. The adjustments required by
this SECTION 4 shall be made whenever and as often as any specified event
requiring an adjustment shall occur, except that any adjustment of the
number of shares of Common Stock for which this Warrant is exercisable
that would otherwise be required may be postponed (except in the case of a
subdivision or combination of shares of the Common Stock, as provided for
in SECTION 4(B)) up to, but not beyond the date of exercise if such
adjustment either by itself or with other adjustments not previously made
adds or subtracts less than one percent (1%) of the shares of Common Stock
for which this Warrant is exercisable immediately prior to the making of
such adjustment. Any adjustment representing a change of less than such
minimum amount (except as aforesaid) which is postponed shall be carried
forward and made (x) as soon as such adjustment, together with other
adjustments required by this SECTION 4 and not previously made, would
result in a minimum adjustment, or (y) on the date of exercise. For the
purpose of any adjustment, any specified event shall be deemed to have
occurred at the close of business on the date of its occurrence.

          (iii) FRACTIONAL INTERESTS. In computing adjustments under
this SECTION 4, fractional interests in Common Stock shall be taken into
account to the nearest one one-hundredth (1/100th) of a share.

          (iv)  WHEN ADJUSTMENT NOT REQUIRED. If the Issuer shall take a
record of the holders of its Common Stock for the purpose of entitling
them to receive a dividend or distribution or subscription or purchase

rights and shall, thereafter and before the distribution to stockholders thereof, legally abandon its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by reason of the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

(h)    FORM OF WARRANT AFTER ADJUSTMENTS. The form of this Warrant need not be changed because of any adjustments in the Warrant Price or the number and kind of Securities purchasable upon the exercise of this Warrant.

(i)    ESCROW OF WARRANT STOCK. If after any property becomes distributable pursuant to this SECTION 4 by reason of the taking of any record of the holders of Common Stock, but prior to the occurrence of the event for which such record is taken, and the Holder exercises this Warrant, any shares of Common Stock issuable upon exercise by reason of such adjustment shall be deemed the last shares of Common Stock for which this Warrant is exercised (notwithstanding any other provision to the contrary herein) and such shares or other property shall be held in escrow for the Holder by the Issuer to be issued to the Holder upon and to the extent that the event actually takes place, upon payment of the current Warrant Price. Notwithstanding any other provision to the contrary herein, if the event for which such record was taken fails to occur or is rescinded, then such escrowed shares shall be cancelled by the Issuer and escrowed property returned.

5.    NOTICE OF ADJUSTMENTS. Whenever the Warrant Price or Warrant Share Number shall be adjusted pursuant to SECTION 4 hereof (for purposes of this SECTION 5, each an "ADJUSTMENT"), the Issuer shall cause its Chief Financial Officer to prepare and execute a certificate setting forth, in reasonable detail, the event requiring the Adjustment, the amount of the Adjustment, the method by which such Adjustment was calculated (including a description of the basis on which the Board made any determination hereunder), and the Warrant Price and Warrant Share Number after giving effect to such Adjustment, and shall

10

<PAGE>

cause copies of such certificate to be delivered to the Holder of this Warrant promptly after each Adjustment. Any dispute between the Issuer and the Holder of this Warrant with respect to the matters set forth in such certificate may at the option of the Holder of this Warrant be submitted to an Independent Appraiser selected by the Holder; PROVIDED that the Issuer shall have ten (10) days after receipt of notice from such Holder of its selection of such Independent Appraiser to object thereto, in which case such Holder shall select another such Independent Appraiser and the Issuer shall have no such right of objection. The Independent Appraiser selected by the Holder of this Warrant as provided in the preceding sentence shall be instructed to deliver a written opinion as to such matters to the Issuer and such Holder within thirty (30) days after submission to it of such dispute. Such opinion shall be final and binding on the parties hereto. The costs and expenses of the initial firm selected as Independent Appraiser shall be paid equally by the Issuer and the Holder and, in the case of an objection by the Issuer, the costs and expenses of the subsequent firm selected as Independent Appraiser shall be paid in full by the Issuer.

6.    FRACTIONAL SHARES. No fractional shares of Warrant Stock will be issued in connection with any exercise hereof, but in lieu of such fractional shares, the Issuer shall round the number of shares to be issued upon exercise up to the nearest whole number of shares.

7.    OWNERSHIP CAP AND EXERCISE RESTRICTION. Notwithstanding anything to

the contrary set forth in this Warrant, at no time may a Holder of this Warrant exercise this Warrant if the number of shares of Common Stock to be issued pursuant to such exercise would exceed, when aggregated with all other shares of Common Stock owned by such Holder at such time, the number of shares of Common Stock which would result in such Holder beneficially owning (as determined in accordance with Section 13(d) of the Exchange Act and the rules thereunder) in excess of 9.99% of the then issued and outstanding shares of Common Stock; PROVIDED, HOWEVER, that upon a holder of this Warrant providing the Issuer with sixty-one (61) days notice (pursuant to SECTION 12 hereof) (the "WAIVER NOTICE") that such Holder would like to waive this SECTION 7 with regard to any or all shares of Common Stock issuable upon exercise of this Warrant, this SECTION 7 will be of no force or effect with regard to all or a portion of the Warrant referenced in the Waiver Notice; PROVIDED, FURTHER, that this provision shall be of no further force or effect during the sixty-one (61) days immediately preceding the expiration of the term of this Warrant.

8.    DEFINITIONS. For the purposes of this Warrant, the following terms have the following meanings:

"ADDITIONAL SHARES OF COMMON STOCK" means all shares of Common Stock issued by the Issuer after the Original Issue Date, and all shares of Other Common, if any, issued by the Issuer after the Original Issue Date, except: (i) securities issued (other than for cash) in connection with a merger, acquisition, or consolidation, (ii) securities issued pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding on or prior to the date of the Purchase Agreement or issued pursuant to the Purchase Agreement (so long as the conversion or exercise price in such securities are not amended to lower such price and/or adversely affect the Holders), (iii) the Warrant Stock, (iv) Common Stock issued or the issuance or grants of options to purchase Common Stock pursuant to the Company's stock option plans and employee stock purchase plans that either (x) exist on the date of the Purchase Agreement, or (y) do not exceed ten percent (10%) of the outstanding Common Stock of the Company as of the date of the Purchase Agreement, and (v) any warrants issued to the placement agent and its designees for the transactions contemplated by the Purchase Agreement.

"BOARD" shall mean the Board of Directors of the Issuer.

11

<PACE>

"CAPITAL STOCK" means and includes (i) any and all shares, interests, participations or other equivalents of or interests in (however designated) corporate stock, including, without limitation, shares of preferred or preference stock, (ii) all partnership interests (whether general or limited) in any Person which is a partnership, (iii) all membership interests or limited liability company interests in any limited liability company, and (iv) all equity or ownership interests in any Person of any other type.

"CERTIFICATE OF INCORPORATION" means the Certificate of Incorporation of the Issuer as in effect on the Original Issue Date, and as hereafter from time to time amended, modified, supplemented or restated in accordance with the terms hereof and thereof and pursuant to applicable law.

"COMMON STOCK" means the Common Stock, $0.001 par value per share, of the Issuer and any other Capital Stock into which such stock may hereafter be changed.

"COMMON STOCK EQUIVALENT" means any Convertible Security or warrant, option or other right to subscribe for or purchase any Additional Shares of Common Stock or any Convertible Security.

"CONVERTIBLE SECURITIES" means evidences of Indebtedness, shares of Capital Stock or other Securities which are or may be at any time convertible into or exchangeable for Additional Shares of Common Stock. The term "CONVERTIBLE SECURITY" means one of the Convertible Securities.

"GOVERNMENTAL AUTHORITY" means any governmental, regulatory or self-regulatory entity, department, body, official, authority, commission, board, agency or instrumentality, whether federal, state or local, and whether domestic or foreign.

"HOLDERS" mean the Persons who shall from time to time own any Warrant. The term "Holder" means one of the Holders.

