**EXECUTION COPY**

**SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT**

Dated as of April 23, 2007

among

**MARKETING WORLDWIDE CORPORATION**

and

**THE PURCHASERS LISTED ON EXHIBIT A**

## **TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I** | **Purchase and Sale of Preferred Stock** | |
| Section 1.1 | Purchase and Sale of Preferred Stock | 1 |
| Section 1.2 | Warrants | 1 |
| Section 1.3 | Conversion Shares | 1 |
| Section 1.4 | Purchase Price and Closing | 2 |
| | | |
| **ARTICLE II** | **Representations and Warranties** | |
| Section 2.1 | Representations and Warranties of the Company | 2 |
| Section 2.2 | Representations and Warranties of the Purchasers | 11 |
| | | |
| **ARTICLE III** | **Covenants** | |
| Section 3.1 | Securities Compliance | 13 |
| Section 3.2 | Registration and Listing | 13 |
| Section 3.3 | Inspection Rights | 13 |
| Section 3.4 | Compliance with Laws | 13 |
| Section 3.5 | Keeping of Records and Books of Account | 14 |
| Section 3.6 | Reporting Requirements | 14 |
| Section 3.7 | Amendments | 14 |
| Section 3.8 | Other Agreements | 14 |
| Section 3.9 | Distributions | 14 |
| Section 3.10 | Status of Dividends | 15 |
| Section 3.11 | Use of Proceeds | 15 |
| Section 3.12 | Reservation of Shares | 16 |
| Section 3.13 | Transfer Agent Instructions | 16 |
| Section 3.14 | Disposition of Assets | 16 |
| Section 3.15 | Reporting Status | 16 |
| Section 3.16 | Disclosure of Transaction | 16 |
| Section 3.17 | Disclosure of Material Information | 17 |
| Section 3.18 | Pledge of Securities | 17 |
| Section 3.19 | Form SB-2 Eligibility | 17 |
| Section 3.20 | Lock-Up Agreement | 17 |
| Section 3.21 | DTC | 17 |
| Section 3.22 | Subsequent Financings | 17 |
| Section 3.23 | Approval of Acquisitions. | 18 |
| Section 3.24 | Sarbanes-Oxley Act | 19 |

# TABLE OF CONTENTS
(continued)

**ARTICLE IV Conditions**

| | | |
|---|---|---|
| Section 4.1 | Conditions Precedent to the Obligation of the Company to Sell the Shares | 19 |
| Section 4.2 | Conditions Precedent to the Obligation of the Purchasers to Purchase the Shares | 19 |

**ARTICLE V Stock Certificate Legend**

| | | |
|---|---|---|
| Section 5.1 | Legend | 21 |

**ARTICLE VI Indemnification**

| | | |
|---|---|---|
| Section 6.1 | General Indemnity | 22 |
| Section 6.2 | Indemnification Procedure | 22 |

**ARTICLE VII Miscellaneous**

| | | |
|---|---|---|
| Section 7.1 | Fees and Expenses | 23 |
| Section 7.2 | Specific Enforcement, Consent to Jurisdiction | 23 |
| Section 7.3 | Entire Agreement; Amendment | 24 |
| Section 7.4 | Notices | 24 |
| Section 7.5 | Waivers | 25 |
| Section 7.6 | Headings | 25 |
| Section 7.7 | Successors and Assigns | 25 |
| Section 7.8 | No Third Party Beneficiaries | 25 |
| Section 7.9 | Governing Law | 25 |
| Section 7.10 | Survival | 25 |
| Section 7.11 | Counterparts | 26 |
| Section 7.12 | Publicity | 26 |
| Section 7.13 | Severability | 26 |
| Section 7.14 | Further Assurances | 26 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | List of Purchasers |
| Exhibit B | Certificate of Designation of the Relative Rights and Preferences of the Series A Convertible Preferred Stock |
| Exhibit C-1 | Series A Warrant |
| Exhibit C-2 | Series B Warrant |
| Exhibit C-3 | Series C Warrant |

**TABLE OF CONTENTS**
(continued)

| | |
|---|---|
| Exhibit C-4 | Series J Warrant |
| Exhibit C-5 | Series D Warrant |
| Exhibit C-6 | Series E Warrant |
| Exhibit C-7 | Series F Warrant |
| Exhibit D | Registration Rights Agreement |
| Exhibit E | Lock-Up Agreement |
| Exhibit F | Escrow Agreement |
| Exhibit G | Irrevocable Transfer Agent Instructions |
| Exhibit H | Opinion of Counsel |

# SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT

This SERIES A CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT (the "**Agreement**") is dated as of April 23, 2007 by and among Marketing Worldwide Corporation, a Delaware corporation (the "**Company**"), and each of the Purchasers of shares of Series A Convertible Preferred Stock of the Company whose names are set forth on **Exhibit A** hereto (individually, a "**Purchaser**" and collectively, the "**Purchasers**").