"INDEPENDENT APPRAISER" means a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing (which may be the firm that regularly examines the financial statements of the Issuer) that is regularly engaged in the business of appraising the Capital Stock or assets of corporations or other entities as going concerns, and which is not affiliated with either the Issuer or the Holder of any Warrant.

"ISSUER" means Marketing Worldwide Corporation, a Delaware corporation, and its successors.

"MAJORITY HOLDERS" means at any time the Holders of Warrants exercisable for a majority of the shares of Warrant Stock issuable under the Warrants at the time outstanding.

"ORIGINAL ISSUE DATE" means April 23, 2007.

"OTC BULLETIN BOARD" means the over-the-counter electronic bulletin board.

12

<PAGE>

"OTHER COMMON" means any other Capital Stock of the Issuer of any class which shall be authorized at any time after the date of this Warrant (other than Common Stock) and which shall have the right to participate in the distribution of earnings and assets of the Issuer without limitation as to amount.

"OUTSTANDING COMMON STOCK" means, at any given time, the aggregate amount of outstanding shares of Common Stock, assuming full exercise, conversion or exchange (as applicable) of all options, warrants and other Securities which are convertible into or exercisable or exchangeable for, and any right to subscribe for, shares of Common Stock that are outstanding at such time.

"PERSON" means an individual, corporation, limited liability company, partnership, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority or other entity of whatever nature.

"PER SHARE MARKET VALUE" means on any particular date (a) the last

closing bid price per share of the Common Stock on such date on the OTC
Bulletin Board or another registered national stock exchange on which the
Common Stock is then listed, or if there is no such price on such date,
then the closing bid price on such exchange or quotation system on the
date nearest preceding such date, or (b) if the Common Stock is not listed
then on the OTC Bulletin Board or any registered national stock exchange,
the last closing bid price for a share of Common Stock in the
over-the-counter market, as reported by the OTC Bulletin Board or in the
National Quotation Bureau Incorporated or similar organization or agency
succeeding to its functions of reporting prices) at the close of business
on such date, or (c) if the Common Stock is not then reported by the OTC
Bulletin Board or the National Quotation Bureau Incorporated (or similar
organization or agency succeeding to its functions of reporting prices),
then the "Pink Sheet" quotes for the applicable Trading Days preceding
such date of determination, or (d) if the Common Stock is not then
publicly traded the fair market value of a share of Common Stock as
determined by an Independent Appraiser selected in good faith by the
Majority Holders; PROVIDED, however, that the Issuer, after receipt of the
determination by such Independent Appraiser, shall have the right to
select an additional Independent Appraiser, in which case, the fair market
value shall be equal to the average of the determinations by each such
Independent Appraiser; and PROVIDED, FURTHER that all determinations of
the Per Share Market Value shall be appropriately adjusted for any stock
dividends, stock splits or other similar transactions during such period.
The determination of fair market value by an Independent Appraiser shall
be based upon the fair market value of the Issuer determined on a going
concern basis as between a willing buyer and a willing seller and taking
into account all relevant factors determinative of value, and shall be
final and binding on all parties. In determining the fair market value of
any shares of Common Stock, no consideration shall be given to any
restrictions on transfer of the Common Stock imposed by agreement or by
federal or state securities laws, or to the existence or absence of, or
any limitations on, voting rights.

    "PURCHASE AGREEMENT" means the Series A Convertible Preferred Stock
Purchase Agreement dated as of April 23, 2007, among the Issuer and the
Purchasers.

    "PURCHASERS" means the purchasers of the Series A Convertible
Preferred Stock and the Warrants issued by the Issuer pursuant to the
Purchase Agreement.

                                  13

<PAGE>

    "SECURITIES" means any debt or equity securities of the Issuer,
whether now or hereafter authorized, any instrument convertible into or
exchangeable for Securities or a Security, and any option, warrant or
other right to purchase or acquire any Security. "Security" means one of
the Securities.

    "SECURITIES ACT" means the Securities Act of 1933, as amended, or
any similar federal statute then in effect.

    "SUBSIDIARY" means any corporation at least 50% of whose outstanding
Voting Stock shall at the time be owned directly or indirectly by the
Issuer or by one or more of its Subsidiaries, or by the Issuer and one or
more of its Subsidiaries.

    "TERM" has the meaning specified in SECTION 1 hereof.

"TRADING DAY" means (a) a day on which the Common Stock is traded on the OTC Bulletin Board, or (b) if the Common Stock is not traded on the OTC Bulletin Board, a day on which the Common Stock is quoted in the over-the-counter market as reported by the National Quotation Bureau Incorporated (or any similar organization or agency succeeding its functions of reporting prices); PROVIDED, HOWEVER, that in the event that the Common Stock is not listed or quoted as set forth in (a) or (b) hereof, then Trading Day shall mean any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"VOTING STOCK" means, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) having ordinary voting power for the election of a majority of the members of the Board of Directors (or other governing body) of such corporation, other than Capital Stock having such power only by reason of the happening of a contingency.

"WARRANTS" means the Warrants issued and sold pursuant to the Purchase Agreement, including, without limitation, this Warrant, and any other warrants of like tenor issued in substitution or exchange for any thereof pursuant to the provisions of SECTION 2(C), 2(D) OR 2(E) hereof or of any of such other Warrants.

"WARRANT PRICE" initially means $0.70, as such price may be adjusted from time to time as shall result from the adjustments specified in this Warrant, including SECTION 4 hereto.

"WARRANT SHARE NUMBER" means at any time the aggregate number of shares of Warrant Stock which may at such time be purchased upon exercise of this Warrant, after giving effect to all prior adjustments and increases to such number made or required to be made under the terms hereof.

"WARRANT STOCK" means Common Stock issuable upon exercise of any Warrant or Warrants or otherwise issuable pursuant to any Warrant or Warrants.

<center>14</center>

<PAGE>

9.    OTHER NOTICES. In case at any time:

        (A)    the Issuer shall make any distributions to the holders of Common Stock; or

        (B)    the Issuer shall authorize the granting to all holders of its Common Stock of rights to subscribe for or purchase any shares of Capital Stock of any class or other rights; or

        (C)    there shall be any reclassification of the Capital Stock of the Issuer; or

        (D)    there shall be any capital reorganization by the Issuer; or

        (E)    there shall be any (i) consolidation or merger

involving the Issuer or (ii) sale, transfer or other disposition of all or substantially all of the Issuer's property, assets or business (except a merger or other reorganization in which the Issuer shall be the surviving corporation and its shares of Capital Stock shall continue to be outstanding and unchanged and except a consolidation, merger, sale, transfer or other disposition involving a wholly-owned Subsidiary); or

(F)  there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Issuer or any partial liquidation of the Issuer or distribution to holders of Common Stock;

then, in each of such cases, the Issuer shall give written notice to the Holder of the date on which (i) the books of the Issuer shall close or a record shall be taken for such dividend, distribution or subscription rights or (ii) such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be, shall take place. Such notice also shall specify the date as of which the holders of Common Stock of record shall participate in such dividend, distribution or subscription rights, or shall be entitled to exchange their certificates for Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be. Such notice shall be given at least twenty (20) days prior to the action in question and not less than ten (10) days prior to the record date or the date on which the Issuer's transfer books are closed in respect thereto. This Warrant entitles the Holder to receive copies of all financial and other information distributed or required to be distributed to the holders of the Common Stock.

      10.   AMENDMENT AND WAIVER. Any term, covenant, agreement or condition in this Warrant may be amended, or compliance therewith may be waived (either generally or in a particular instance and either retroactively or prospectively), by a written instrument or written instruments executed by the Issuer and the Majority Holders; PROVIDED, HOWEVER, that no such amendment or waiver shall reduce the Warrant Share Number, increase the Warrant Price, shorten the period during which this Warrant may be exercised or modify any provision of this SECTION 10 without the consent of the Holder of this Warrant. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of this Warrant unless the same consideration is also offered to all holders of the Warrants.