The parties hereto agree as follows:

## ARTICLE I
## Purchase and Sale of Preferred Stock

**Section 1.1** Purchase and Sale of Preferred Stock. Upon the following terms and conditions, the Company shall issue and sell to the Purchasers and each of the Purchasers shall purchase from the Company, the number of shares of the Company's Series A Convertible Preferred Stock, par value $0.001 per share and at a purchase price of $1.00 per share (the "**Preferred Shares**"), convertible into shares of the Company's common stock, par value $0.001 per share (the "**Common Stock**"), in the amounts set forth opposite such Purchaser's name on **Exhibit A** hereto. The designation, rights, preferences and other terms and provisions of the Series A Convertible Preferred Stock are set forth in the Certificate of Designation of the Relative Rights and Preferences of the Series A Convertible Preferred Stock attached hereto as **Exhibit B** (the "**Certificate of Designation**"). The Company and the Purchasers are executing and delivering this Agreement in accordance with and in reliance upon the exemption from securities registration afforded by Rule 506 of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "**Securities Act**") or Section 4(2) of the Securities Act.

**Section 1.2** Warrants. Upon the following terms and conditions and for no additional consideration, each of the Purchasers shall be issued (i) Series A Warrants, in substantially the form attached hereto as **Exhibit C-1** (the "**Series A Warrant**"), (ii) Series B Warrants, in substantially the form attached hereto as **Exhibit C-2** (the "**Series B Warrant**"), (iii) Series C Warrants, in substantially the form attached hereto as **Exhibit C-3** (the "**Series C Warrant**"), (iv) Series J Warrants, in substantially the form attached hereto as **Exhibit C-4** (the "**Series J Warrant**"), (v) Series D Warrants, in substantially the form attached hereto as **Exhibit C-5** (the "**Series D Warrant**"), (vi) Series E Warrants, in substantially the form attached hereto as **Exhibit C-6** (the "**Series E Warrant**"), and (vii) Series F Warrants, in substantially the form attached hereto as **Exhibit C-7** (the "**Series F Warrant**"; and, together with the Series A Warrant, the Series B Warrant, the Series C Warrant, the Series J Warrant, the Series D Warrant and the Series E Warrant, the "**Warrants**"). Any shares of Common Stock issuable upon exercise of the Warrants (and such shares when issued) are herein referred to as the "**Warrant Shares**."

**Section 1.3** Conversion Shares. The Company has authorized and has reserved and covenants to continue to reserve, free of preemptive rights and other similar contractual rights of stockholders, a number of shares of Common Stock equal to one hundred twenty percent (120%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all of the Preferred Shares and a number of shares of Common Stock equal to one hundred percent (100%) of the number of shares of Common Stock as shall from time to time be sufficient to effect the exercise of the Warrants then outstanding. Any shares of Common Stock issuable upon conversion of the Preferred Shares and exercise of the Warrants (and such shares when issued) are herein referred to as the "**Conversion Shares**" and the Warrant Shares, respectively. The Preferred Shares, the Conversion Shares

and the Warrant Shares are sometimes collectively referred to as the "**Shares**."