                                    15

<PAGE>

      11.   GOVERNING LAW; JURISDICTION. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction. This Warrant shall not be interpreted or construed with any presumption against the party causing this Warrant to be drafted. The Issuer and the Holder agree that venue for any dispute arising under this Warrant will lie exclusively in the state or federal courts located in New York County, New York, and the parties irrevocably waive any right to raise FORUM NON CONVENIENS or any other argument that New York is not the proper venue. The Issuer and the Holder irrevocably consent to personal jurisdiction in the state and federal courts of the state of New York. The Issuer and the Holder consent to process being served in any such suit,

action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Warrant and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this SECTION 11 shall affect or limit any right to serve process in any other manner permitted by law. The Issuer and the Holder hereby agree that the prevailing party in any suit, action or proceeding arising out of or relating to this Warrant or the Purchase Agreement, shall be entitled to reimbursement for reasonable legal fees from the non-prevailing party. The parties hereby waive all rights to a trial by jury.

12.    NOTICES. Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery by telecopy or facsimile at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Issuer:                    Marketing Worldwide Corporation
                                     2212 Grand Commerce Drive
                                     Howell, Michigan 48855
                                     Attention: James Marvin
                                     Tel. No.: (517) 540-0045
                                     Fax No.: (517) 540-0923

with copies (which copies
shall not constitute notice)
to:                                  Weed & Co. LLP
                                     4695 Mac Arthur Court, Suite 1430
                                     Newport Beach, CA 92660
                                     Attention: Richard O. Weed
                                     Tel. No.: (949) 475-9086
                                     Fax No.: (949) 475-9087

If to any Holder:                    At the address of such Holder set forth on
                                     EXHIBIT A to the Purchase Agreement, with
                                     copies to:

                                     Sadis & Goldberg LLP
                                     551 Fifth Avenue, 21st Floor
                                     New York, New York 10176
                                     Attention: Steven Huttler, Esq.
                                     Tel. No.: (212) 947-3793
                                     Fax No.: (212) 947-3796

                                     16
<PAGE>

Any party hereto may from time to time change its address for notices by giving written notice of such changed address to the other party hereto.

13.    WARRANT AGENT. The Issuer may, by written notice to each Holder of this Warrant, appoint an agent having an office in New York, New York for the purpose of issuing shares of Warrant Stock on the exercise of this Warrant pursuant to SECTION 2(B) hereof, exchanging this Warrant pursuant to SECTION 2(D) hereof or replacing this Warrant pursuant to SECTION 3(D) hereof, or any of the foregoing, and thereafter any such issuance, exchange or replacement, as the

case may be, shall be made at such office by such agent.

14.     REMEDIES. The Issuer stipulates that the remedies at law of the Holder of this Warrant in the event of any default or threatened default by the Issuer in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

15.     SUCCESSORS AND ASSIGNS. This Warrant and the rights evidenced hereby shall inure to the benefit of and be binding upon the successors and assigns of the Issuer, the Holder hereof and (to the extent provided herein) the Holders of Warrant Stock issued pursuant hereto, and shall be enforceable by any such Holder or Holder of Warrant Stock.

16.     CONSTRUCTION. This Warrant shall be deemed to be jointly drafted by the Company and all the Holders and shall not be construed against any person as the drafter hereof.

17.     HEADINGS. The headings of the Sections of this Warrant are for convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

18.     REGISTRATION RIGHTS. The Holder of this Warrant is entitled to the benefit of certain registration rights with respect to the shares of Warrant Stock issuable upon the exercise of this Warrant pursuant to the Registration Rights Agreement and the registration rights with respect to the shares of Warrant Stock issuable upon the exercise of this Warrant by any subsequent Holder may only be assigned in accordance with the terms and provisions of the Registrations Rights Agreement and SECTION 2(E) hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

17

<PAGE>

IN WITNESS WHEREOF, the Issuer has executed this Series J Warrant as of the day and year first above written.

MARKETING WORLDWIDE CORPORATION

By: /s/ Michael Winzkowski
    -----------------------
Name: Michael Winzkowski
Title: Chief Executive Officer

18

<PAGE>

EXERCISE FORM
SERIES J WARRANT

MARKETING WORLDWIDE CORPORATION

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to purchase _____ shares of Common Stock of Marketing

Worldwide Corporation covered by the within Warrant.

Dated: _____          Signature     _____

                                  Address       _____

                                                _____

Number of shares of Common Stock beneficially owned or deemed beneficially owned by the Holder on the date of Exercise: _____

The undersigned is an "accredited investor" as defined in Regulation D under the Securities Act of 1933, as amended.

The undersigned intends that payment of the Warrant Price shall be made as (check one):

    Cash Exercise_____

    Cashless Exercise_____

If the Holder has elected a Cash Exercise, the Holder shall pay the sum of $_____ by certified or official bank check (or via wire transfer) to the Issuer in accordance with the terms of the Warrant.

If the Holder has elected a Cashless Exercise, a certificate shall be issued to the Holder for the number of shares equal to the whole number portion of the product of the calculation set forth below, which is _____. The Company shall pay a cash adjustment in respect of the fractional portion of the product of the calculation set forth below in an amount equal to the product of the fractional portion of such product and the Per Share Market Value on the date of exercise, which product is _____.

$$X = Y - \frac{(A)(Y)}{B}$$

Where:

The number of Ordinary Shares to be issued to the Holder _____("X").

The number of Ordinary Shares purchasable upon exercise of all of the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised _____ ("Y").

The Warrant Price _____ ("A").

The Per Share Market Value of one Ordinary Share _____ ("B").

<div align="center">ASSIGNMENT</div>

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the within Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer the said Warrant on the books of the within named corporation.

Dated: _____          Signature     _____

                                  Address       _____

                                                _____

## PARTIAL ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the right to purchase _____ shares of Warrant Stock evidenced by the within Warrant together with all rights therein, and does irrevocably constitute and appoint _____, attorney, to transfer that part of the said Warrant on the books of the within named corporation.

Dated: _____       Signature       _____

                                   Address         _____

                                                   _____

### FOR USE BY THE ISSUER ONLY:

This Warrant No. W-____ canceled (or transferred or exchanged) this _____ day of _____, _____, shares of Common Stock issued therefor in the name of _____, Warrant No. W-_____ issued for ____ shares of Common Stock in the name of _____.

19

```
</TEXT>
</DOCUMENT>
```

# Exhibit E

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR THE ISSUER SHALL HAVE RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

<div align="center">SERIES G WARRANT TO PURCHASE</div>

<div align="center">SHARES OF COMMON STOCK</div>

<div align="center">OF</div>

<div align="center">MARKETING WORLDWIDE CORPORATION</div>

<div align="center">Expires April 23, 2011</div>

No.: **W-G-07-01**                                        Number of Shares: 490,000
Date of Issuance: April 23, 2007

FOR VALUE RECEIVED, the undersigned, Marketing Worldwide Corporation, a Delaware corporation (together with its successors and assigns, the "**Issuer**"), hereby certifies that Carter Securities, LLC or its registered assigns is entitled to subscribe for and purchase, during the Term (as hereinafter defined), up to 490,000 shares (subject to adjustment as hereinafter provided) of the duly authorized, validly issued, fully paid and non-assessable Common Stock of the Issuer, at an exercise price per share equal to the Warrant Price then in effect, subject, however, to the provisions and upon the terms and conditions hereinafter set forth. Capitalized terms used in this Warrant and not otherwise defined herein shall have the respective meanings specified in **Section 8** hereof.

1.      **Term**. The term of this Warrant shall commence on April 23, 2007 and shall expire at 6:00 p.m., Eastern Time, on April 23, 2011 (such period being the "**Term**").

2.      **Method of Exercise; Payment; Issuance of New Warrant; Transfer and Exchange**.

(a)      Time of Exercise. The purchase rights represented by this Warrant may be exercised in whole or in part during the Term.