Section 1.4   Purchase Price and Closing. Subject to the terms and conditions hereof, the Company agrees to issue and sell to the Purchasers and, in consideration of and in express reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Purchasers, severally but not jointly, agree to purchase the Preferred Shares and the Warrants for an aggregate purchase price of up to Three Million Five Hundred Thousand Dollars ($3,500,000) (the "**Purchase Price**"). The closing of the purchase and sale of the Preferred Shares and the Warrants to be acquired by the Purchasers from the Company under this Agreement shall take place at the offices of Sadis & Goldberg LLP, 551 Fifth Avenue, 21st Floor, New York, New York 10176 (the "**Closing**") at 10:00 a.m., New York time on such date as the Purchasers and the Company may agree upon; *provided*, that all of the conditions set forth in **Article IV** hereof and applicable to the Closing shall have been fulfilled or waived in accordance herewith (the "**Closing Date**"). Subject to the terms and conditions of this Agreement, at the Closing the Company shall deliver or cause to be delivered to each Purchaser (x) a certificate for the number of Preferred Shares set forth opposite the name of such Purchaser on **Exhibit A** hereto, (y) its Warrants to purchase such number of shares of Common Stock as is set forth opposite the name of such Purchaser on **Exhibit A** attached hereto and (z) any other documents required to be delivered pursuant to **Article IV** hereof. At the Closing, each Purchaser shall deliver its Purchase Price by wire transfer to the escrow account pursuant to the Escrow Agreement (as hereafter defined). In addition, the parties acknowledge that Thirty Five Thousand Dollars ($35,000) of the Purchase Price funded on the Closing Date shall be deducted by the escrow agent from the total amount otherwise payable to the Company, and paid over to counsel for the Purchasers in payment of legal fees of the Purchasers.

## ARTICLE II
## Representations and Warranties

Section 2.1   Representations and Warranties of the Company. The Company hereby represents and warrants to the Purchasers, as of the date hereof and Closing Date (except as set forth on the Schedule of Exceptions attached hereto with each numbered Schedule corresponding to the section number herein), as follows:

(a)   Organization, Good Standing and Power. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power to own, lease and operate its properties and assets and to conduct its business as it is now being conducted. The Company does not have any Subsidiaries except as set forth in the Company's Form 10-KSB for the year ended September 30, 2006, including the accompanying financial statements (the "**Form 10-KSB**"), or in the Company's Form 10-QSB for the fiscal quarter ended December 31, 2006 (the "**Form 10-QSB**"), or on **Schedule 2.1(g)** hereto. Except as set forth on **Schedule 2.1(a)**, the Company and each such Subsidiary is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary except for any jurisdiction(s) (alone or in the aggregate) in which the failure to be so qualified will not have a Material Adverse Effect (as defined in **Section 2.1(c)** hereof) on the Company's financial condition.

(b)   Authorization; Enforcement. The Company has the requisite corporate power and authority to enter into and perform this Agreement, the Registration Rights Agreement in the form attached hereto as **Exhibit D** (the "**Registration Rights Agreement**"), the Lock-Up Agreement (as defined in **Section 3.20** hereof) in the form attached hereto as **Exhibit E**, the Escrow Agreement by and among the Company, the Purchasers and the escrow agent named therein, dated as of the date hereof, substantially in the form of **Exhibit F** attached hereto (the "**Escrow Agreement**"), the Irrevocable Transfer Agent Instructions (as defined in **Section 3.13**) substantially in the form of **Exhibit G** attached

2

hereto, the Certificate of Designation, and the Warrants (collectively, the "**Transaction Documents**") and to issue and sell the Shares, the Warrants and the Additional Warrants in accordance with the terms hereof. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action, and no further consent or authorization of the Company or its Board of Directors or stockholders is required. This Agreement has been duly executed and delivered by the Company. The other Transaction Documents will have been duly executed and delivered by the Company at the Closing. Each of the Transaction Documents constitutes, or shall constitute when executed and delivered, a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

(c) <u>Capitalization</u>. The authorized capital stock of the Company and the shares thereof currently issued and outstanding as of the date hereof are set forth on **Schedule 2.1(c)** hereto. All of the outstanding shares of the Common Stock and the Preferred Shares have been duly and validly authorized. Except as set forth on **Schedule 2.1(c)** hereto, no shares of Common Stock are entitled to preemptive rights or registration rights and there are no outstanding options, warrants, scrip, rights to subscribe to, call or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company. There are no contracts, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of the capital stock of the Company or options, securities or rights convertible into shares of capital stock of the Company. Except as set forth on **Schedule 2.1(c)** hereto, the Company is not a party to any agreement granting registration or anti-dilution rights to any person with respect to any of its equity or debt securities. The Company is not a party to, and it has no knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock of the Company. The offer and sale of all capital stock, convertible securities, rights, warrants, or options of the Company issued prior to the Closing complied with all applicable Federal and state securities laws, and no stockholder has a right of rescission or claim for damages with respect thereto. The Company has furnished or made available to the Purchasers true and correct copies of the Company's Certificate of Incorporation as in effect on the date hereof (the "**Certificate**"), and the Company's Bylaws as in effect on the date hereof (the "**Bylaws**"). For the purposes of this Agreement, "**Material Adverse Effect**" means any material adverse effect on the business, operations, properties, prospects, or financial condition of the Company and its Subsidiaries and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement.