(b)      Method of Exercise. The Holder hereof may exercise this Warrant, in whole or in part, by the surrender of this Warrant (with the exercise form attached hereto duly executed) at the principal office of the Issuer, and by the payment to the Issuer of an amount of consideration



therefor equal to the Warrant Price in effect on the date of such exercise multiplied by the number of shares of Warrant Stock with respect to which this Warrant is then being exercised, payable by certified or official bank check or by wire transfer to an account designated by the Issuer. This Warrant may also be exercised by means of a "cashless exercise" in which the Holder shall be entitled to receive a certificate for the number of shares equal to the quotient obtained by dividing [(A-B) (X)] by (A), where:

> (A) = the average of the high and low trading prices per share of Common Stock on the trading day preceding the date of such election;
> (B) = the Exercise Price of the Warrants; and
> (X) = the number of shares issuable upon exercise of the Warrants in accordance with the terms of this Warrant.

(c)     <u>Issuance of Stock Certificates</u>.  In the event of any exercise of this Warrant in accordance with and subject to the terms and conditions hereof, certificates for the shares of Warrant Stock so purchased shall be dated the date of such exercise and delivered to the Holder hereof within a reasonable time, not exceeding three (3) Trading Days after such exercise (the "<u>**Delivery Date**</u>").  The Holder shall deliver this original Warrant, or an indemnification undertaking with respect to such Warrant in the case of its loss, theft or destruction, at such time that this Warrant is fully exercised.  With respect to partial exercises of this Warrant, the Issuer shall keep written records for the Holder of the number of shares of Warrant Stock exercised as of each date of exercise.

(d)     <u>Omitted.</u>

(e)     <u>Transferability of Warrant</u>.  Subject to **Section 2(g)** hereof, this Warrant may be transferred by a Holder, in whole or in part, without the consent of the Issuer.  If transferred pursuant to this paragraph, this Warrant may be transferred on the books of the Issuer by the Holder hereof in person or by duly authorized attorney, upon surrender of this Warrant at the principal office of the Issuer, properly endorsed (by the Holder executing an assignment in the form attached hereto) and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer.  This Warrant is exchangeable at the principal office of the Issuer for Warrants to purchase the same aggregate number of shares of Warrant Stock, each new Warrant to represent the right to purchase such number of shares of Warrant Stock as the Holder hereof shall designate at the time of such exchange.  All Warrants issued on transfers or exchanges shall be dated the Original Issue Date and shall be identical with this Warrant except as to the number of shares of Warrant Stock issuable pursuant thereto.

(f)     <u>Continuing Rights of Holder</u>.  The Issuer will, at the time of or at any time after each exercise of this Warrant, upon the request of the Holder hereof, acknowledge in writing the extent, if any, of its continuing obligation to afford to such Holder all rights to which such Holder shall continue to be entitled after such exercise in accordance with the terms of this Warrant; *provided* that if any such Holder shall fail to make any such request, the failure shall not affect the continuing obligation of the Issuer to afford such rights to such Holder.

(g)     <u>Compliance with Securities Laws.</u>



(i)     The Holder of this Warrant, by acceptance hereof, acknowledges that this Warrant and the shares of Warrant Stock to be issued upon exercise hereof are being acquired solely for the Holder's own account and not as a nominee for any other party, and for investment, and that the Holder will not offer, sell or otherwise dispose of this Warrant or any shares of Warrant Stock to be issued upon exercise hereof except pursuant to an effective registration statement, or an exemption from registration, under the Securities Act and any applicable state securities laws.

(ii)     Except as provided in paragraph (iii) below, this Warrant and all certificates representing shares of Warrant Stock issued upon exercise hereof shall be stamped or imprinted with a legend in substantially the following form:

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR THE ISSUER SHALL HAVE RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

(iii)     The Issuer agrees to reissue this Warrant or certificates representing any of the Warrant Stock, without the legend set forth above if at such time, prior to making any transfer of any such securities, the Holder shall give written notice to the Issuer describing the manner and terms of such transfer.  Such proposed transfer will not be effected until: (a) either (i) the Issuer has received an opinion of counsel reasonably satisfactory to the Issuer, to the effect that the registration of such securities under the Securities Act is not required in connection with such proposed transfer, (ii) a registration statement under the Securities Act covering such proposed disposition has been filed by the Issuer with the Securities and Exchange Commission and has become effective under the Securities Act, (iii) the Issuer has received other evidence reasonably satisfactory to the Issuer that such registration and qualification under the Securities Act and state securities laws are not required, or (iv) the Holder provides the Issuer with reasonable assurances that such security can be sold pursuant to Rule 144 under the Securities Act; and (b) either (i) the Issuer has received an opinion of counsel reasonably satisfactory to the Issuer, to the effect that registration or qualification under the securities or "blue sky" laws of any state is not required in connection with such proposed disposition, or (ii) compliance with applicable state securities or "blue sky" laws has been effected or a valid exemption exists with respect thereto.  The Issuer will respond to any such notice from a holder within three (3) Trading Days.  In the case of any proposed transfer under this



**Section 2(g)**, the Issuer will use reasonable efforts to comply with any such applicable state securities or "blue sky" laws, but shall in no event be required, (x) to qualify to do business in any state where it is not then qualified, (y) to take any action that would subject it to tax or to the general service of process in any state where it is not then subject, or (z) to comply with state securities or "blue sky" laws of any state for which registration by coordination is unavailable to the Issuer. The restrictions on transfer contained in this **Section 2(g)** shall be in addition to, and not by way of limitation of, any other restrictions on transfer contained in any other section of this Warrant. Whenever a certificate representing the Warrant Stock is required to be issued to a the Holder without a legend, in lieu of delivering physical certificates representing the Warrant Stock, the Issuer shall cause its transfer agent to electronically transmit the Warrant Stock to the Holder by crediting the account of the Holder's Prime Broker with DTC through its DWAC system (to the extent not inconsistent with any provisions of this Warrant or the Purchase Agreement).

(h)    _Accredited Investor Status_.  In no event may the Holder exercise this Warrant in whole or in part unless the Holder is an "accredited investor" as defined in Regulation D under the Securities Act.

3.    **Stock Fully Paid; Reservation and Listing of Shares; Covenants**.

(a)    _Stock Fully Paid_.  The Issuer represents, warrants, covenants and agrees that all shares of Warrant Stock which may be issued upon the exercise of this Warrant or otherwise hereunder will, when issued in accordance with the terms of this Warrant, be duly authorized, validly issued, fully paid and non-assessable and free from all taxes, liens and charges.  The Issuer further covenants and agrees that during the period within which this Warrant may be exercised, the Issuer will at all times have authorized and reserved for the purpose of the issuance upon exercise of this Warrant a number of authorized but unissued shares of Common Stock equal to at least one hundred percent (100%) of the number of shares of Common Stock issuable upon exercise of this Warrant without regard to any limitations on exercise.

(b)    _Reservation_.  If any shares of Common Stock required to be reserved for issuance upon exercise of this Warrant or as otherwise provided hereunder require registration or qualification with any Governmental Authority under any federal or state law before such shares may be so issued, the Issuer will in good faith use its best efforts as expeditiously as possible at its expense to cause such shares to be duly registered or qualified.

(c)    _Covenants_.  The Issuer shall not by any action including, without limitation, amending the Certificate of Incorporation or the by-laws of the Issuer, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder hereof against dilution (to the extent specifically provided herein) or impairment.  Without limiting the generality of the foregoing, the Issuer will (i) not permit the par value, if any, of its Common Stock to exceed the then effective Warrant Price, (ii) not amend or modify any

provision of the Certificate of Incorporation or by-laws of the Issuer in any manner that would adversely affect the rights of the Holders of the Warrants, (iii) take all such action as may be reasonably necessary in order that the Issuer may validly and legally issue fully paid and nonassessable shares of Common Stock, free and clear of any liens, claims, encumbrances and restrictions (other than as provided herein) upon the exercise of this Warrant, and (iv) use its best efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof as may be reasonably necessary to enable the Issuer to perform its obligations under this Warrant.