(d) <u>Issuance of Shares</u>. The Preferred Shares and the Warrants to be issued at the Closing have been duly authorized by all necessary corporate action and the Preferred Shares, when paid for or issued in accordance with the terms hereof, shall be validly issued and outstanding, fully paid and nonassessable and entitled to the rights and preferences set forth in the Certificate of Designation. When the Conversion Shares and the Warrant Shares are issued in accordance with the terms of the Certificate of Designation and the Warrants, respectively, such shares will be duly authorized by all necessary corporate action and validly issued and outstanding, fully paid and nonassessable, and the holders shall be entitled to all rights accorded to a holder of Common Stock.

(e) <u>No Conflicts</u>. The execution, delivery and performance of the Transaction Documents by the Company, the performance by the Company of its obligations under the Certificate of Designation and the consummation by the Company of the transactions contemplated herein and therein do not and will not (i) violate any provision of the Company's Certificate or Bylaws, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default)

under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, mortgage, deed of trust, indenture, note, bond, license, lease agreement, instrument or obligation to which the Company is a party or by which it or its properties or assets are bound, (iii) create or impose a lien, mortgage, security interest, charge or encumbrance of any nature on any property of the Company under any agreement or any commitment to which the Company is a party or by which the Company is bound or by which any of its respective properties or assets are bound, or (iv) result in a violation of any federal, state, local or foreign statute, rule, regulation, order, judgment or decree (including Federal and state securities laws and regulations) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries are bound or affected. The business of the Company and its Subsidiaries is not being conducted in violation of any laws, ordinances or regulations of any governmental entity, except for possible violations which singularly or in the aggregate do not and will not have a Material Adverse Effect. The Company is not required under Federal, state or local law, rule or regulation to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under the Transaction Documents, or issue and sell the Preferred Shares, the Warrants, the Conversion Shares and the Warrant Shares in accordance with the terms hereof or thereof (other than (x) any consent, authorization or order that has been obtained as of the date hereof, (y) any filing or registration that has been made as of the date hereof or (z) any filings which may be required to be made by the Company with the Commission or state securities administrators subsequent to the Closing, any registration statement which may be filed pursuant hereto or any other Transaction Document, and the Certificate of Designation); *provided*, that for purposes of the representation made in this sentence, the Company is assuming and relying upon the accuracy of the relevant representations and agreements of the Purchasers herein.

(f) **Commission Documents, Financial Statements**. The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the Commission pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended the ("**Exchange Act**"), including material filed pursuant to Section 13(a) or 15(d) of the Exchange Act (all of the foregoing including filings incorporated by reference therein being referred to herein as the "**Commission Documents**"). The Company has delivered or made available to each of the Purchasers true and complete copies of the Commission Documents. The Company has not provided to the Purchasers any material non-public information or other information which, according to applicable law, rule or regulation, was required to have been disclosed publicly by the Company but which has not been so disclosed, other than with respect to the transactions contemplated by this Agreement. At the times of their respective filings, the Form 10-KSB and the Form 10-QSB complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder and other federal, state and local laws, rules and regulations applicable to such documents, and, as of their respective dates, none of the Form 10-KSB and the Form 10-QSB contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the Commission Documents comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission or other applicable rules and regulations with respect thereto. Such financial statements have been prepared in accordance with U. S. generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may not include footnotes or may be condensed or summary statements), and fairly present in all material respects the financial position of the Company and its Subsidiaries as of the dates thereof and the results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(g) <u>Subsidiaries</u>. **Schedule 2.1(g)** hereto sets forth each Subsidiary of the Company, showing the jurisdiction of its incorporation or organization and showing the percentage of each person's ownership. For the purposes of this Agreement, "**Subsidiary**" shall mean any corporation or other entity of which at least a majority of the securities or other ownership interest having ordinary voting power (absolutely or contingently) for the election of directors or other persons performing similar functions are at the time owned directly or indirectly by the Company and/or any of its other Subsidiaries. All of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, and are fully paid and nonassessable. There are no outstanding preemptive, conversion or other rights, options, warrants or agreements granted or issued by or binding upon any Subsidiary for the purchase or acquisition of any shares of capital stock of any Subsidiary or any other securities convertible into, exchangeable for or evidencing the rights to subscribe for any shares of such capital stock. Neither the Company nor any Subsidiary is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of the capital stock of any Subsidiary or any convertible securities, rights, warrants or options of the type described in the preceding sentence. Neither the Company nor any Subsidiary is party to, nor has any knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock of any Subsidiary.