(d)    <u>Loss, Theft, Destruction, Mutilation of Warrants</u>.    Upon receipt of evidence satisfactory to the Issuer of the ownership of and the loss, theft, destruction or mutilation of any Warrant and, in the case of any such loss, theft or destruction, upon receipt of indemnity or security satisfactory to the Issuer or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Issuer will make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same number of shares of Common Stock.

(e)    <u>Payment of Taxes</u>.  The Issuer will pay any documentary stamp taxes attributable to the initial issuance of the Warrant Stock issuable upon exercise of this Warrant; *provided, however*, that the Issuer shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the issuance or delivery of any certificates representing Warrant Stock in a name other than that of the Holder in respect to which such shares are issued.

**4.    <u>Adjustment of Warrant Price and Number of Shares Issuable Upon Exercise</u>.** The Warrant Price and the number of shares of Warrant Stock that may be purchased upon exercise of this Warrant shall be subject to adjustment from time to time as set forth in this **<u>Section 4</u>**. The Issuer shall give the Holder notice of any event described below which requires an adjustment pursuant to this **<u>Section 4</u>** in accordance with the notice provisions set forth in **<u>Section 5</u>**.

(a)    <u>Recapitalization, Reorganization, Reclassification, Consolidation, Merger or Sale</u>.

(i)    In case the Issuer after the Original Issue Date shall do any of the following (each, a "**<u>Triggering Event</u>**"): (a) consolidate or merge with or into any other Person and the Issuer shall not be the continuing or surviving Person of such consolidation or merger, or (b) permit any other Person to consolidate with or merge into the Issuer and the Issuer shall be the continuing or surviving Person but, in connection with such consolidation or merger, any Capital Stock of the Issuer shall be changed into or exchanged for Securities of any other Person or cash or any other property, or (c) transfer all or substantially all of its properties or assets to any other Person, or (d) effect a capital reorganization or reclassification of its Capital Stock, then, and in the case of each such Triggering Event, proper provision shall be made to the Warrant Price and the number of shares of Warrant Stock that may be purchased upon exercise of this Warrant so that, upon the basis and the terms and in the manner provided in this Warrant, the Holder of this Warrant shall be entitled upon the exercise hereof at any time after the consummation of such Triggering Event, to the extent this Warrant is not exercised prior



to such Triggering Event, to receive at the Warrant Price as adjusted to take into account the consummation of such Triggering Event, in lieu of the Common Stock issuable upon such exercise of this Warrant prior to such Triggering Event, the Securities, cash and property to which such Holder would have been entitled upon the consummation of such Triggering Event if such Holder had exercised the rights represented by this Warrant immediately prior thereto (including the right of a shareholder to elect the type of consideration it will receive upon a Triggering Event), subject to adjustments (subsequent to such corporate action) as nearly equivalent as possible to the adjustments provided for elsewhere in this **Section 4**, and the Warrant Price shall be adjusted to equal the product of (A) the closing price of the common stock of the continuing or surviving Person as a result of such Triggering Event as of the date immediately preceding the date of the consummation of such Triggering Event multiplied by (B) the quotient of (i) the Warrant Price divided by (ii) the Per Share Market Value of the Common Stock as of the date immediately preceding the Original Issue Date; *provided, however,* the Holder at its option may elect to receive an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula.  Immediately upon the occurrence of a Triggering Event, the Issuer shall notify the Holder in writing of such Triggering Event and provide the calculations in determining the number of shares of Warrant Stock issuable upon exercise of the new warrant and the adjusted Warrant Price. Upon the Holder's request, the continuing or surviving Person as a result of such Triggering Event shall issue to the Holder a new warrant of like tenor evidencing the right to purchase the adjusted number of shares of Warrant Stock and the adjusted Warrant Price pursuant to the terms and provisions of this **Section 4(a)(i)**. Notwithstanding the foregoing to the contrary, this **Section 4(a)(i)** shall only apply if the surviving entity pursuant to any such Triggering Event has a class of equity securities registered pursuant to the Securities Exchange Act of 1934, as amended, and its common stock is listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board. In the event that the surviving entity pursuant to any such Triggering Event is not a public company (or similar Person) that is registered pursuant to the Securities Exchange Act of 1934, as amended, or its common stock is not listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board, then the Holder shall have the right to demand that the Issuer pay to the Holder an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula.

(ii)    In the event that the Holder has elected not to exercise this Warrant prior to the consummation of a Triggering Event and has also elected not to receive an amount in cash equal to the value of this Warrant calculated in accordance with the Black-Scholes formula pursuant to the provisions of **Section 4(a)(i)** above, so long as the surviving entity pursuant to any Triggering Event is a company that has a class of equity securities registered pursuant to the Securities Exchange Act of 1934, as amended, and its common stock is listed or quoted on a national securities exchange, national automated quotation system or the OTC Bulletin Board, the surviving entity and/or each Person (other than the Issuer) which may be required to deliver any Securities, cash or property upon the exercise of this Warrant as provided herein shall assume, by written instrument delivered to, and reasonably satisfactory to, the Holder of this Warrant, (A) the



obligations of the Issuer under this Warrant (and if the Issuer shall survive the consummation of such Triggering Event, such assumption shall be in addition to, and shall not release the Issuer from, any continuing obligations of the Issuer under this Warrant) and (B) the obligation to deliver to such Holder such Securities, cash or property as, in accordance with the foregoing provisions of this **subsection (a)**, such Holder shall be entitled to receive, and the surviving entity and/or each such Person shall have similarly delivered to such Holder an opinion of counsel for the surviving entity and/or each such Person, which counsel shall be reasonably satisfactory to such Holder, or in the alternative, a written acknowledgement executed by the President or Chief Financial Officer of the Issuer, stating that this Warrant shall thereafter continue in full force and effect and the terms hereof (including, without limitation, all of the provisions of this **subsection (a)**) shall be applicable to the Securities, cash or property which the surviving entity and/or each such Person may be required to deliver upon any exercise of this Warrant or the exercise of any rights pursuant hereto.

(b)     Stock Dividends, Subdivisions and Combinations.  If at any time the Issuer shall:

(i)     make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, shares of Common Stock,

(ii)    subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock, or

(iii)   combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock,

then (1) the number of shares of Common Stock for which this Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock which a record holder of the same number of shares of Common Stock for which this Warrant is exercisable immediately prior to the occurrence of such event would own or be entitled to receive after the happening of such event, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment.

(c)     Certain Other Distributions.  If at any time the Issuer shall make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive any dividend or other distribution of:

(i)     cash (other than a cash dividend payable out of earnings or earned surplus legally available for the payment of dividends under the laws of the jurisdiction of incorporation of the Issuer),



(ii)    any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock), or

(iii)    any warrants or other rights to subscribe for or purchase any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever (other than cash, Common Stock Equivalents or Additional Shares of Common Stock), then (1) the number of shares of Common Stock for which this Warrant is exercisable shall be adjusted to equal the product of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the Per Share Market Value of Common Stock at the date of taking such record and (B) the denominator of which shall be such Per Share Market Value minus the amount allocable to one share of Common Stock of any such cash so distributable and of the fair value (as determined in good faith by the Board of Directors of the Issuer and supported by an opinion from an investment banking firm mutually agreed upon by the Issuer and the Holder) of any and all such evidences of indebtedness, shares of stock, other securities or property or warrants or other subscription or purchase rights so distributable, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment. A reclassification of the Common Stock (other than a change in par value, or from par value to no par value or from no par value to par value) into shares of Common Stock and shares of any other class of stock shall be deemed a distribution by the Issuer to the holders of its Common Stock of such shares of such other class of stock within the meaning of this **Section 4(c)** and, if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock within the meaning of **Section 4(b)**.