(h) <u>No Material Adverse Change</u>. Other than as disclosed in the Company's Commission Documents, since September 30, 2006, the Company has not experienced or suffered any Material Adverse Effect.

(i) <u>No Undisclosed Liabilities</u>. Except as set forth on **Schedule 2.1(i)**, since September 30, 2006 neither the Company nor any of its Subsidiaries has any liabilities, obligations, claims or losses (whether liquidated or unliquidated, secured or unsecured, absolute, accrued, contingent or otherwise) other than those incurred in the ordinary course of the Company's or its Subsidiaries' respective businesses and which, individually or in the aggregate, do not or would not have a Material Adverse Effect on the Company or its Subsidiaries, as the case may be.

(j) <u>Off Balance Sheet Arrangements</u>. There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Commission Documents and is not so disclosed or that otherwise would be reasonably likely to have a Material Adverse Effect.

(k) <u>No Undisclosed Events or Circumstances</u>. No event or circumstance has occurred or exists with respect to the Company or its Subsidiaries or their respective businesses, properties, prospects, operations or financial condition, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

(l) <u>Indebtedness</u>. The Form 10-KSB, Form 10-QSB or **Schedule 2.1(l)** hereto sets forth as of a recent date all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "**Indebtedness**" shall mean (a) any liabilities for borrowed money or amounts owed, whether individually or in aggregate, in excess of $100,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $25,000 due under leases required to be capitalized in accordance with GAAP. Except as set forth on **Schedule 2.1(l)**, neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(m) <u>Title to Assets</u>. Except as set forth on **Schedule 2.1(m)**, each of the Company and the Subsidiaries has good and marketable title to all of its real and personal property reflected in the Form 10-KSB, free and clear of any mortgages, pledges, charges, liens, security interests or other encumbrances, except for those disclosed in the Form 10-KSB. Except as set forth on **Schedule 2.1(m)**, all leases of the Company and each of its Subsidiaries are valid and subsisting and in full force and effect.

(n) <u>Actions Pending</u>. There is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or any other proceeding pending or, to the knowledge of the Company, threatened against the Company or any Subsidiary which questions the validity of this Agreement or any of the other Transaction Documents or the transactions contemplated hereby or thereby or any action taken or to be taken pursuant hereto or thereto. There is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or any other proceeding pending or, to the knowledge of the Company, threatened, against or involving the Company, any Subsidiary or any of their respective properties or assets. There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company or any Subsidiary or any officers or directors of the Company or Subsidiary in their capacities as such.

(o) <u>Compliance with Law</u>. The business of the Company and the Subsidiaries has been and is presently being conducted in accordance with all applicable federal, state and local governmental laws, rules, regulations and ordinances, except for such noncompliance that, individually or in the aggregate, would not cause a Material Adverse Effect. The Company and each of its Subsidiaries have all franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals necessary for the conduct of its business as now being conducted by it unless the failure to possess such franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals, individually or in the aggregate, would not have a Material Adverse Effect.

(p) <u>Taxes</u>. The Company and each of the Subsidiaries has accurately prepared and filed all federal, state and other tax returns required by law to be filed by it, has paid or made provisions for the payment of all taxes shown to be due and all additional assessments, and adequate provisions have been and are reflected in the financial statements of the Company and the Subsidiaries for all current taxes and other charges to which the Company or any Subsidiary is subject and which are not currently due and payable. None of the federal income tax returns of the Company or any Subsidiary have been audited by the Internal Revenue Service. The Company has no knowledge of any additional assessments, adjustments or contingent tax liability (whether federal or state) of any nature whatsoever, whether pending or threatened against the Company or any Subsidiary for any period, nor of any basis for any such assessment, adjustment or contingency.