(d)    Issuance of Additional Shares of Common Stock Common Stock Equivalents. In the event the Company, shall, at any during the Term, issue or sell any Additional Shares of Common Stock or Common Stock Equivalents (otherwise than as provided in the foregoing **subsections (a) through (c) of this Section 4**), at a price per share less than the Warrant Price, or without consideration, the Warrant Price then in effect upon each such issuance shall be adjusted to that price (rounded to the nearest cent) determined by multiplying the Warrant Price by a fraction: (1) the numerator of which shall be equal to the *sum* of (A) the number of shares of Common Stock outstanding immediately prior to the issuance of such Additional Shares of Common Stock *plus* (B) the number of shares of Common Stock (rounded to the nearest whole share) which the aggregate consideration for the total number of such Additional Shares of Common Stock so issued would purchase at a price per share equal to the then Warrant Price; and (2) the denominator of which shall be equal to the number of shares of Common Stock outstanding immediately after the issuance of such Additional Shares of Common Stock. No adjustment of the number of shares of Common Stock shall be made upon the issuance of any Additional Shares of Common Stock which are issued pursuant to the exercise of any warrants or



other subscription or purchase rights or pursuant to the exercise of any conversion or exchange rights in any Common Stock Equivalents if any such adjustment shall previously have been made upon the issuance of such warrants or other rights or upon the issuance of such Common Stock Equivalents (or upon the issuance of any warrant or other rights therefore).

      (e)    <u>Other Provisions applicable to Adjustments under this Section</u>. The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which this Warrant is exercisable and the Warrant Price then in effect provided for in this **Section 4**:

      (i)    <u>Computation of Consideration</u>. To the extent that any Additional Shares of Common Stock or any Common Stock Equivalents (or any warrants or other rights therefor) shall be issued for cash consideration, the consideration received by the Issuer therefor shall be the amount of the cash received by the Issuer therefor, or, if such Additional Shares of Common Stock or Common Stock Equivalents are offered by the Issuer for subscription, the subscription price, or, if such Additional Shares of Common Stock or Common Stock Equivalents are sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price (in any such case subtracting any amounts paid or receivable for accrued interest or accrued dividends and without taking into account any compensation, discounts or expenses paid or incurred by the Issuer for and in the underwriting of, or otherwise in connection with, the issuance thereof). In connection with any merger or consolidation in which the Issuer is the surviving Person (other than any consolidation or merger in which the previously outstanding shares of Common Stock of the Issuer shall be changed to or exchanged for the stock or other securities of another Person), the amount of consideration therefore shall be, deemed to be the fair value, as determined reasonably and in good faith by the Board, of such portion of the assets and business of the nonsurviving Person as the Board may determine to be attributable to such shares of Common Stock or Common Stock Equivalents, as the case may be. The consideration for any Additional Shares of Common Stock issuable pursuant to any warrants or other rights to subscribe for or purchase the same shall be the consideration received by the Issuer for issuing such warrants or other rights plus the additional consideration payable to the Issuer upon exercise of such warrants or other rights. The consideration for any Additional Shares of Common Stock issuable pursuant to the terms of any Common Stock Equivalents shall be the consideration received by the Issuer for issuing warrants or other rights to subscribe for or purchase such Common Stock Equivalents, plus the consideration paid or payable to the Issuer in respect of the subscription for or purchase of such Common Stock Equivalents, plus the additional consideration, if any, payable to the Issuer upon the exercise of the right of conversion or exchange in such Common Stock Equivalents. In the event of any consolidation or merger of the Issuer in which the Issuer is not the surviving Person or in which the previously outstanding shares of Common Stock of the Issuer shall be changed into or exchanged for the stock or other securities of another Person, or in the event of any sale of all or substantially all of the assets of the Issuer for stock or other securities of any Person, the Issuer shall be deemed to have issued a number of shares of its Common Stock for stock or securities or other property of the other Person computed on the basis of the actual exchange ratio on which the transaction



was predicated, and for a consideration equal to the fair market value on the date of such transaction of all such stock or securities or other property of the other Person. In the event any consideration received by the Issuer for any securities consists of property other than cash, the fair market value thereof at the time of issuance or as otherwise applicable shall be as determined in good faith by the Board. In the event Common Stock is issued with other shares or securities or other assets of the Issuer for consideration which covers both, the consideration computed as provided in this **Section 4(g)(i)** shall be allocated among such securities and assets as determined in good faith by the Board.

(ii)     When Adjustments to Be Made. The adjustments required by this **Section 4** shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that any adjustment of the number of shares of Common Stock for which this Warrant is exercisable that would otherwise be required may be postponed (except in the case of a subdivision or combination of shares of the Common Stock, as provided for in **Section 4(b)**) up to, but not beyond the date of exercise if such adjustment either by itself or with other adjustments not previously made adds or subtracts less than one percent (1%) of the shares of Common Stock for which this Warrant is exercisable immediately prior to the making of such adjustment. Any adjustment representing a change of less than such minimum amount (except as aforesaid) which is postponed shall be carried forward and made (x) as soon as such adjustment, together with other adjustments required by this **Section 4** and not previously made, would result in a minimum adjustment, or (y) on the date of exercise. For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.

(iii)     Fractional Interests. In computing adjustments under this **Section 4**, fractional interests in Common Stock shall be taken into account to the nearest one one-hundredth (1/100th) of a share.

(iv)     When Adjustment Not Required. If the Issuer shall take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or distribution or subscription or purchase rights and shall, thereafter and before the distribution to stockholders thereof, legally abandon its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by reason of the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

(h)     Form of Warrant after Adjustments. The form of this Warrant need not be changed because of any adjustments in the Warrant Price or the number and kind of Securities purchasable upon the exercise of this Warrant.

(i)     Escrow of Warrant Stock. If after any property becomes distributable pursuant to this **Section 4** by reason of the taking of any record of the holders of Common Stock, but prior to the occurrence of the event for which such record is taken, and the Holder exercises this Warrant, any shares of Common Stock issuable upon exercise by reason of such adjustment shall be



deemed the last shares of Common Stock for which this Warrant is exercised (notwithstanding any other provision to the contrary herein) and such shares or other property shall be held in escrow for the Holder by the Issuer to be issued to the Holder upon and to the extent that the event actually takes place, upon payment of the current Warrant Price. Notwithstanding any other provision to the contrary herein, if the event for which such record was taken fails to occur or is rescinded, then such escrowed shares shall be cancelled by the Issuer and escrowed property returned.

5.    **Notice of Adjustments.**  Whenever the Warrant Price or Warrant Share Number shall be adjusted pursuant to **Section 4** hereof (for purposes of this **Section 5**, each an "**Adjustment**"), the Issuer shall cause its Chief Financial Officer to prepare and execute a certificate setting forth, in reasonable detail, the event requiring the Adjustment, the amount of the Adjustment, the method by which such Adjustment was calculated (including a description of the basis on which the Board made any determination hereunder), and the Warrant Price and Warrant Share Number after giving effect to such Adjustment, and shall cause copies of such certificate to be delivered to the Holder of this Warrant promptly after each Adjustment. Any dispute between the Issuer and the Holder of this Warrant with respect to the matters set forth in such certificate may at the option of the Holder of this Warrant be submitted to an Independent Appraiser selected by the Holder; *provided* that the Issuer shall have ten (10) days after receipt of notice from such Holder of its selection of such Independent Appraiser to object thereto, in which case such Holder shall select another such Independent Appraiser and the Issuer shall have no such right of objection. The Independent Appraiser selected by the Holder of this Warrant as provided in the preceding sentence shall be instructed to deliver a written opinion as to such matters to the Issuer and such Holder within thirty (30) days after submission to it of such dispute. Such opinion shall be final and binding on the parties hereto. The costs and expenses of the initial firm selected as Independent Appraiser shall be paid equally by the Issuer and the Holder and, in the case of an objection by the Issuer, the costs and expenses of the subsequent firm selected as Independent Appraiser shall be paid in full by the Issuer.