(q) <u>Certain Fees</u>. Except for the fees payable pursuant to that certain securities placement agreement dated December 21, 2006 by and between Carter Securities LLC and the Company, no brokers, finders or financial advisory fees or commissions will be payable by the Company or any Subsidiary or any Purchaser with respect to the transactions contemplated by this Agreement.

(r) <u>Disclosure</u>. Neither this Agreement or the Schedules hereto nor any other documents, certificates or instruments furnished to the Purchasers by or on behalf of the Company or any Subsidiary in connection with the transactions contemplated by this Agreement contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made herein or therein, in the light of the circumstances under which they were made herein or therein, not misleading.

(s) <u>Operation of Business</u>. Except as set forth in **Schedule 2.1(s)**, the Company and

6

each of the Subsidiaries owns or possesses all patents, trademarks, domain names (whether or not registered) and any patentable improvements or copyrightable derivative works thereof, websites and intellectual property rights relating thereto, service marks, trade names, copyrights, licenses and authorizations, and all rights with respect to the foregoing, which are necessary for the conduct of its business as now conducted without any conflict with the rights of others.

(t) <u>Environmental Compliance</u>. The Company and each of its Subsidiaries have obtained all material approvals, authorization, certificates, consents, licenses, orders and permits or other similar authorizations of all governmental authorities, or from any other person, that are required under any Environmental Laws. Except as set forth on **<u>Schedule 2.1(t)</u>**, the Form 10-KSB or Form 10-QSB describes all material permits, licenses and other authorizations issued under any Environmental Laws to the Company or its Subsidiaries. "**<u>Environmental Laws</u>**" shall mean all applicable laws relating to the protection of the environment including, without limitation, all requirements pertaining to reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, materials or wastes, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, material or wastes, whether solid, liquid or gaseous in nature. The Company has all necessary governmental approvals required under all Environmental Laws and used in its business or in the business of any of its Subsidiaries. The Company and each of its Subsidiaries are also in compliance with all other limitations, restrictions, conditions, standards, requirements, schedules and timetables required or imposed under all Environmental Laws. Except for such instances as would not individually or in the aggregate have a Material Adverse Effect, there are no past or present events, conditions, circumstances, incidents, actions or omissions relating to or in any way affecting the Company or its Subsidiaries that violate or may violate any Environmental Law after the Closing Date or that may give rise to any environmental liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation (i) under any Environmental Law, or (ii) based on or related to the manufacture, processing, distribution, use, treatment, storage (including without limitation underground storage tanks), disposal, transport or handling, or the emission, discharge, release or threatened release of any hazardous substance.

(u) <u>Books and Record Internal Accounting Controls</u>. The books and records of the Company and its Subsidiaries accurately reflect in all material respects the information relating to the business of the Company and the Subsidiaries, the location and collection of their assets, and the nature of all transactions giving rise to the obligations or accounts receivable of the Company or any Subsidiary. The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(v) <u>Material Agreements</u>. Except for the Transaction Documents (with respect to clause (i) only), as disclosed in the Commission Documents or as set forth on **<u>Schedule 2.1(v)</u>** hereto, or as would not be reasonably likely to have a Material Adverse Effect, (i) the Company and each of its Subsidiaries have performed all obligations required to be performed by them to date under any written or oral contract, instrument, agreement, commitment, obligation, plan or arrangement, filed or required to be filed with the Commission (the "**Material Agreements**"),

7

(ii) neither the Company nor any of its Subsidiaries has received any notice of default under any Material Agreement and, (iii) to the best of the Company's knowledge, neither the Company nor any of its Subsidiaries is in default under any Material Agreement now in effect.

(w) <u>Transactions with Affiliates</u>. Except as set forth in the Commission Documents, there are no loans, leases, agreements, contracts, royalty agreements, management contracts or arrangements or other continuing transactions between (a) the Company or any Subsidiary on the one hand, and (b) on the other hand, any officer, employee, consultant or director of the Company or any of its Subsidiaries, or any person owning any capital stock of the Company or any Subsidiary or any member of the immediate family of such officer, employee, consultant, director or stockholder, or any corporation or other entity controlled by such officer, employee, consultant, director or stockholder, or a member of the immediate family of such officer, employee, consultant, director or stockholder.