6.    **Fractional Shares.**  No fractional shares of Warrant Stock will be issued in connection with any exercise hereof, but in lieu of such fractional shares, the Issuer shall round the number of shares to be issued upon exercise up to the nearest whole number of shares.

7.    **Ownership Cap and Exercise Restriction.**  Notwithstanding anything to the contrary set forth in this Warrant, at no time may a Holder of this Warrant exercise this Warrant if the number of shares of Common Stock to be issued pursuant to such exercise would exceed, when aggregated with all other shares of Common Stock owned by such Holder at such time, the number of shares of Common Stock which would result in such Holder beneficially owning (as determined in accordance with Section 13(d) of the Exchange Act and the rules thereunder) in excess of 9.99% of the then issued and outstanding shares of Common Stock; *provided, however,* that upon a holder of this Warrant providing the Issuer with sixty-one (61) days notice (pursuant to **Section 12** hereof) (the "**Waiver Notice**") that such Holder would like to waive this **Section 7** with regard to any or all shares of Common Stock issuable upon exercise of this Warrant, this **Section 7** will be of no force or effect with regard to all or a portion of the Warrant referenced in the Waiver Notice; *provided, further,* that this provision shall be of no further force or effect during the sixty-one (61) days immediately preceding the expiration of the term of this Warrant.



8.    **Definitions**.   For the purposes of this Warrant, the following terms have the following meanings:

"**Additional Shares of Common Stock**" means all shares of Common Stock issued by the Issuer after the Original Issue Date, and all shares of Other Common, if any, issued by the Issuer after the Original Issue Date, except: (i) securities issued (other than for cash) in connection with a merger, acquisition, or consolidation, (ii) securities issued pursuant to the conversion or exercise of convertible or exercisable securities issued or outstanding on or prior to the date of the Purchase Agreement or issued pursuant to the Purchase Agreement (so long as the conversion or exercise price in such securities are not amended to lower such price and/or adversely affect the Holders), (iii) the Warrant Stock, (iv) Common Stock issued or the issuance or grants of options to purchase Common Stock pursuant to the Company's stock option plans and employee stock purchase plans that either (x) exist on the date of the Purchase Agreement, or (y) do not exceed ten percent (10%) of the outstanding Common Stock of the Company as of the date of the Purchase Agreement.

"**Board**" shall mean the Board of Directors of the Issuer.

"**Capital Stock**" means and includes (i) any and all shares, interests, participations or other equivalents of or interests in (however designated) corporate stock, including, without limitation, shares of preferred or preference stock, (ii) all partnership interests (whether general or limited) in any Person which is a partnership, (iii) all membership interests or limited liability company interests in any limited liability company, and (iv) all equity or ownership interests in any Person of any other type.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Issuer as in effect on the Original Issue Date, and as hereafter from time to time amended, modified, supplemented or restated in accordance with the terms hereof and thereof and pursuant to applicable law.

"**Common Stock**" means the Common Stock, $0.001 par value per share, of the Issuer and any other Capital Stock into which such stock may hereafter be changed.

"**Common Stock Equivalent**" means any Convertible Security or warrant, option or other right to subscribe for or purchase any Additional Shares of Common Stock or any Convertible Security.

"**Convertible Securities**" means evidences of Indebtedness, shares of Capital Stock or other Securities which are or may be at any time convertible into or exchangeable for Additional Shares of Common Stock.   The term "**Convertible Security**" means one of the Convertible Securities.



"**Governmental Authority**" means any governmental, regulatory or self-regulatory entity, department, body, official, authority, commission, board, agency or instrumentality, whether federal, state or local, and whether domestic or foreign.

"**Holders**" mean the Persons who shall from time to time own any Warrant. The term "Holder" means one of the Holders.

"**Independent Appraiser**" means a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing (which may be the firm that regularly examines the financial statements of the Issuer) that is regularly engaged in the business of appraising the Capital Stock or assets of corporations or other entities as going concerns, and which is not affiliated with either the Issuer or the Holder of any Warrant.

"**Issuer**" means Marketing Worldwide Corporation, a Delaware corporation, and its successors.

"**Majority Holders**" means at any time the Holders of Warrants exercisable for a majority of the shares of Warrant Stock issuable under the Warrants at the time outstanding.

"**Original Issue Date**" means April 23, 2007.

"**OTC Bulletin Board**" means the over-the-counter electronic bulletin board.

"**Other Common**" means any other Capital Stock of the Issuer of any class which shall be authorized at any time after the date of this Warrant (other than Common Stock) and which shall have the right to participate in the distribution of earnings and assets of the Issuer without limitation as to amount.

"**Outstanding Common Stock**" means, at any given time, the aggregate amount of outstanding shares of Common Stock, assuming full exercise, conversion or exchange (as applicable) of all options, warrants and other Securities which are convertible into or exercisable or exchangeable for, and any right to subscribe for, shares of Common Stock that are outstanding at such time.

"**Person**" means an individual, corporation, limited liability company, partnership, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority or other entity of whatever nature.

"**Per Share Market Value**" means on any particular date (a) the last closing bid price per share of the Common Stock on such date on the OTC Bulletin Board or another registered national stock exchange on which the Common Stock is then listed, or if there is no such price on such date, then the closing bid price on such exchange or quotation system on the date nearest preceding such date, or (b) if the Common Stock is not listed then on the OTC Bulletin Board or any registered national stock exchange, the last

closing bid price for a share of Common Stock in the over-the-counter market, as reported by the OTC Bulletin Board or in the National Quotation Bureau Incorporated or similar organization or agency succeeding to its functions of reporting prices) at the close of business on such date, or (c) if the Common Stock is not then reported by the OTC Bulletin Board or the National Quotation Bureau Incorporated (or similar organization or agency succeeding to its functions of reporting prices), then the "Pink Sheet" quotes for the applicable Trading Days preceding such date of determination, or (d) if the Common Stock is not then publicly traded the fair market value of a share of Common Stock as determined by an Independent Appraiser selected in good faith by the Majority Holders; *provided, however*, that the Issuer, after receipt of the determination by such Independent Appraiser, shall have the right to select an additional Independent Appraiser, in which case, the fair market value shall be equal to the average of the determinations by each such Independent Appraiser; and *provided, further* that all determinations of the Per Share Market Value shall be appropriately adjusted for any stock dividends, stock splits or other similar transactions during such period. The determination of fair market value by an Independent Appraiser shall be based upon the fair market value of the Issuer determined on a going concern basis as between a willing buyer and a willing seller and taking into account all relevant factors determinative of value, and shall be final and binding on all parties. In determining the fair market value of any shares of Common Stock, no consideration shall be given to any restrictions on transfer of the Common Stock imposed by agreement or by federal or state securities laws, or to the existence or absence of, or any limitations on, voting rights.

"**Purchase Agreement**" means the Series A Convertible Preferred Stock Purchase Agreement dated as of April 23, 2007.

"**Purchasers**" means the purchasers of the Series A Convertible Preferred Stock and the Warrants issued by the Issuer pursuant to the Purchase Agreement.

"**Securities**" means any debt or equity securities of the Issuer, whether now or hereafter authorized, any instrument convertible into or exchangeable for Securities or a Security, and any option, warrant or other right to purchase or acquire any Security. "Security" means one of the Securities.

"**Securities Act**" means the Securities Act of 1933, as amended, or any similar federal statute then in effect.

"**Subsidiary**" means any corporation at least 50% of whose outstanding Voting Stock shall at the time be owned directly or indirectly by the Issuer or by one or more of its Subsidiaries, or by the Issuer and one or more of its Subsidiaries.

"**Term**" has the meaning specified in **Section 1** hereof.