(x) <u>Securities Act of 1933</u>. Based in material part upon the representations herein of the Purchasers, the Company has complied and will comply with all applicable federal and state securities laws in connection with the offer, issuance and sale of the Shares and the Warrants hereunder. Neither the Company nor anyone acting on its behalf, directly or indirectly, has or will sell, offer to sell or solicit offers to buy any of the Shares, the Warrants or similar securities to, or solicit offers with respect thereto from, or enter into any preliminary conversations or negotiations relating thereto with, any person, or has taken or will take any action so as to bring the issuance and sale of any of the Shares and the Warrants under the registration provisions of the Securities Act and applicable state securities laws, and neither the Company nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of any of the Shares and the Warrants.

(y) <u>Governmental Approvals</u>. Except for the filing of any notice prior or subsequent to the Closing Date that may be required under applicable state and/or Federal securities laws (which if required, shall be filed on a timely basis), including the filing of a Form D and a registration statement or statements pursuant to the Registration Rights Agreement, and the filing of the Certificate of Designation with the Secretary of State for the State of Delaware, no authorization, consent, approval, license, exemption of, filing or registration with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, is or will be necessary for, or in connection with, the execution or delivery of the Preferred Shares and the Warrants, or for the performance by the Company of its obligations under the Transaction Documents.

(z) <u>Employees</u>. Neither the Company nor any Subsidiary has any collective bargaining arrangements or agreements covering any of its employees. Except as set forth on **Schedule 2.1(z)**, neither the Company nor any Subsidiary has any employment contract, agreement, regarding proprietary information, non-competition agreement, non-solicitation agreement, confidentiality agreement, or any other similar contract or restrictive covenant, relating to the right of any officer, employee or consultant to be employed or engaged by the Company or such Subsidiary. No officer, consultant or key employee of the Company or any Subsidiary whose termination, either individually or in the aggregate, could have a Material Adverse Effect, has terminated or, to the knowledge of the Company, has any present intention of terminating his or her employment or engagement with the Company or any Subsidiary.

(aa) <u>Absence of Certain Developments</u>. Except as set forth on **Schedule 2.1(aa)**, since September 30, 2006, neither the Company nor any Subsidiary has:

(i) issued any stock, bonds or other corporate securities or any rights,

8

options or warrants with respect thereto;

(ii)    borrowed any amount or incurred or become subject to any liabilities (absolute or contingent) except current liabilities incurred in the ordinary course of business which are comparable in nature and amount to the current liabilities incurred in the ordinary course of business during the comparable portion of its prior fiscal year;

(iii)   discharged or satisfied any lien or encumbrance or paid any obligation or liability (absolute or contingent), other than current liabilities paid in the ordinary course of business;

(iv)    declared or made any payment or distribution of cash or other property to stockholders with respect to its stock, or purchased or redeemed, or made any agreements so to purchase or redeem, any shares of its capital stock;

(v)     sold, assigned or transferred any other tangible assets, or canceled any debts or claims, except in the ordinary course of business;

(vi)    sold, assigned or transferred any patent rights, trademarks, trade names, copyrights, trade secrets or other intangible assets or intellectual property rights, or disclosed any proprietary confidential information to any person except to customers in the ordinary course of business;

(vii)   suffered any substantial losses or waived any rights of material value, whether or not in the ordinary course of business, or suffered the loss of any material amount of prospective business;

(viii)  made any changes in employee compensation except in the ordinary course of business and consistent with past practices;

(ix)    made capital expenditures or commitments therefor that aggregate in excess of $100,000;

(x)     entered into any other transaction other than in the ordinary course of business, or entered into any other material transaction, whether or not in the ordinary course of business;

(xi)    made charitable contributions or pledges in excess of $25,000;

(xii)   suffered any material damage, destruction or casualty loss, whether or not covered by insurance;

(xiii)  experienced any material problems with labor or management in connection with the terms and conditions of their employment;

(xiv)   effected any two or more events of the foregoing kind which in the aggregate would be material to the Company or its Subsidiaries; or

(xv)    entered into an agreement, written or otherwise, to take any of the foregoing actions.