"**Trading Day**" means (a) a day on which the Common Stock is traded on the OTC Bulletin Board, or (b) if the Common Stock is not traded on the OTC Bulletin Board, a day on which the Common Stock is quoted in the over-the-counter market as



reported by the National Quotation Bureau Incorporated (or any similar organization or agency succeeding its functions of reporting prices); *provided, however,* that in the event that the Common Stock is not listed or quoted as set forth in (a) or (b) hereof, then Trading Day shall mean any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"**Voting Stock**" means, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) having ordinary voting power for the election of a majority of the members of the Board of Directors (or other governing body) of such corporation, other than Capital Stock having such power only by reason of the happening of a contingency.

"**Warrants**" means the Warrants issued and sold pursuant to the Purchase Agreement, including, without limitation, this Warrant, and any other warrants of like tenor issued in substitution or exchange for any thereof pursuant to the provisions of **Section 2(c), 2(d) or 2(e)** hereof or of any of such other Warrants.

"**Warrant Price**" initially means $0.65, as such price may be adjusted from time to time as shall result from the adjustments specified in this Warrant, including **Section 4** hereto.

"**Warrant Share Number**" means at any time the aggregate number of shares of Warrant Stock which may at such time be purchased upon exercise of this Warrant, after giving effect to all prior adjustments and increases to such number made or required to be made under the terms hereof.

"**Warrant Stock**" means Common Stock issuable upon exercise of any Warrant or Warrants or otherwise issuable pursuant to any Warrant or Warrants.

9.    **Other Notices**.  In case at any time:

> (A)    the Issuer shall make any distributions to the holders of Common Stock; or
>
> (B)    the Issuer shall authorize the granting to all holders of its Common Stock of rights to subscribe for or purchase any shares of Capital Stock of any class or other rights; or
>
> (C)    there shall be any reclassification of the Capital Stock of the Issuer; or
>
> (D)    there shall be any capital reorganization by the Issuer; or
>
> (E)    there shall be any (i) consolidation or merger involving the Issuer or (ii) sale, transfer or other disposition of all or



substantially all of the Issuer's property, assets or business (except a merger or other reorganization in which the Issuer shall be the surviving corporation and its shares of Capital Stock shall continue to be outstanding and unchanged and except a consolidation, merger, sale, transfer or other disposition involving a wholly-owned Subsidiary); or

(F)     there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Issuer or any partial liquidation of the Issuer or distribution to holders of Common Stock;

then, in each of such cases, the Issuer shall give written notice to the Holder of the date on which (i) the books of the Issuer shall close or a record shall be taken for such dividend, distribution or subscription rights or (ii) such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be, shall take place.  Such notice also shall specify the date as of which the holders of Common Stock of record shall participate in such dividend, distribution or subscription rights, or shall be entitled to exchange their certificates for Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be.  Such notice shall be given at least twenty (20) days prior to the action in question and not less than ten (10) days prior to the record date or the date on which the Issuer's transfer books are closed in respect thereto.  This Warrant entitles the Holder to receive copies of all financial and other information distributed or required to be distributed to the holders of the Common Stock.

      **10.**     **Amendment and Waiver**.  Any term, covenant, agreement or condition in this Warrant may be amended, or compliance therewith may be waived (either generally or in a particular instance and either retroactively or prospectively), by a written instrument or written instruments executed by the Issuer and the Majority Holders; *provided, however*, that no such amendment or waiver shall reduce the Warrant Share Number, increase the Warrant Price, shorten the period during which this Warrant may be exercised or modify any provision of this **Section 10** without the consent of the Holder of this Warrant.  No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of this Warrant unless the same consideration is also offered to all holders of the Warrants.

      **11.**     **Governing Law; Jurisdiction**.  This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction.  This Warrant shall not be interpreted or construed with any presumption against the party causing this Warrant to be drafted.  The Issuer and the Holder agree that venue for any dispute arising under this Warrant will lie exclusively in the state or federal courts located in New York County, New York, and the parties irrevocably waive any right to raise *forum non conveniens* or any other argument that New York is not the proper venue.  The Issuer and the Holder irrevocably consent to personal jurisdiction in the state and federal courts of the state of New York.  The Issuer and the Holder consent to process being served in any such suit, action or



proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Warrant and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this **Section 11** shall affect or limit any right to serve process in any other manner permitted by law. The Issuer and the Holder hereby agree that the prevailing party in any suit, action or proceeding arising out of or relating to this Warrant or the Purchase Agreement, shall be entitled to reimbursement for reasonable legal fees from the non-prevailing party. The parties hereby waive all rights to a trial by jury.

12.     **Notices**. Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery by telecopy or facsimile at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.     The addresses for such communications shall be:

If to the Issuer:                    Marketing Worldwide Corporation
                                     2212 Grand Commerce Drive
                                     Howell, Michigan 48855
                                     Attention: James Marvin
                                     Tel. No.: (517) 540-0045
                                     Fax No.: (517) 540-0923

with copies (which copies
shall not constitute notice)
to:                                  Weed & Co. LLP
                                     4695 Mac Arthur Court, Suite 1430
                                     Newport Beach, CA 92660
                                     Attention: Richard O. Weed
                                     Tel. No.: (949) 475-9086
                                     Fax No.: (949) 475-9087

If to any Holder:                    At the address of such Holder shown on the books and records
                                     of the Issuer

Any party hereto may from time to time change its address for notices by giving written notice of such changed address to the other party hereto.

13.     **Warrant Agent**. The Issuer may, by written notice to each Holder of this Warrant, appoint an agent having an office in New York, New York for the purpose of issuing shares of Warrant Stock on the exercise of this Warrant pursuant to **Section 2(b)** hereof, exchanging this Warrant pursuant to **Section 2(d)** hereof or replacing this Warrant pursuant to **Section 3(d)** hereof, or any of the foregoing, and thereafter any such issuance, exchange or replacement, as the case may be, shall be made at such office by such agent.



14.     **Remedies**.   The Issuer stipulates that the remedies at law of the Holder of this Warrant in the event of any default or threatened default by the Issuer in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

15.     **Successors and Assigns**.   This Warrant and the rights evidenced hereby shall inure to the benefit of and be binding upon the successors and assigns of the Issuer, the Holder hereof and (to the extent provided herein) the Holders of Warrant Stock issued pursuant hereto, and shall be enforceable by any such Holder or Holder of Warrant Stock.

16.     **Construction**.   This Warrant shall be deemed to be jointly drafted by the Company and all the Holders and shall not be construed against any person as the drafter hereof.

17.     **Headings**.   The headings of the Sections of this Warrant are for convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

IN WITNESS WHEREOF, the Issuer has executed this Series G Warrant as of the day and year first above written.

MARKETING WORLDWIDE CORPORATION

By: /s/ _____

Name: James Marvin
Title: Chief Financial Officer

EXERCISE FORM
SERIES G WARRANT

MARKETING WORLDWIDE CORPORATION

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to purchase _____ shares of Common Stock of Marketing Worldwide Corporation covered by the within Warrant.

Dated: _____    Signature    _____

                                Address     _____

                                            _____

Number of shares of Common Stock beneficially owned or deemed beneficially owned by the Holder on the date of Exercise: _____

The undersigned is an "accredited investor" as defined in Regulation D under the Securities Act of 1933, as amended.

The undersigned intends that payment of the Warrant Price shall be made as (check one):

            Cash Exercise_____

            Cashless Exercise_____

If the Holder has elected a Cash Exercise, the Holder shall pay the sum of $_____ by certified or official bank check (or via wire transfer) to the Issuer in accordance with the terms of the Warrant.

If the Holder has elected a Cashless Exercise, a certificate shall be issued to the Holder for the number of shares equal to the whole number portion of the product of the calculation set forth below, which is _____.   The Company shall pay a cash adjustment in respect of the fractional portion of the product of the calculation set forth below in an amount equal to the product of the fractional portion of such product and the Per Share Market Value on the date of exercise, which product is _____.

$$X = Y - \frac{(A)(Y)}{B}$$

Where:

The number of Ordinary Shares to be issued to the Holder _____("X").

The number of Ordinary Shares purchasable upon exercise of all of the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised _____ ("Y").